**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| STEPHEN P. LAFFEY<br>Plaintiff | : | |
| vs. | : | C.A.No.: 05-<br>05 206 |
| ROGER N. BEGIN, in his capacity as Chairperson of The Rhode Island Board of Elections and<br>THE RHODE ISLAND BOARD OF ELECTIONS<br>Defendant | : | |

## VERIFIED COMPLAINT

Plaintiff, Stephen P. Laffey, duly sworn and under oath, hereby complains of Defendant, The Rhode Island Board of Elections, as follows:

## INTRODUCTION

This case involves a direct assault on freedom of speech and of the press. WPRO and Steve Laffey, by means of a free press, entered the market place of ideas to discuss political issues. This speech was made more than 18 months before any election. It was made by a person who was not an announced candidate for office and who never advocated his election to office. Nevertheless, the Board of Elections deemed that *The Steve Laffey Show* represented an illegal political campaign contribution by WPRO to

Laffey. The Board censored Laffey and ordered him off the air. Mr. Laffey now seeks the aid of this Court to restore his First Amendment rights

## JURISDICTION AND VENUE

1. Plaintiff brings a civil rights action pursuant to 42 U.S.C. §1983 and §1988 for deprivations of Plaintiff's rights secured by the First and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is conferred on this Court by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in the Court of all suits brought pursuant to 42 U.S.C. §1983.

3. Jurisdiction is conferred on this Court by 28 U.S.C. §1331 because the cause of action arises under the Constitution and laws of the United States.

## PARTIES

4. Plaintiff Steve Laffey is a citizen of and resides in City of Cranston, County of Providence, of the State of Rhode Island and brings this complaint in his capacity as a private citizen of the United States of America.

5. Defendant, the Rhode Island Board of Elections ("the Board"), was created by and is organized pursuant to the Rhode Island Election Law.

6. Defendant's principle place of business is located at 50 Branch Avenue, Providence, Rhode Island.

7. Defendant Roger N. Begin (Begin) is sued only in his capacity as the duly appointed Chairperson of the Board of Elections.

8. Venue properly lies in the District of Rhode Island pursuant to 28 U.S.C. § 1391 in that Defendant's principle place of business is located in this Federal district.

## FACTS

9. This case is about censorship of political speech by the Rhode Island Board of Elections.

10. Steve Laffey currently serves as the Mayor of Cranston Rhode Island.

11. Plaintiff has not announced that he is a candidate for any public office.

12. Upon information and belief, sometime in the summer of 2004, WPRO management heard plaintiff hosting a radio talk show on WHJJ - an AM radio competitor.

13. WPRO concluded that plaintiff had a talent as a radio talk show host.

14. Because of his talent, WPRO wanted plaintiff to be a personality on WPRO.

15. In the summer of 2004, plaintiff filled in as a guest host on *The Dan Yorke Show* on several occasions.

16. In the fall 2004, WPRO contacted plaintiff to set up a meeting to explore plaintiff's interest in a regular presence on WPRO.
17. Plaintiff expressed interest as long as it comes after the November Election.
18. After the election, WPRO began discussions with plaintiff about regularly appearing on its radio station.
19. In January 2005, WPRO offered plaintiff a job as host the Friday morning time slot between 9:00 am to 11:00 am.
20. The show was called *The Steve Laffey Show*.
21. WPRO viewed employing Plaintiff's talent as offering a valuable economic service to WPRO.
22. WPRO brought up the issue of compensation.
23. Plaintiff refused to take compensation for the show.
24. At no time did WPRO intend to make a contribution to plaintiff.
25. Plaintiff has never declared to WPRO that he intends to seek election to a public office.
26. WPRO gave plaintiff a letter of agreement.
27. A true and accurate copy of that agreement is attached as Exhibit A to this complaint.

28. WPRO never transferred money to plaintiff or to his campaign committee.

29. WPRO never provided plaintiff or his campaign committee with paid personal services.

30. WPRO never provided plaintiff or his campaign committee with any item of tangible real or personal property of a fair market value in excess of one hundred dollars.

31. Plaintiff's first show aired on February 25, 2005.

32. During his show, plaintiff would take phone calls from listeners.

33. On the February 25, 2005 show, plaintiff took calls and discussed the following topics: (a) the possible resignation of the Pope and his illness, (b) property tax Relief, and (c) immigration with guest Julio Aragon.

34. On the March 4, 2005 show, plaintiff took calls and discussed the following topics: (a) school spending and property taxes with Richard Sanitti Town Councilmen from Coventry, (b) voter initiative with Bob Arruda, Senator Cote and Maris Code, and (c) the worst state legislative bills of the week.

35. On the March 11, 2005 show, plaintiff took calls and discussed the following topics: (a) the Expungement Bill; and (b) Rhode Island Training School conditions with Peter Salom.

36. On the March 18, 2005 show, plaintiff discussed: (a) credit card companies and bankruptcy; and (b) 'tween years and adolescence attire, (c) gambling casinos.

37. On March 25, 2005, plaintiff was away and did not host his show.

38. On the April 1, 2005 show, plaintiff discussed: (a) Terry Schiavo and (b) property taxes, municipal budget, and school spending.

39. On the April 8, 2005 show, plaintiff discussed: (a) the Pope and his death; and (b) contract negotiations between the East Greenwich School Committee and teachers.

40. On the April 15, 2005 show, plaintiff discussed: (a) Armenian Genocide with Vitali Ianko (author of "The Promise at the Sea"); (b) the *Lively Experiment* show, (c) federal income tax reform, and (d) sex offenders relating to placing their names on a public list.

41. Plaintiff's last show was April 15th.

42. Plaintiff did not do his show on Friday, April 22nd because he was unavailable.

43. On April 27, plaintiff informed WPRO that he would not appear on Friday's (April 29) show because he was enjoined by the Board of Elections.

44. WPRO neither contributes to nor supports political candidates.

45. WPRO does not advocate the election or defeat of any candidate.

46. WPRO does not advocate for the election or defeat of plaintiff for any office.

47. Plaintiff has never declared to WPRO that he intends to seek future election to a public office.

48. On March 1, 2005, Aram Garabedian, who plaintiff defeated in the 2002 election for Mayor of Cranston, filed a complaint against plaintiff with the defendant.

49. The complaint alleged that plaintiff's radio show represented an in-kind contribution to a political candidate by a corporation in violation of R.I.G.L §17-25-10.1.

50. A true and accurate copy of the Garabedian complaint is attached hereto as Exhibit B.

51. On March 28, 2005, Mr. Michael Lepizzera, Jr., legal counsel for plaintiff, answered the complaint.

52. Mr. Lepizzera argued that plaintiff's job at WPRO was not a campaign contribution under the Rhode Island's Election Law and in any event the First Amendment protected plaintiff's speech.

53. Mr. Lepizzera alleged that in his answer that:

    1. Stephen Laffey is the current mayor of the City of Cranston.

2. Stephen Laffey is not a candidate for any state, federal or municipal office.
3. Stephen Laffey hoses a radio show on 630 WPRO, some Friday mornings.
4. Stephen Laffey is not paid for his appearance
5. WPRO sells radio advertisements during his appearance as part of their business.
6. The "Steve Laffey Show" addresses issues of national, state, and municipal import as well as human interest stories.
7. Said show is an interactive show wherein callers largely determine the discourse of what transpires on said show.
8. Currently, other public officials, Representative Joseph Trillo, Senator Polisena and others have television shows on public access cable to discuss issues affecting the public at large.
9. Stephen Laffey, in addition to being the Mayor of Cranston, is an individual with First Amendment Rights guaranteed to him by the United States Constitution.
10. The Board of Elections has no jurisdiction to monitor the speech of private parties.
11. The bedrock of any democracy is to promote, insure and protect, the marketplace of free ideas and their exchange in public regardless of the disdain or joy in the message or the honor or hatred of the messenger.

54. A true and accurate copy of plaintiff's submission is attached hereto as Exhibit C.

55. RIGL § 17-2-5(a)(7)(i) empowers the Board to enforce R.I.G.L § 17-25-1, *et seq*.

56. On April 26, 2005, the Board of Election held a hearing on the alleged violation of R.I.G.L § 17-25-1 *et seq*.

57. A true an accurate copy of the April 26, 2005 proceeding before the Board is attached to hereto as Exhibit D.

58. This complaint fully incorporates Exhibit D into this complaint as if fully set forth herein.

59. On April 26, 2005, the Board ordered:

> Stephen P. Laffey's appearance as a host of the WPRO weekly Steve Laffey Show, constitutes a violation of the campaign finance laws of the State of Rhode Island, R.I. Gen. Laws §17-25-1, et seq. The receipt of airtime from WPRO in the format as a host of said radio show constitutes an "in-kind contribution" as that term is defined and applied under R.I. Gen. Laws §17-25-10.1.
>
> For the reasons set forth above, and elaborated at the hearing today, Laffey is prohibited from the receipt of such in-kind contributions from WPRO and is therefore enjoined from appearing as the host of *The Steve Laffey Show*.

60. A true and accurate copy of the Order is attached hereto as Exhibit E.

61. This complaint fully incorporates Exhibit E into this complaint as if fully set forth herein.

62. The Board reached a conclusion that "[t]he receipt of airtime from WPRO in the format as a host of said radio show constitutes an 'in-kind contribution' as that term is defined and applied under R.I. Gen. Laws §17-25-10.1." However, the never explained its reasoning.

63. Neither any State Statute nor any Board regulation defines "in-kind contribution."

64. Some Board Members suggested that the free airtime represented the in-kind" contribution.

65. Another Board Member suggested that the talk show spot was an "in-kind" contribution because it enhanced plaintiff's political reputation.

66. The Chairman of the Board Roger Begin, in reaching his decision, reasoned that:

> When all is said and done, I think this Board needs to weigh all of the evidence that is before us and draw a conclusion as to what is campaign and what is personal. The reality is, every elected official, every person that is subject to the requirements of the Campaign Finance Reporting Laws, they are a person in their personal life, and they may have a business on the business side, and – as well as their political. The separation of those activities is something that the body of evidence that – on matters such as this as presented to the Board, we must weigh and make a judgment as to where that line is drawn between what is personal/business versus what is political.

67. Chairman of the Board Roger Begin stated publicly that "As a general rule, [the Board] made a distinction between an individual who appears on a commercial radio station, and somebody who appears on a cable TV program. ... Cable TV, by its charter and its franchise, has to permit public access to anybody whereas a commercial radio show is only available to a select few."

## FIRST CAUSE OF ACTION

68. Plaintiff repeats and realleges all the proceeding paragraphs of this complaint as if fully set forth herein and repeats and realleges ¶72 - ¶91.

69. Defendant has violated plaintiff's right of freedom of speech and right to freedom of the press guaranteed by the First Amendment of the United States Constitution by enjoining him from hosting *The Steve Laffey Show* on WPRO.

70. RIGL §17-25-10.1 violates plaintiff's First Amendment to the United States Constitution because it is unconstitutionally vague, unconstitutionally overboard, and not viewpoint neutral because the Board possessed unbridled discretion in determining which speech was covered by the statute.

## SECOND CAUSE OF ACTION

71. Plaintiff repeats and realleges all the proceeding paragraphs of this complaint as if fully set forth herein.

72. *The Providence Journal* regularly endorses candidates for public office.

73. Attached hereto as Exhibit E are sample editorials that appeared in *The Providence Journal* that urged the election of certain candidates to public office.

74. *The Providence Journal* has selectively allowed public officials access to its editorial pages.

75. Attached hereto as Exhibit F are editorials that appeared in *the Providence Journal* that were written by elected officials including Rhode Island Governor Donald L. Carcieri, Warwick Mayor Scott Avedisian, Pawtucket Mayor James Doyle, State Representative James Trillo, Rhode Island Attorney General Patrick Lynch, United States Congressman James Langevin, North Providence Mayor A. Ralph Mollis, State Representative (and majority leader of the Rhode Island House) Gordon D. Fox.

76. Upon information and belief, *the Providence Journal* retains control over who it publishes on its editorial pages and does grant unlimited accesses to the public to have their editorials printed.

77. Providence Mayor David Cicilline has a cable television show and a monthly radio show on WPRO called *Ask the Mayor*.

78. Attached hereto as Exhibit G is press release from Mayor Cicilline's office touting his radio and television.

79. Rhode Island Governor Donald L. Carcieri hosts a monthly radio show on WPRO called *Ask the Governor*.

80. Upon information and belief, State Senator Leo Blais writes a weekly column for a paper in Coventry.

81. Woonsocket City Councilwomen Sue Pouliot hosts a weekly cable television show called *Up Front.*

82. Upon information and belief, all of the above named elected officials maintained active campaign accounts with the Rhode Island Board of Elections.

83. The Board has never taken action to enforce the "in-kind" contribution regulations against any other media outlet or any other public officials mentioned in ¶74 - ¶85.

84. The Board, as permitted by Rhode Island, issued an advisory opinion in the case of Barbara A. Szepatowski.

85. Ms. Szepatowski is an announced candidate for Jamestown Town Council.

86. She also writes a weekly pet column for *The Jamestown Journal.*

87. Ms. Szepatowski was and is not paid for her column.

88. The Board ruled that *The Jamestown Journal* was not providing Ms. Szepatowski and "in-kind" contribution.

89. The Board distinguished between Ms. Szepatowski's situation and plaintiff's on the basis that everyone has uninhibited access to the newspaper and if it so chose, *The Jamestown Journal* could stop printing her column at anytime.

90. Defendant has violated plaintiff's right guaranteed by the Equal Protection Clause of Fourteenth Amendment of the United States Constitution by allowing an announced candidate for public office to write a weekly newspaper column, but forbidding an unannounced candidate from hosting a radio show.

**THIRD CAUSE OF ACTION**

91. Plaintiff repeats and realleges all the proceeding paragraphs of this complaint as if fully set forth herein.

92. Defendant could not lawfully enjoined plaintiff from appearing on the radio, because the field of radio broadcasting has been preempted by Congress 47 U.S.C. § 315 et. seg..

**WHEREFORE,** Plaintiff asks this Court (1) to declare that defendant's action in enjoining him from hosting *The Steve Laffey Show* on WPRO violated both the free speech and free press clauses of the First Amendment to the United States Constitution; (2) to declare that defendant's action in enjoining him from hosting *The Steve Laffey Show* on WPRO violated the Equal Protection Clause of Fourteenth Amendment of the United States Constitution; (3) to declare that plaintiff had a right under the free speech and free press clauses of the First Amendment to the United States

Constitution to host *The Steve Laffey Show* on WPRO; (4) to enjoin the defendant from penalizing plaintiff or enforcing its Order of April 26 2005, (5) to declare RIGL §17-25-10.1 violates the First Amendment to the United States Constitution to because it is unconstitutionally vague, unconstitutionally overbroad, and not viewpoint neutral; (6) to award plaintiff $1.00 in damages, (7) to declare that the Board had no authority to regulate a radio broadcast because the United States government has placed sole power to regulated radio broadcasts to itself and has preempted any authority of a state to regulate radio broadcasts; (8) to award plaintiff the cost of prosecuting this action together with attorneys' fees pursuant to 42 U.S.C. §1988, and (9) to grant other and different relief that the Court, in the exercise of its wisdom and discretion, deems just and proper.

Stephen P. Laffey, being duly sworn, states he has read the foregoing complaint and the same is true to his own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, he believes them to be true.

STEPHEN P. LAFFEY

Sworn before me this 11th day of May 2005.

Notary Public

DAVID F. CORDEIRO
Notary Public - ID# 52393
My Commission Expires 11-5-07

Respectfully submitted,
Plaintiff, Stephen P. Laffey
By and through his Attorneys,

Michael J. Lepizzera, Jr. (Bar No. 4995)
Lepizzera & Laprocina
301 Metro Center Boulevard Suite 102
Warwick, R.I. 02886
Tel: (401) 739-7397

Tom Marcelle (admission *pro hac vice* pending)
2 E-Comm Sq., 3rd Floor
Albany, New York 12207
Tel: (518) 427-1720

**THE UNITED STATES DISTRICT COURT**
**FOR**
**THE DISTRICT OF RHODE ISLAND**

---

STEPHEN P. LAFFEY, Plaintiff

05 206

-against- NO.05-CV-______(____/___)

THE RHODE ISLAND BOARD OF ELECTIONS, Defendant

---

## DECLARATION OF BARBARA HAYNES

I, Barbara Haynes, hereby declare the following:

1. I work for WPRO in the capacity of General Manager.
2. In the summer of 2004, Mr. Laffey filled in as a guest host on *the Dan Yorke Show* on several occasions.
3. WPRO believed that Laffey had talent as a radio talk show and appealed to listeners.
4. In the fall 2004, WPRO contacted Mr. Laffey to set up a meeting to explore Mr. Laffey's interest in a regular presence on WPRO.
5. In January 2005, WPRO offered Mr. Laffey a job as host of the Friday morning time slot between 9:00 am to 11:45 am.

6. WPRO viewed employing Mr. Laffey's talent as offering a valuable programming benefit to WPRO.

7. At no time did WPRO intend to make a contribution to Mr. Laffey.

8. WPRO does not support political candidates.

9. WPRO does not advocate the election or defeat of any candidate.

10. WPRO does not advocate for the election or defeat of Mr. Laffey for any office.

Pursuant to 28 U.S.C. §1746, I declare that the foregoing is true and correct.

Executed the 11th day of May 2005

Barbara Haynes

Barbara Haynes

General Manager

Citadel Broadcasting Company

D.B.A WPRO AM

①

April 8, 2005

Mayor Stephen Laffey
City of Cranston
896 Park Avenue
Cranston, RI 02920

Dear Mr. Laffey:

This letter serves to confirm the terms of our agreement (the "*Agreement*") whereby you ("*Contractor*") will provide services to Citadel Broadcasting Company ("*Citadel*"), on behalf of radio station WPRO ("*Station*").

1. **Services.** Contractor will render on-air services to Citadel as the host of a talk radio program entitled "Stephen Laffey Show" (the "*Program*"), to be aired Fridays from 9 a.m. to 11:45 a.m. Upon mutual agreement with Contractor, Station may alter the days and times of the Program. At Station's sole option and discretion, the Program will originate at Station's studio or at such other remote locations as selected by Station and agreed to by Contractor. Contractor will be responsible for performing all duties necessary to in order to be adequately prepared to host and present the Program. Contractor acknowledges and agrees that the Program shall be presented under the supervision, direction and control of Citadel, Station or designee, and that Citadel shall have the unqualified right to change, edit or otherwise alter the content of or the personnel involved in the presentation and production of the Program.

2. **Term.** The term of this Agreement shall commence on the date this Agreement is executed and end when either party gives the other two weeks notice of the intent to cancel (the "*Term*").

3. **Expenses.** Contractor will be solely responsible for payment of his out-of-pocket expenses and the expenses associated with any equipment owned by Contractor used by him to perform the services hereunder.

4. **Exclusivity of Services.** Contractor agrees that during the Term of this Agreement, Contractor will not provide the services set forth in Paragraph 1 for any radio station within the Providence, RI market as defined by Arbitron, other than radio stations owned by Citadel, without the consent of Station which shall not be unreasonably withheld.

5. **Termination.** Citadel or Station may terminate this Agreement without cause upon two (2) weeks written notice to Contractor. Citadel or Station may terminate this Agreement for cause, with or without notice, at any time. "Cause" shall be defined as (1) willful or substantial neglect of duties; (2) any material breach of this Agreement; (3) dishonesty; (4) theft; (5) use or possession of illegal drugs during working hours; (6) use of alcohol during working hours; (7) unethical business conduct; (8) any permanent physical or vocal impairment which precludes Contractor's ability to perform Contractor's obligations under this Agreement; and (9) any violation of FCC rules and regulations including rules relating to indecency, payola and/or plugola.

6. **Contractor's Warranties**

(a) Contractor represents and warrants that Contractor is under no obligation whatsoever which will or might prevent Contractor from fully performing its obligations under this Agreement. Citadel is aware of Contractor's obligations to the City of Cranston, which shall take priority over Contractor's obligations hereunder. Citadel acknowledges that such responsibilities may periodically cause Contractor to miss a weekly Program with little advance notice. To the extent such cancellations adversely affect Citadel's operations, Citadel shall have the right to alter this Agreement accordingly.

(b) Contractor will disclose in writing to Station any proprietary or other financial interest Contractor has or acquires in any organization with which Station or any of its affiliated entities does business or with which they compete; provided, however, that Contractor will not be required to disclose any investment of one percent (1%) or less in stock or other securities of a corporation listed on a national securities exchange or regularly traded in the over-the counter markets.

(c) The warranties and indemnities set forth herein are in addition to, and not limitation of, those contained elsewhere in this Agreement.

7. **Indemnities**. Contractor shall indemnify and hold Citadel, Station, their parent corporation and affiliated entities, their shareholders, officers, directors, agents, employees, successors and assigns from and against any and all liability, action, claims, demands, losses, expenses (including attorneys' fees) or damages caused by or arising out of (1) any performance or utterance (ad lib or otherwise) by Contractor that is broadcast on Station or made while Contractor is performing services for Station or Citadel; (2) the use of any material furnished by Contractor; or (3) Contractor's breach of any provision of this Agreement. Citadel shall have the right to assume the defense of and control of disposition of any such claim or litigation, whether by compromise, settlement or other resolution, and Contractor shall cooperate with requests of Citadel to such end. Citadel and Station will indemnify and hold Contractor harmless from breach of any provision of this Agreement by Citadel

or Station. The expiration or termination of the Agreement shall not affect the continuing indemnification obligations of Citadel, Station or Contractor hereunder.

8. **Payola**. Contractor agrees that in connection with the performance of Contractor's obligations under this Agreement, Contractor will not accept or agree to accept any money, service or other consideration from any third party for the inclusion of any matter as a part of Contractor's on-air performance in connection with this Agreement without appropriate disclosure.

9. **Unauthorized Acts; Political Broadcasting**. Contractor shall refrain from any offensive or distasteful remarks or conduct in Contractor's performances on-air, the broadcast of which Citadel believes would not be in the public interest or may jeopardize Citadel's Federal license to operate Station, and shall faithfully comply to the best of Contractor's abilities with all of Citadel's and Station's directives relating to on-the-air material and the manner of delivering or using the same. Contractor shall notify Station at least 60 days prior to becoming a legally qualified candidate for elective office and acknowledges and agrees that at such time, Citadel shall have the right to terminate broadcast of the Program. Contractor shall not intentionally use the Program to promote his candidacy for any public office, shall refrain from on-air attacks on his opponents for elective office and shall refrain from on-air solicitation of funds for elective office. Citadel's intent hereunder is to provide citizens with access to a public official in order to address local, national and international issues consistent with Contractor's position as an elected official.

10. **Assignment**. Citadel or Station shall have the right to assign this Agreement, in whole or in part, to any person or entity who succeeds to ownership of Station, or to any of Citadel's affiliated stations in the Providence market area, subject to Contractor's prior written consent. Contractor agrees and acknowledges that Contractor may not assign this Agreement or any rights hereunder under any circumstances.

11. **Independent Contractor**. Contractor is engaged by Station only for the purposes and to the extent set forth in this Agreement, and the relationship to Station shall at all times be that of an independent contractor. Nothing in this Agreement shall be construed to create an employer/employee or joint venture relationship between or among any of the parties hereto, and Contractor agrees that Contractor shall not be entitled to any compensation or benefits under any Station employee benefit plan. Contractor agrees to keep all Citadel and Station information confidential.

12. **Property Rights**. Contractor agrees that Citadel and Station shall be the exclusive owner of any and all rights in and to the Programs on which Contractor renders services and any elements, characteristics or incidents therein which are not in the public domain. Contractor agrees that Station can use Contractor's names and

likenesses in connection with publicizing, advertising and promoting the Programs contemplated by this Agreement.

13. **Other**. This Agreement contains the entire understanding between the parties and shall be construed according to the laws of the State of Rhode Island. Any notices under this Agreement shall be in writing and delivered to the respective addresses indicated in this letter. Contractor will not, without Station's prior written approval, incur any expenses whatsoever on Station's behalf, or obligate Station for any personal expenditure by Contractor or use Station's name for any purpose except as specifically provided herein.

If the terms and conditions set out above are consistent with your understanding, please so indicate below.

Very truly yours,

**Citadel Broadcasting Company dba WPRO**

By: ______________________________
General Manager

ACCEPTED AND AGREED:

By: ______________________
Stephen Laffey

2

March 1, 2005

173 Belvedere Drive
Cranston, RI 02920

Board of Elections
50 Branch Avenue
Providence, RI 02904

I hereby request that the Board of Elections investigate the activities of Mayor Stephen P. Laffey who is currently serving as the host of "The Steve Laffey Show" on WPRO-AM radio every Friday morning between the hours of 9AM and 11:30AM.

I believe the time allocated is an "in kind contribution" which qualifies as a contribution other than money which is cited in The Guide To The Rhode Island Campaign Contribution Expenditures Reporting Act (R.I.G.L.1725) on page 23 in section F. "in kind contributions" and on page 28 of the guide "in kind contribution" are prohibited by corporations. Again other things of value are cited which in this case is two (2) hours and forty- five (45) minutes of free promotion and advertising of a personality, in this case, an acting mayor and potential candidate.

The value received in these blocks of time whether receiving compensation or not far exceeds in value any amount Mayor Laffey receives in pay or any other compensation.

Based on The Powers And Duties Of The Board Of Elections in section 9 of the guide on page 22, the Board shall investigate and/or conduct hearings on possible violations of the law on its own interaction or on the filing of a verified complaint based upon actual knowledge and under the pain of perjury (RIGL17-25-5 (a).

Enclosed are additional materials from the website of Mayor Laffey found on www.electlaffey.com which promote the radio show as well as material for campaign contributions.

It is my strong conviction that the "show value" is and "in kind contribution" and the Board after review should as outlined on page 25 of the Guide issue a cease and desist order from hosting the show.

It should be noted that the Mayor has previously hosted shows on WPRO-AM.

Please feel free to contact me at 641-5855 if there are any questions.

Sincerely yours

Aram G. Garabedian

Aram G. Garabedian
Cranston Council President

Enclosures
1. Copy of Guide (R.I.G.L. 17-25)
2. Providence Journal 2/27/05
3. Providence Journal 2/28/05
4. Providence Journal Editorial 2/25/05
5. Laffey WEBSITE, Campaign material, and contribution material, Radio show promotion

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
COUNTY OF PROVIDENCE

In Providence, RI, in said County and State, on the 1st day of March 2005, before me personally appeared Aram G. Garabedian, the Cranston Council President, to me known and known by me to be the party executing the foregoing instrument, and acknowledged said instrument by executed, to be free act and deed, free act and deed, free act and deed in capacity as aforesaid, and the free act and deed of Aram G. Garabedian, Cranston Council President.

Notary Public
Commission Expires 8-27-05

# GUIDE

TO THE

# *RHODE ISLAND CAMPAIGN CONTRIBUTIONS & EXPENDITURES REPORTING ACT*

(R.I.G.L. 17-25)

**STATE OF RHODE ISLAND**
**BOARD OF ELECTIONS**
50 Branch Avenue
Providence, Rhode Island 02904

EXHIBIT 1

**B. Candidate.**

The term *"candidate"* means any individual who undertakes any action whether preliminary or final which is necessary under the law to qualify for nomination for election or election to public office, and/or any individual who receives a contribution or makes an expenditure or gives his consent for any other person to receive a contribution or make an expenditure with a view to bringing about his nomination or election to public office, whether or not the specific public office for which he will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he has announced his candidacy or filed a declaration of candidacy at such time.

**C. Contributions And Expenditures.**

The terms *"contributions"* and *"expenditures"* include all transfers of money, paid political services or other thing of value to or by any candidate, committee of a political party or a political action committee. (Also, see Section 8 "Definition of Contribution.")

**D. Election.**

The term *"election"* means any primary, general or special election or town meeting for any public office of the state, municipality or district, or for the determination of any question submitted to the voters of the state, municipality or district. [See R.I.G.L 17-25-3(c)]

**E. Election Cycle.**

The term *"election cycle"* means the twenty-four month period commencing on January 1 of odd number years and ending on December 31 of even number years; provided, however, with respect to the public financing of election campaigns of general officers under §17-25-19, 17-25-20 and §17-25-25, "election cycle" shall mean the forty-eight month period commencing on January 1 of odd-numbered years and ending December 31 of even-numbered years.

**F. In-Kind Contribution.**

An *"in-kind contribution"* is a contribution which includes "other thing of value" and "paid personal services" as well as contributions other than money.

**G. Other Thing Of Value.**

The term *"other thing of value"* means any item of tangible, real or personal property.

**L. Public Office.**

The term *"public office"* means any state, municipal, school or district office or other position that is filled by popular election, except political party offices. "Political party offices" shall mean any state, city, town, ward, or representative or senatorial district committee office of a political party or delegate to a political party convention or any similar office.

**M. State.**

The term *"state"* means State of Rhode Island

**N. Testimonial Affair.**

The term *"testimonial affair"* means an affair of any kind or nature including, but not limited to, cocktail parties, breakfasts, luncheons, dinners, dances, picnics, or similar affairs expressly and directly intended to raise campaign funds on behalf of a candidate for nomination or election to a public office in this state or expressly and directly intended to raise funds on behalf of any state or municipal committee of a political party or any political action committee.

## 11. OFFENSES AND PENALTIES

**A. Investigation By The Board.**

The Board of Elections may conduct confidential investigations and closed hearings relative to alleged violations of the campaign contributions and expenditures reporting law on its own initiative or upon receipt of a verified written complaint. Upon completion of its investigation or hearings, if the Board has reason to believe that a violation of the reporting law has occurred, the Board may require the violator to be prosecuted by the Attorney General. [See R.I.G.L 17-25-5(7)]

**1. Violations.**

Upon a finding that there has been a violation of the campaign finance laws, the Board of Elections may issue an order requiring the violator to:

(a) cease and desist from such violation;
(b) file any report, statements or other information as required by the campaign finance law; and/or
(c) pay a civil fine for each violation, in an amount not to exceed the greater of: 1) $1,000 or 2) 3 times the amount the violator failed to report properly or unlawfully contributed, expended, gave or received.

In addition the Board may turn over any evidence to the Attorney General which may be used in a subsequent criminal proceeding against the violator.

**B. Criminal Penalties: RI Campaign Finance Laws.**

Any person who willfully and knowingly violates the provisions the campaign finance laws shall upon conviction be guilty of a petty misdemeanor and shall be fined not more than $1,000 per violation. [See R.I.G.L 17-25-13]

**C. Criminal Penalties/Gambling Questions.**

Any person who willfully and knowingly violates the provisions regarding gambling questions shall upon conviction be guilty of a felony and shall be imprisoned for a term of not more than two years, or shall be fined not more than $5,000, or both. [See R.I.G.L 17-25.1-2]

**D. Injunctive Relief And Forfeiture Of Contributions.**

Whenever the Board of Elections has reason to believe that a candidate, political party committee, or political action committee or its campaign treasurer or deputy campaign treasurer has accepted a contribution or made an expenditure in violation of the campaign contributions and expenditures reporting law, willfully and knowingly has made a false statement in any required report, has failed to file a required report, or has otherwise violated the reporting law, the Board, in addition to all other actions authorized by law, may request the Attorney General to bring an action in the name of the state in the Superior Court against the person or committee to enjoin it from continuing such violation or doing any acts in furtherance thereof and for such other relief as the court deems appropriate. In addition, the court may order the forfeiture of any or all contributions that have not been reported or have been accepted in violation of the reporting law. In the event of illegal acts or contributions under Chapter 17-25, the Court shall also impose a civil penalty not exceeding three times the amount of: (1) contributions made or accepted in violation of the law; (2) expenditures made in violation of the law; and (3) contributions or expenditures not reported as required by law. All funds so collected shall be deposited in the public financing of elections campaign fund. [See R.I.G.L 17-25-16]

APPENDIX A

SUMMARY CHART
OF ALLOWABLE AND PROHIBITED CONTRIBUTIONS
(All limitations below are calendar year limitations)

| | Candidate | | PAC | Political Party | Political Party for organizational & party building activities[1] | Aggregate Limits |
|---|---|---|---|---|---|---|
| | Money[2 3] | In-Kind[4] | | | | |
| Person[5 6] | $1,000/$2,000[7] | $1,000/$2,000[8] | $1,000 | $1,000 | $10,000 | $10,000[9] |
| PAC[10] | $1,000/$2,000[7] | $1,000/$2,000[8] | $1,000 | $1,000 | $10,000 | $25,000[11] |
| Party Committee | $25,000[12] | Unlimited[13] | $1,000 | $1,000 | $10,000 | ——— |
| Corporations[14] | Prohibited | Prohibited | Prohibited | Prohibited | Prohibited | ——— |
| Employees of Corps if reimbursed by Corp[15] | Prohibited | Prohibited | Prohibited | Prohibited | Prohibited | ——— |
| Candidate loan to himself[16] | Unlimited | Unlimited[17] | ——— | ——— | ——— | ——— |

1. Amounts listed below do not count toward aggregate limit of $10,000 for persons and $25,000 for political action committees which may be contributing to one or more candidates, pac's or political party committees or a combination of each for political purposes.
2. Contributions in cash in excess of $25 are prohibited and must be made by check or money order. §17-25-10.1(i)
3. Loans are counted as contributions until repaid.
4. "In-Kind" contributions include "other thing of value," paid personal services and anything else other than monetary contributions. §17-25-3(6) defines "other thing of value" as any item of tangible, real or personal property with a fair market value in excess of $100.
5. Contributions from dependent children are counted as contributions from a person.
6. §17-25-10(b) allows a person not acting in concert to expend sums on an unlimited basis. Since a "political action committee" (defined in §17-25-3(9) is not a person under §17-25-3(8), political actions committees not acting in concert must abide by the limitations stated herein.
7. The limit is $1,000 if the candidate does not elect to accept public financing and $2,000 if the candidate does elect to accept public financing. §17-25-30(b)
8. The total of money and "other things of value" cannot exceed the $1,000/$2,000 limitation.
9. Limitations on contributions by a person to more than one candidate, or to more than one political action committee, or to more than one political party committee, or to a combination of candidates, political action committees, and political party committees may not exceed $10,000 within a calendar year.
10. A PAC organized exclusively for the purpose of promoting or opposing a ballot question may expend in excess of $25,000 to promote or oppose that referendum, and shall not be subject to the requirements of making contributions to at least 5 candidates and must terminate all activity within 30 days following that election. (§17-25-15(f))
11. Political Action Committees may not make contributions which in the aggregate exceed $25,000 within a calendar year.
12. Candidate may not accept contributions from any combination or party committees in excess of $25,000.
13. Except for Radio, TV and the cost of Print Advertisements which shall be subject to the aforementioned limitation of $25,000 §17-25-10.1(c)
14. Also includes other business entities as defined in §17-25-10.1(h)&(j)
15. §17-25-10.1(h)
16. §17-25-10.1(g)
17. §17-25-1(b) Contributions include "other things of value."

LAFF— IN THE MORNING




JOURNAL PHOTO / KRIS CRAIG

**Cranston Mayor Stephen P. Laffey makes a point yesterday during his first regular hosting of a morning talk show on WPRO (630-AM). Laffey, a former college radio host, will not be paid for his air time.**

# Cranston mayor talks the talk

From his broadcast bully pulpit, Stephen P. Laffey assails "lousy politicians" and explains how he would solve the nation's immigration problems.

**BY DANIEL BARBARISI**
JOURNAL STAFF WRITER

EAST PROVIDENCE — The familiar strains of the *Superman* movie score kick in as the man billed as Cranston's supermayor pulls the microphone close to his mouth to start his first day on the job.

"It's the Steve, the Steve, *The Steve Laffey Show*," Mayor Stephen P. Laffey says, bringing the radio show back from commercial.

"You're listening to *The Steve Laffey Show*. Let's say that again. You're listening to *The Steve Laffey Show*," Laffey says, chuckling and casting his eyes up at the ceiling as he says his name.

This is clearly not a man who hates the sound of his own voice.

Laffey's debut as Rhode Island's first sitting mayor to host his own radio program was slow to get going yesterday morning, with only a few callers joining Laffey for his 9 a.m. start on WPRO (630-AM).

In fact, the phones were mostly quiet for the first 15 minutes, with Laffey fielding only one call as he talked about the health of Pope John Paul II.

But Laffey started to ramp up as he left the pope behind and broke into portions of his stump speech, bashing generous union contracts and speaking of the "lousy politicians" in the legislature who saddled Cranston with laws that are friendly to what Laffey calls "special interests."

The 43-year-old Republican mayor also made use of his bully pulpit to plug the Tax Relief Act of 2005, a piece of legislation that he and and several allies in the State House are backing.

Laffey, once a radio-show host at Bowdoin College in Maine, showed that he knows how to play the radio game. When he finally had two callers waiting, he egged listeners on, making it seem as if there were scores of people waiting to talk to him.

"The lines are really starting to light up now; we're talking about property taxes," Laffey said.

Since he took the helm in Cranston in 2002, Laffey has been a frequent guest on radio programs on WHJJ (920-AM) and WPRO — particularly in the afternoon on *The Dan Yorke Show*. On several occasions, he has guest-hosted when Yorke was off.

But when it was announced Wednesday that Laffey would have his own show, he became the first sitting mayor in Rhode Island history to have a commercial-radio talk show. Laffey is not

> 'The lines are really starting to light up now; we're talking about property taxes.'

SEE **SHOW, A6**

EXHIBIT H2 Prov Journal Bulletin

The Providence Journal

# Show

*Continued from Page A1*

paid for his program, which will run every Friday from 9 to 11:45 a.m., replacing Steve Kass.

The Federal Communications Commission said Wednesday that it does not differentiate between an official and a private citizen unless the official is an officially recognized candidate for office.

Once the host is a candidate — with a formal declaration to canvassers, for example — provisions of the Communications Act of 1934 require that his or her political opponents be given equal time on the air.

Yesterday's callers were nearly all supportive of the mayor, and Laffey took only one negative call — from a man named Tony from Cranston, who called saying he wanted to talk property taxes with the mayor.

Once on the air, however, Tony quickly asked Laffey why he had put an ad in the newspaper seeking a private investigator.

Laffey cut him off immediately, giving a quick explanation that this is a routine practice, done by all cities every year in order to have an investigator on retainer.

"Thanks for the undercutting call, Tony," Laffey said, before pushing the button to send the show to commercial.

As the show continued, Laffey brought in guest Julio Aragon, president of the Mexican-American Association of Rhode Island, to discuss immigration issues and Laffey's self-initiated "fact-finding expedition" last week to the U.S.-Mexico border, and the phone lines really did light up.

For the last hour and a half of the program, Laffey had four or five callers waiting at all times as he discussed immigration issues and, at one point, even promised to solve the nation's immigration problems.

"We won't leave this show, before I get out of here, without finding some solutions to the difficult problem of immigration," Laffey said before going to commercial. When he returned, he proposed encouraging American companies such as Wal-Mart to go directly to the border recruit workers from among those crossing, and allow them two- or three-year work visas to join such companies.

"I think it went very well. There were lots of callers. The topics were timely," Laffey said after the show. "It was a lot of fun. I learned a lot. I'll learn more as I go along. . . . You have to be pretty nimble, I think, to succeed at radio; you have to tailor it to what the people want to hear."

As for his critics? "Listen in next week."

# Garabedian: Talk-show stint may be illegal

BY DANIEL BARBARISI
JOURNAL STAFF WRITER

CRANSTON — Republican Mayor Stephen P. Laffey, in taking on a weekly radio talk show, may be violating his oath of office, City Council President Aram Garabedian has suggested.

Democrat Garabedian, in a letter Thursday, invited the mayor to appear before the council tonight to answer questions about his "acceptance of a radio talk show host position on WPRO and its impact on his duties as mayor and possible violation of oath of office."

"The Steve Laffey Show" debuted Friday morning on WPRO-AM, covering a range of topics ranging from the mayor's tax plans to the health of Pope John Paul II. Laffey is taking over the 9-to-11:45 time slot formerly held by Steve Kass, who now will be on the air only four days a week.

Garabedian said Saturday that the mayor, by being away from his office on Friday mornings, may be violating his oath to oversee the day-to-day operations of the city.

SEE LAFFEY, C5



## Laffey

*Continued from Page C1*

"Is he negligent or is he violating his oath when he takes leave and does these other activities?" Garabedian said. "Is he, by going to this radio station, not upholding that oath?"

When asked for comment on Saturday, Laffey issued a statement:

"Mr Garabedian has been around for a long, long time. In another era, he probably took on some big issues. It's unfortunate that lately he seems to have lost his focus.

"Hopefully, he can get back on track and, as I did with the past City Council, we can work together to help solve real problems. The city solicitor will walk him through the charter that seems to be so disorienting to him. Maybe his upcoming three-week vacation will be helpful," Laffey said.

Garabedian said the mayor's job description is poorly laid out in the City Charter. There is no listing of vacation days or sick time, or a prescribed workday.

"Why is it the mayor doesn't have a workday? Maybe the council will feel that the mayor should have a workday," Garabedian said.

Laffey has stated categorically that he is receiving no compensation for his radio stint — and he did so again on Saturday. But Garabedian said he had his doubts, and he also suggested that a value should be placed on the air time that the mayor has been given to talk about his political agenda.

City Solicitor Michael Glucksman said Saturday that he has reviewed both the m[illegible] oral oath of office and th[illegible] ter. "I didn't see any spec[illegible] violations of any charter pr[illegible] sion, or his oath of offi[illegible] Glucksman said.

He also said that he doe[illegible] think the City Council has power to mandate a specific of office hours for the mayo[illegible] which is, in a sense, a 24-h[illegible] job, he said.

Laffey hadn't deci[illegible] whether he would att[illegible] tonight's council meeting, [illegible] his deputy director of admi[illegible] tration, Robin Muksian-Sch[illegible]

Prov. Journal Bulletin
Monday Feb 28, 2005

EXHIBIT #3

The Providence Journal
FOUNDED IN 1829

Howard G. Sutton
PUBLISHER
Joel P. Rawson
SENIOR VICE PRESIDENT AND EXECUTIVE EDITOR
Robert B. Whitcomb
VICE PRESIDENT AND EDITORIAL PAGES EDITOR

*Publishers of*
*The Providence Journal since 1829*
*The Providence Sunday Journal since 1885*
*The Evening Bulletin 1863-1995*

Sevellon Brown
PUBLISHER 1942-1954
John C.A. Watkins
PUBLISHER 1954-1979
Michael P. Metcalf
PUBLISHER 1979-1987
Stephen Hamblett
PUBLISHER 1987-1999

## EDITORIALS

# The Laffey Show

A healthy ego is often indispensable to success, but the self-promotion of some Rhode Island figures appears to be going too far. For instance, Cranston Mayor Stephen Laffey plans to do a radio show every Friday, from 9 to 11:45 a.m., on WPRO.

Mayor Laffey is, without a doubt, an entertaining speaker, and his passion for changing the political culture of Rhode Island is commendable. But he is also an elected politician, who has responsibility for serving the public. And he is clearly seeking higher office, hoping to run someday for either the U.S. Senate or governor.

An occasional appearance on radio or TV is fine, but a regular commercial radio show, even if he is not paid for it, presents Mayor Laffey with obvious conflicts of interest. Whose interests would he be promoting? The Cranston taxpayers'? The station's and its advertisers'? His own ego and political career? Mr. Laffey, just 43, will have plenty of time to pursue a radio career if he ever tires of politics.

The mayor would be wise to follow the example of Rhode Island Chief Justice Frank Williams, who decided to pull the plug on his controversial Web site, which lavishly celebrated the judge and solicited paid speaking engagements. Mr. Williams was right to determine that such an approach was inappropriate for someone in his high office.

EXHIBIT #4




Contribute Volunteer Contact Us Home

- About Steve Laffey
- Contribute
- Volunteer
- News & Information
- Photo Gallery
- Calendar & Events
- Links

**Populist Leader of Cranston Is Getting The Job Done**

**Moody's Rates City Bonds Investment Grade**

CRANSTON – Moody's Investors Service yesterday became the second major bond-rating agency to raise the city's status from junk-bond to investment grade.

See Providence Journal Bond Rating Article

See Providence Journal Tax Summit Article

Click for more information



Hea

Mayor Laffey every Friday @ 9AM on 630 WPRO



**Flash 7 Video:**
56k | 384k
(Requires Flash Player 7)

**Judge Procaccini's Decision** (116KB PDF)
(Requires Acrobat Reader)

**New Fitch Rating** (28KB PDF)
(Requires Acrobat Reader)

**New Moody Rating** (76KB PDF)
(Requires Acrobat Reader)





**Taxpayer Relief Bill Press Conference 2.17.05**

**I Want to Contribute**

- Join Mayor Laffey's Bullhorn Club
- Make a Financial Contribution

**I Want to Volunteer**

- Elect Laffey Lawn Signs
- Coffee Hour with The Mayor
- Walk With Mayor Laffey
- E-mail Updates
- Distribute Literature
- General Volunteer Work

EXHIBIT #5



Privacy Policy

Paid for by Friends of Laffey, Richard J. Sullivan, Treasurer, 401-831-0200

MAYOR LAFFEY

Let's Secure Our Future.



**Media Coverage**

2005-02-26 - **Cranston mayor talks the talk**

From his broadcast bully pulpit, Stephen P. Laffey assails "lousy politicians" and explains how he would solve the nation's immigration problems.

Saturday, February 26, 2005

BY DANIEL BARBARISI
Journal Staff Writer

EAST PROVIDENCE -- The familiar strains of the Superman movie theme kick in as the man billed as Cranston's supermayor pulls the microphone close to his mouth to start his first day on the job.

"It's the Steve, the Steve, The Steve Laffey Show," Mayor Stephen P. Laffey says, bringing the radio show back from commercial.

"You're listening to The Steve Laffey Show. Let's say that again. You're listening to The Steve Laffey Show," Laffey says, chuckling and casting his eyes up at the ceiling as he says his name.

This is clearly not a man who hates the sound of his own voice.

Laffey's debut as Rhode Island's first sitting mayor to host his own radio program was slow to get going yesterday morning, with only a few callers joining Laffey for his 9 a.m. start on WPRO (630-AM).

In fact, the phones were mostly quiet for the first 15 minutes, with Laffey fielding only one call as he talked about the health of Pope John Paul II.

But Laffey started to ramp up as he left the pope behind and broke into portions of his stump speech, bashing generous union contracts and speaking of the "lousy politicians" in the legislature who saddled Cranston with laws that are friendly to what Laffey calls "special interests."

The 43-year-old Republican mayor also made use of his bully pulpit to plug the Tax Relief Act of 2005, a piece of legislation that he and and several allies in the State House are backing.

Laffey, once a radio-show host at Bowdoin College in Maine, showed that he knows how to play the radio game. When he finally had two callers waiting, he egged listeners on, making it seem as if there were scores of people waiting to talk to him.

"The lines are really starting to light up now; we're talking about property taxes," Laffey said.

Since he took the helm in Cranston in 2002, Laffey has been a frequent guest on radio programs on WHJJ (920-AM) and WPRO -- particularly in the afternoon on The Dan Yorke Show. On several occasions, he has guest-hosted when Yorke was off.

But when it was announced Wednesday that Laffey would have his own show, he became the first sitting mayor in Rhode Island history to have a commercial-radio talk show. Laffey is not paid for his program, which will run every Friday from 9 to 11:45 a.m., replacing Steve Kass.

The Federal Communications Commission said Wednesday that it does not differentiate between an official and a private citizen unless the official is an officially recognized candidate for office.

Once the host is a candidate -- with a formal declaration to canvassers, for example -- provisions of the Communications Act of 1934 require that his or her political opponents be given equal time on the air.

Yesterday's callers were nearly all supportive of the mayor, and Laffey took only one negative call -- from a man named Tony from Cranston, who called saying he wanted to talk property taxes with the mayor.

Once on the air, however, Tony quickly asked Laffey why he had put an ad in the newspaper seeking a private investigator.

Laffey cut him off immediately, giving a quick explanation that this is a routine practice, done by all cities every year in order to have an investigator on retainer.

"Thanks for the undercutting call, Tony," Laffey said, before pushing the button to send the show to commercial.

As the show continued, Laffey brought in guest Julio Aragon, president of the Mexican-American Association of Rhode Island, to discuss immigration issues and Laffey's self-initiated "fact-finding expedition" last week to the U.S.-Mexico border, and the phone lines really did light up.

For the last hour and a half of the program, Laffey had four or five callers waiting at all times as he discussed immigration issues and, at one point, even promised to solve the nation's immigration problems.

"We won't leave this show, before I get out of here, without finding some solutions to the difficult problem of immigration," Laffey said before going to commercial. When he returned, he proposed encouraging American companies such as Wal-Mart to go directly to the border recruit workers from among those crossing, and allow them two- or three-year work visas to join such companies.

"I think it went very well. There were lots of callers. The topics were timely," Laffey said after the show. "It was a lot of fun. I learned a lot. I'll learn more as I go along. . . . You have to be pretty nimble, I think, to succeed at radio; you have to tailor it to what the people want to hear."

As for his critics? "Listen in next week."

© 2005 The Providence Journal

Back to Media Coverage



Privacy Policy

Paid for by Friends of Laffey, Richard J. Sullivan, Treasurer, 401-831-0200

## Media Coverage

2005-02-21 - **Legislation includes a long list of ways for cities and towns to save taxpayer dollars.**

Friday, February 18, 2005

BY LIZ ANDERSON
Journal State House Bureau

PROVIDENCE – A group of House Republicans, joined by Cranston Mayor Stephen Laffey, yesterday proposed an omnibus "taxpayers' relief" bill that would revamp municipal-employee pension plans, eliminate some union bargaining rights, and remove a variety of state education requirements.

Rep. Bruce J. Long, R-Middletown, called the long list a "menu of opportunities" for local communities. He said tight budgets offer "an opportunity for solutions that aren't available when there's too much money around."

Other GOP sponsors in the House include Rep. James F. Davey, of Cranston; Rep. Richard W. Singleton, of Cumberland; Rep. Nicholas Gorham, of Coventry, and Rep. Laurence W. Ehrhardt of North Kingstown.

The bill includes a pension proposal for all teachers, municipal employees, police and firefighters in the state system with less than 20 years of service.

Teachers and municipal employees could retire at age 55 with 30 years of service; police and firefighters at age 55 with 10 years of service, or age 50 with 20 years of service. The maximum pension would be 75 percent of an average of the highest three years' salaries, and cost-of-living increases would be tied to the consumer price index and capped at 3 percent.

Cranston police and firefighters would not be able to include longevity pay or holiday pay in their calculations, and would be subject to the same average-salary calculations as others, rather than having a pension based on their final paycheck.

Davey said the group had no calculations on total savings from the changes, but for teachers alone they should "significantly exceed" the savings from Governor Carcieri's own pension proposal in the coming budget year.

Another provision would remove the right of municipal employee unions to bargain over pension benefits. A third would require all municipal employees to pay 20 percent of their health-care premiums, but allow for some income-related adjustments.

Communities would no longer be required to provide school bus monitors, and the cost of busing students to out-of-town schools would be handed off to the state. The state would also have to pay any special education costs that exceed 50 percent of the state average. Towns could seek more flexibility on such matters as class size and school hours.

City and town councils would have to ratify any union contract, including school contracts. And unions could not specify, in their contracts, what health insurer is provided.

Government managers would get more rights to privatize government business and lay off or reduce the number of employees – "regardless of minimum manning requirements and the impact of these decisions on individual employees or the bargaining unit."

Laffey invoked the saying: "Either you pay me now or you pay me later." Said the mayor: "Either you do this stuff now, or we're going to do it later," when more "draconian" changes would be needed.

Singleton and others said they had discussed the bill Wednesday night with House Speaker William J. Murphy, D-West Warwick, and Majority Leader Gordon D. Fox, D-Providence, and were told the bill would have a fair hearing.

© 2005 The Providence Journal

Back to Media Coverage



Privacy Policy

Paid for by Friends of Laffey, Richard J. Sullivan, Treasurer, 401-831-0200

CONTRIBUTIONS!

# Friends Of Laffey

## Printable Contribution Form

• Yes! I want to help Mayor Laffey continue to lead the charge in the taxpayer revolution. Enclosed is my check for...

☐ **$1000.00 - THE BULLHORN CLUB**
*Share a Bullhorn Breakfast with Steve and get your own "trademark" bullhorn. You never know when you will need it to enforce change.*

☐ **$365.00 - THE THREE-SIXTY-FIVE CLUB**
*"A dollar a day keeps special interests away"*

☐ **$100.00 - THE REVOLUTION CLUB**
*Receive a DVD entitled "Cranston: The Taxpayers Revolt" - an exciting compilation of stories of Steve's fight to take back Cranston's government from special interest groups.*

☐ **$50.00 - THE TAXPAYERS**
*Receive a surprise gift from the Mayor.*

☐ **$25.00 - THE LAFFEY CLUB**
*Join the fight for change and receive a quarterly newsletter. Enjoy updates as the battle continues to unfold.*

Club Membership: $25 $50 $100 $365 $1000 Other ____

**Amount: $**

**Name:** **Phone:**
**Address:** **State:**
**City:** **Zip Code:**

**Occupation:**
**Employer:**
**Employer Address:** **State:**
**City:** **Zip Code:**

**Thank you!** Please make checks payable to "Friends of Laffey".

Maximum contribution is $1000.00 per person. Personal or PAC checks only. Political contributions are not tax deductible.

Election laws require the reporting of name, mailing address, employer and occupation of each contributor. Please mail this, along with your check, to this address:

**Friends of Laffey**
PO Box 8510
Cranston, RI 02920

③

LEPIZZERA LAPROCINA

COUNSELLORS AT LAW

Michael J. Lepizzera Jr.
Paul N. Laprocina Jr.
Christopher F. DePalo *
Wendy A. Waller *†

* Admitted in MA
† Admitted in CT

March 28, 2005

Mr. Richard E. Thornton
Supervising Accountant
Rhode Island Board of Elections
50 Branch Avenue
Providence, Rhode Island 02904

**Re:** **<u>March 1, 2005 Aram Garabedian complaint</u>**

Dear Mr. Thornton:

Please find enclosed the response of Stephen Laffey to the March 1, 2005 complaint filed by Aram Garabedian with the Board of Elections.

This will serve to confirm that I represent the interests of Stephen Laffey with respect to this complaint. All future notices and correspondence should be directed to the undersigned.

Please feel free to contact me should you have any questions and/or comments regarding this matter.

Very truly yours,

*Michael J. Lepizzera, Jr.*

Michael J. Lepizzera, Jr.

CC Aram Garabedian w/enclosure

301 Metro Center Blvd., Suite 102, Warwick, Rhode Island 02886 · Tel. 401.739.7397 · Fax 401.384.6950
www.lldlawyers.com

STATE OF RHODE ISLAND March 28, 2005

HON. BOARD OF ELECTIONS

Response of Stephen Laffey, citizen of the City of Cranston,
State of Rhode Island.

## STATEMENT OF UNDISPUTED FACTS

1. Stephen Laffey is the current mayor of the City of Cranston.

2. Stephen Laffey is not a candidate for any state, federal or municipal office.

3. Stephen Laffey hosts a radio show on 630 WPRO, some Friday mornings.

4. Stephen Laffey is not paid for his appearance.

5. WPRO sells radio advertisements during his appearance as part of their business.

6. The "Steve Laffey Show" addresses issues of national, state, and municipal import as well as human interest stories.

7. Said show is an interactive show wherein callers largely determine the discourse of what transpires on said show.

8. Currently, other public officials, Representative Joseph Trillo, Senator Polisena and others have television shows on public access cable to discuss issues affecting the public at large.

9. Stephen Laffey, in addition to being the Mayor of Cranston, is an individual with First Amendment Rights guaranteed to him by the United States Constitution.

10. The Board of Elections has no jurisdiction to monitor the speech of private parties.

11. **The bedrock of any democracy is to promote, insure and protect, the marketplace of free ideas and their exchange in public regardless of the disdain or joy in the message or the honor or hatred of the messenger.**

*Issue One*

***Does Stephen Laffey qualify under the definition of a candidate?***

It is undisputed that the Board of Elections has limited jurisdiction to govern the course of dealing with candidates. Simply, Stephen Laffey does not fall within the

statutory construction of the definition of a candidate and thus Stephen Laffey respectfully suggests this board has no jurisdiction to adjudicate the Garabedian complaint. The General Assembly of Rhode Island has defined in R.I.G.L. Sec. 17-25-3 (2) the definition of a candidate.

> **"Candidate" means any individual who undertakes any action, whether preliminary or final, which is necessary under the law to qualify for nomination for election, or election to public office, and/or any individual who receives a contribution or makes an expenditure or gives his or her consent for any other person to receive a contribution or make an expenditure with a view to bringing about his or her nomination or election to any public office, whether or not the specific public office for which he or she will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he or she has announced his or her candidacy or filed a declaration of candidacy at that time.**

The first part of the definition is instructive and perhaps determinative that in fact Stephen Laffey does not fall within the definition of a "candidate" as defined under Rhode Island Law. The candidate must take **"any action, whether preliminary or final, which is necessary under the law to qualify for nomination for election."** The action that must have been contemplated by the General Assembly is some formal action. The formal actions that candidates are required to take are; the notice of organization, the filing of nomination papers, the collecting of signatures, etc. Hosting a radio show dealing with the 'events of the day' does not constitute the action on behalf of a candidate which is necessary to commence a bid for public office.

In addition, Stephen Laffey has not taken any contributions with a view toward any specific office. WPRO has made a business decision that Stephen Laffey will enhance their listenership. Stephen Laffey is a statewide figure drawing interest from the general public due to his ideas, style and controversy. There is no attempt on the part of

WPRO to insulate the mayor from ridicule, debate or criticism. Stephen Laffey has no control over the content, direction, political viewpoint of the callers, nor is any attempt made by WPRO to aggrandize his stature. This voluntary act on behalf of Stephen Laffey is undertaken simply because he enjoys talking to people and he has been a frequent talk show guest and guest host. For purposes of comparison, political commercials seek to bolster candidates, enhance credentials and show candidates at their best moments not subject individuals to ridicule, public scrutiny and irate callers.

Clearly, under this construct, the second part of the definition is inapplicable to Stephen Laffey. The definition goes on to state; "**and/or any individual who receives a contribution or makes an expenditure or gives his or her consent for any other person to receive a contribution or make an expenditure with a view to bringing about his or her nomination or election to any public office.**" The arrangement between Stephen Laffey and WPRO is not one made with a view to bring about a nomination to anything. Clearly this part of the definition would require both the donor and recipient to possess the same intent. For that to happen it would have to go something like this;

**WPRO:** "Hey Steve are you going to run for president?"

**Laffey:** "Yes."

**WPRO:** "We will give you this air time to help you."

**Laffey:** "Ok, that sounds good."

Absent a meeting of the minds, the questions remain: Where is the contribution? and Contribution of what? If at all, the only one contributing anything of value is Stephen

Laffey. He is the one who has given something of value in this business transaction with WPRO.

Putting aside for a moment the undisputed facts of this complaint, the Respondent also points out that there are fatal constitutional defects with the definition of candidate crafted by our General Assembly. While this is not the forum to methodically articulate those particular defects, the Respondent will say that the balance of the statute is unconstitutionally vague and will result in far reaching and unintended consequences for all citizens.

If applied literally, this definition would cover virtually any citizen in the State of Rhode Island. For example, if radio talk show host Steve Kass one day thinks for five minutes on his drive in to work that he may run for office, he is a candidate under the Garabedian interpretation.[1] I don't think we are ushering in an era of "thought" police. In addition, if Mayor Cicilline walks around Capitol Grill from table to table shaking hands, has the restaurant given him a venue and thus something of value? Would he have to report a hall fee? Under the Garabedian rules, he just might. I guess coffee hours would prove difficult to report. If a candidate has a traditional coffee hour, of course the proceeds would be declared, but would the candidate need an appraiser to determine the square footage and appropriate rental value of the living room?[2]

In closing, the complainant has confused a business transaction with political activity. WPRO in perhaps it's most profitable time slot is unquestionably making

[1] R.I.G.L. Sec. 17-25-3 (2) **"whether or not the specific public office for which he or she will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he or she has announced his or her candidacy or filed a declaration of candidacy at that time."**

[2] Frequently candidates meet at establishments such as Panera Bread to expose their views to audiences for hours on end. Should this be listed as something of value? Is it perhaps a phantom rental fee?

money from the "Steve Laffey" show and Stephen Laffey is not getting paid but rather is donating his services. Even if Laffey does fall within the definition of a candidate, the following section would clearly exempt the "Laffey Show" from scrutiny;

> **R.I.G.L. 17-25-3(7) "Paid personal services means personal services of every kind and nature the costs or consideration for which is paid or provided by someone other than the committee or candidate for whom the services are rendered, but shall not include personal services provided without compensation by persons volunteering their time.**

Laffey, assuming that he is a candidate, is volunteering his time without compensation and thus is outside the construct of the statute.

Quite simply, the complainant is upset by hearing "Stephen Laffey the citizen" on the radio. The complainant rather than looking at the "letter of the law" is considering the collateral effect that the show may have on his future life.[3] The Respondent respectfully requests that the board look at the limited scope of the transaction rather than the possible "effect" on his persona. Who knows Stephen Laffey may want to be a radio personality?

In the vast and expansive marketplace and marketplace of ideas, the complainant has many options which include calling the show to express his own agenda or simply turning the dial.[4] The complainant's options do not include, however, utilizing this Board.

---

[3] The complainant himself has disseminated press releases on this issue and has received at least two front page articles in the Providence Journal West Bay Section. Furthermore, the complainant and others have characterized or described the "Steve Laffey Show" in a different light at varying times. The description of the show labeled by its critics conveniently changes depending upon the particular forum in which the complaint is being made. At a Cranston City Council meeting the "Steve Laffey Show" was characterized as a job. Before the Ethics Commission, the "Steve Laffey Show" has been referred to as a gift. Now before this Honorable body it is an alleged contribution. One has heard the expression "shotgun approach."

[4] Then again, under the "Garabedian rules" he would have to report an in kind contribution from both Laffey and WPRO.

to muzzle, monitor or otherwise supervise the protected free speech of Stephen Laffey, a citizen of the State of Rhode Island.

For all the foregoing reasons, the Respondent respectfully requests that the Garabedian complaint be dismissed.

Michael J. Lepizzera, Jr., #4995
Lepizzera and Laprocina
301 Metro Center Blvd., #102
Warwick, Rhode Island 02886
(401) 739-7397 Tel:
(401) 384-6950 Fax:

Stephen Laffey

(9)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROCEEDINGS AT HEARING IN RE: :
:
CAMPAIGN FINANCE VIOLATIONS :
PURSUANT TO R.I. GENERAL LAWS :
17-25-5(a)(7)(i) :

PLACE: RHODE ISLAND BOARD OF ELECTIONS
50 BRANCH AVENUE, PROVIDENCE, RI
DATE APRIL 26, 2005
TIME: 9:30 A.M.

BEFORE: ROGER N. BEGIN, CHAIRMAN
THOMAS V. IANNITTI, VICE CHAIRMAN
GEORGE H. BOWEN, III, ACTING EXECUTIVE DIRECTOR
RICHARD E. THORNTON, SUPERVISING ACCOUNTANT
FRANK J. REGO, COMMISSIONER
JUDITH H. BAILEY, COMMISSIONER
FLORENCE G. JOHNSON, COMMISSIONER
RAYMOND XAVIER, COMMISSIONER
JOHN DALUZ, COMMISSIONER
RAYMOND A. MARCACCIO, LEGAL COUNSEL

APPEARANCES:
ON BEHALF OF MAYOR STEPHEN LAFFEY
LEPIZZERA & LAPROCINA
BY: MICHAEL J. LEPIZZERA, JR., ESQ.
ALSO PRESENT: ARAM GARABEDIAN

CAPITOL COURT REPORTING
225 RESERVOIR AVENUE
PROVIDENCE, RI 02907
(401) 453-1005

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | HANDWRITTEN WAIVER | 4 |
| 2 | COMPLAINT AND EXHIBITS ATTACHED THERETO | 35 |

STENOGRAPHER'S NOTE:

EXHIBITS RETAINED BY BOARD OF ELECTIONS.

(COMMENCED AT 9:40 A.M.)

(EXCERPT FROM HEARING)

MR. CHAIRMAN: The next item on the agenda is -- well, as we have it identified on the agenda: The Board may vote to meet in Executive Session on one or more of the following matters: In accordance with 42-46-5(a)(4) to discuss complaints of alleged campaign finance violations, pursuant to 17-25-5(a)(7)(i). It is my understanding that the parties involved will be waiving their -- the individual's right to privacy. I see that we have legal counsel here. Mr. Lepizzera, do you wish to state and are you prepared to present in writing a waiver of your client's right to a confidential hearing on this matter?

MR. LEPIZZERA: Yes. As the Board knows -- good morning, Chairman. As the Board knows, I represent Stephen Laffey regarding Mr. Garabedian's complaints against him. I have just handwritten a note, and I'll read this for the record, dated April 26, 2005, I represent the interests of Stephen Laffey regarding the complaint filed by Aram Garabedian against Stephen

Laffey concerning his show on WPRO. Stephen Laffey requests the complaint be heard in public and in open session before the Board of Elections, and I'll hand that to Mr. Bowen. For the record, I have handed -- I showed Mr. Garabedian that note before I read it into the record.

MR. CHAIRMAN: I'm sorry, I missed that.

MR. LEPIZZERA: I said, for the record, before reading that, I showed Mr. Garabedian the note, that I executed that note.

MR. GARABEDIAN: For the record, I am Aram Garabedian, 173 Belvedere Drive, Cranston. As a complainant, I would like the opportunity at some time to address the Board. Thank you.

MR. CHAIRMAN: Thank you, Mr. Garabedian. We have the handwritten note and this will be marked as Exhibit 1 in this matter.

(EXHIBIT 1 MARKED)

MR. CHAIRMAN: I'm going to ask legal counsel, Ray Marcaccio, to at least for the purposes of the Board and for this public session to identify what the matter is that is for discussion before this Board.

MR. MARCACCIO: This matter involves a

complaint that was made by Mr. Garabedian concerning a radio show that is hosted by the current Mayor of Cranston, Stephen Laffey, who, as we understand it, sits on Friday mornings on WPRO hosting a show that addresses political issues, as well as other issues, broad ranging in scope. Our understanding is that Mr. Laffey is not paid directly for this, he does not receive any compensation for his time, that this show is advertised from time to time by WPRO, and that on occasion, there are references to this radio show in Mr. Laffey's website that he has for political purposes. The complaint alleges that this conduct constitutes electioneering, and as such, is campaign related and is governed, therefore, by the Campaign Finance Laws of the state of Rhode Island. That, Mr. Chair, is my understanding of the issue.

MR. CHAIRMAN: Okay, let me suggest then, Mr. Lepizzera, you're representing Mr. Laffey, you have presented -- and this complaint having been filed properly before the Board, you have, in the time frame provided by law, provided a written response on Mr. Laffey's behalf, a copy that we

all received, and Mr. Garabedian has legally filed the complaint. Let me just ask in the interest of time, I'm not going to ask you to go through rereading all of that which we already have as a matter of public record, but are there any additional comments that you wish to make or summary comments you wish to make, and similarly, Mr. Garabedian, you've provided voluminous information to this Board, and brevity is not a word one normally associates with the name Garabedian. So I will ask, is there anything that you wish to add in regards to your complaint as well. With that, Mr. Lepizzera, would you care to proceed. If anything at all, I'm not asking you to, if you just wish to rest on your statement, that is entirely appropriate.

MR. LEPIZZERA: I do have something else to add if I could proceed.

MR. CHAIRMAN: Please do.

MR. LEPIZZERA: And of course, I'll start out with saying that the complaint was filed by Mr. Garabedian and the burden is on him to prove his case, but that being said, I don't have a problem with going first. First, I'll say that

Mayor Laffey is not here today. The Vice President is actually meeting with him today, and I should say, not Dick Cheney, but the Vice President of Guatemala is present in Cranston today, so he's not available today. Last night, I was sitting down and I was thinking about what words I was going to impart or say to this Board, and I thought to myself, keep it very simple, because this is a very simple issue. It's a straight forward issue. I'll admit that this is not a garden variety complaint on Campaign Finance Law. Now, a garden variety complaint that this Board might usually see is, for example, we have Contributor X that wants to give Candidate Y $10,000. Now, we know that Contributor X cannot give Candidate Y $10,000, so what Contributor X does is he tries to circumvent the Campaign Finance Laws and he goes about and gives different denominations, a thousand dollars or less, to different people, and then those third parties then give Candidate Y those monies. Now, we know that's circumventing Campaign Finance Laws. Now, the question this Board needs to ask itself is the same question of the scenario I just presented to

you, is the WPRO/Laffey transaction seeking to circumvent the Campaign Finance Laws, and I would say to you that the answer to that question is very simple. It's no. And how do you figure that out? Well, what you do is you look at the Laffey/WPRO transaction and you ask yourself, is it a political transaction, or is it a business transaction. I would submit to you this is strictly a business transaction. WPRO -- for this Board to find that Mr. Garabedian's complaint has merit, this Board would have to find that WPRO and Stephen Laffey engaged in a conspiracy, that they sat down and said, okay, WPRO wants to support the candidacy of Stephen Laffey, for whatever office, and I'll discuss that in a few minutes, but WPRO wants to support the candidacy of Stephen Laffey, however, we have Campaign Finance Laws, and we want to give Mr. Laffey free air time, how do we go about doing that, because I think everyone can see that Mr. Laffey has been on the show from late January to the present time, and I would concede that the value of that air time is more than a thousand dollars. Did WPRO and Stephen Laffey engage in that conspiracy? The answer to that is

absolutely no. WPRO is not a charitable organization. WPRO is not a PAC. WPRO is not an entity seeking to support certain candidates. WPRO, which I believe is owned by Citadel Communications, is a corporation in the business to make money. WPRO is not going to give away two-and-a-half hours every Friday, which I'm sure, we don't have them here today, which I'm sure is valuable time, and give it to Stephen Laffey. WPRO hired Stephen Laffey to host a radio show for two-and-a-half hours every Friday, and they are marketing it and they are advertising it because Stephen Laffey is value. WPRO's business decision, for whatever reason, they are in the communications business, they think that Stephen Laffey has value. They believe that Stephen Laffey will increase their market share. It's as simple as that. This is a business transaction. This is not a political transaction. This is not a conspiracy between WPRO and Stephen Laffey to circumvent Campaign Finance Laws.

Now, Stephen Laffey is not -- we'll also concede that Stephen Laffey is not getting paid a salary or a stipend from WPRO, that's his

decision. If Stephen Laffey wanted to, he could be receiving a stipend or a salary or some kind of weekly pay from WPRO. Now, in that case, if he decided to take that stipend or that salary, that would be further evidence of a business transaction, but what you need to look at is, if this is in fact a violation of the Campaign Finance Laws, is WPRO giving something to Stephen Laffey of value, or is Stephen Laffey giving something of value to WPRO? Again, WPRO is not going to be giving away free air time for nothing. They've elected, for whatever their good judgment, a business decision that Stephen Laffey, like Mr. Cass, or like a Dan York, creates value and they decided to hire him.

(COMMISSIONER RAYMOND XAVIER NOW PRESENT)

MR. LEPIZZERA: The burden is on Mr. Garabedian in this case to show -- to prove that this is in fact not a business transaction, but in fact a conspiracy between WPRO and Laffey to circumvent the Campaign Finance Laws. There is no evidence whatsoever before this Board, whatsoever in the complainant's packet submitted to the Board, that this is nothing but a business

transaction, and think about it for a second, we have to -- this Board has to find that the executive producers of Citadel or WPRO sat down with Laffey and said, we're going to support your candidacy, how do we circumvent the Campaign Finance Laws. That's not what this is about, this is simply a business transaction. This is simply Citadel Communications saying we want to increase our market share.

Now, that brings me to my next point. My example in my opening remarks, I talked about Contributor X and Candidate Y. Contributor X wants to give money to Candidate Y, and I talked about if this Board finds Mr. Garabedian's complaint has some merit, that WPRO is trying to support a candidate -- I'm pretty close to Stephen Laffey, obviously, I'm his lawyer, and I'm standing up before you right now on his behalf, what is Stephen Laffey a candidate for? Is he a candidate for U.S. Senate? Is he a candidate for the next mayoral term in Cranston? Is he a candidate for Lieutenant Governor? He's not a candidate for anything right now, quite frankly, and I would submit I'm here arguing why this

complaint has no merit, but I'm going to go backwards here. I'd say that this complaint, that this Board had no jurisdiction whatsoever to regulate, to monitor, to muzzle the free speech of Stephen Laffey. Stephen Laffey is not a candidate for anything. And you know what, the proof is in the pudding, because if Stephen Laffey and WPRO really engaged in this conspiracy, let's look at Stephen Laffey's Campaign Finance Laws, because the proof is in the pudding. I pulled out Stephen Laffey's first quarter 2005 Campaign Finance Report filed with the Board of Elections, I believe, on April 21, I believe last Thursday, and I looked at, and I didn't realize this, I think he raised $1,000 for the first quarter, January, February and March, the first quarter of 2005. If Stephen Laffey and WPRO were utilizing this so-called show to promote his candidacy, again, which he's not a candidate for anything, but let's say he is a candidate for something, he's only raised $1,000. That thousand dollars was given to him on February 4, 2005, by an individual who I believe is a college graduate in Boston, Massachusetts. If this truly was a scheme, a way

to circumvent the Campaign Finance Laws, you would have seen Stephen Laffey, he's reaching out to -- I don't know what the market share, and I don't know what the listenership is at WPRO, he's reached out to thousands and thousands of people for the last 3 months, he hasn't raised one dollar, not one dollar from any of those listeners.

I would also add that this complaint is dangerous, and the reason why it's dangerous is that this complaint has, and this decision by the Board, is going to have very reaching -- far reaching consequences that I want this Board to realize. There are numerous shows out there. We have the Joseph Trillo show. We have the Glenn Madera (phonetic) show. I believe, I don't have personal knowledge of it, but I think Mayor Cicilline has a show. We have The Lively Experiment. We have the Guy Dufault show. If Stephen Laffey is violating the Campaign Finance Laws as Mr. Garabedian suggests, then every time someone does a guest host on those shows I just mentioned, every time they appear on those shows, then this Board needs to look at that transaction

and say, okay, Mr. Trillo, how did you get -- how did you get your TV show, are you paying for it, people appearing on Representative Trillo's show, are they paying for that air time, is Representative Trillo promoting that individual that's appearing on his show. This has to do with free speech. I would agree, if WPRO and Stephen Laffey engaged in this scheme, this decision to circumvent the Campaign Finance Laws, and Stephen Laffey was there using the show and not giving any value to WPRO, then we'd have a problem, but that's not the case here. Stephen Laffey has value to WPRO and that value is people want to listen to him, and again, the proof is in the pudding, not one dollar, think about it, in 3 months has Stephen Laffey raised not one dollar, thousands and thousands of people. I want to see other candidates, other representatives, other politicians host a radio show, not one dollar raised. There would be other money raised. So if that is the proof in the pudding, then that shows right there, this is a business transaction. Stephen Laffey likes to appear on the show, WPRO wants to have him, the viewers want to listen to

him, this is a First Amendment issue, and there's no shenanigans going on between WPRO and Stephen Laffey.

The other point I'd like to raise is, if in fact Mr. Garabedian is right and WPRO and Stephen Laffey engaged in a scheme to circumvent the Campaign Finance Laws, WPRO should be before you as well. I think this complaint should be dismissed out of hand for jurisdictional reasons, and for reasons on the merits that I just discussed. But if Mr. Garabedian is right and Mr. Laffey did something wrong, then he is the recipient of illegal air time, that has value, and if he's the illegal recipient, then we have an illegal donor, an illegal giver, and my concern is that WPRO has never been notified of the Garabedian complaint, WPRO has never been notified of this hearing right here, and my concern is, if this Board rules against Stephen Laffey, which I don't decide the case, you do, I'm an advocate here, I can't see how this Board can rule against Stephen Laffey, but if you did, we're going to have a problem, or WPRO is going to have a problem, because if Laffey illegally received this

free air time, it means that WPRO, ipso facto, gave him an illegal contribution, and that therefore, this Board would have to notify WPRO. WPRO is going to come to this Board and say, wait a minute, we have due process concerns, we weren't notified of the complaint, we weren't notified of the hearing. We have to have our day in court or before this Board, and then WPRO presents their case as to whatever their knowledge is of this business transaction between them, and if they can impart or tell this Board certain things that I'm not aware of, and the Board says, you know what, Mr. Lepizzera was right beforehand, even though we ruled against his client, this really was a business transaction, and says, there was no illegal contribution, then this Board is going to run the jeopardy of two inconsistent decisions, which I don't think the Board wants to get into. So for those following reasons, I would say that this Board does not have jurisdiction over the Garabedian complaint, and WPRO, to the extent it's going to hear this case, WPRO should be before it arguing at the same time, and that, keep it simple, just ask yourself, did WPRO and Laffey try

to circumvent the Campaign Finance Laws. They didn't. This is strictly a business transaction, and what people are upset about is the consequences or the results of that business transaction, because the consequences and the result is that Stephen Laffey, for whatever he may run or he may not run again, whether he runs for U.S. Senate, or he runs for Mayor again, or he runs for Lieutenant Governor, what some people don't like is that there are a lot of viewers listening to Stephen Laffey and his message. The other thing this Board can't get into is regulating the content of his free speech. Now, I don't listen to the show, because I'm usually in court, I'd like to listen to the show, but to the extent this Board starts talking about, amongst yourselves, well, is Stephen Laffey talking about political issues, is he talking about the budget for Cranston, is he talking about the budget, is he talking about what a great job Governor Carcieri is doing. He's also talked about the Pope on the show. So the Board has to be weary of regulating the content of the Laffey show. Put that aside, again, I'll leave you with this. Look

at the transaction. Is this a business transaction or is this a conspiracy? And I would suggest that there's no evidence to show it's a conspiracy, this is strictly a business transaction, and if the Board needs evidence, I don't have WPRO here today, and that's why I think it would be important that WPRO be here. I'm asking the Board to dismiss the case in its entirety, but if this Board is inclined to go any further with this complaint, get WPRO here and let them respond and talk about the business transaction. This is a business transaction. Monday through Friday, there's only so many hours in a week that WPRO has, it's a business, it's not a charitable organization. They are not going to give Stephen Laffey two-and-a-half hours every week but for a business decision. Don't look at -- what some people are doing is they're looking at the result, they're looking at the consequences, we don't like the fact that Stephen Laffey -- that all these viewers get to hear Stephen Laffey. That's not the issue. Stephen Laffey has appeared at a ceremony where the Lions Club went to Alpine Country Club and they

presented him with an award. There must have been 700 people there. Stephen Laffey -- the Lions Club promoted Stephen Laffey. Does Stephen Laffey have to show on his campaign finance report that, by the way, the Lions Club put this Alpine Country Club presentation to me, the value of that hall was X amount of dollars, the value of putting 700 people together in one room, that's value too. It's no different than the WPRO transaction. By Stephen Laffey showing up at that Lions Club ceremony, did they violate the Campaign Finance Laws? Did they have to make sure it was under $1,000? Did Stephen Laffey have to put that on his Campaign Finance Report? No. Same thing with the WPRO transaction, it's a business transaction, and leave it at that.

MR. CHAIRMAN: Mr. Lepizzera, before I invite Mr. Garabedian to make his presentation, can I ask you a few questions.

MR. LEPIZZERA: Sure, I'll answer as best I can.

MR. CHAIRMAN: You say that Mr. Laffey -- you recently had an opportunity to review Mr. Laffey's most recent Campaign Finance Report, is that

correct?

MR. LEPIZZERA: Yes.

MR. CHAIRMAN: So Mr. Laffey is filing Campaign Finance Reports presently?

MR. LEPIZZERA: Yes.

MR. CHAIRMAN: In what capacity is he filing these reports?

MR. LEPIZZERA: I think, and I'm not an expert on Campaign Finance Laws, but I believe he's obligated to file reports as the sitting Mayor, and I believe -- I don't prepare them for him, and I don't assist him, so I mean, that's my understanding.

MR. CHAIRMAN: So as an incumbent elected official, he is filing regularly his Campaign Finance Reports?

MR. LEPIZZERA: I believe so.

MR. CHAIRMAN: And so extending that just in terms of the application to submit, so the public understands what the requirements are, Mr. Laffey, like 95 plus percent of the other elected officials and those obligated under the law, file their reports and Mr. Laffey is doing this.

MR. LEPIZZERA: Yes.

MR. CHAIRMAN: So, if Mr. Laffey in his capacity as Mayor, in filing his reports, he is reporting those contributions that he receives, albeit as you indicated in your presentation that it seems to be fairly modest in the fund raising activity these days, but he is reporting campaign contributions that he receives; is that correct?

MR. LEPIZZERA: Correct.

MR. CHAIRMAN: You're familiar with the Campaign Finance statute that talks about what constitutes a contribution?

MR. LEPIZZERA: Yes.

MR. CHAIRMAN: So, in other words, if an individual attends a fundraiser for Mr. Laffey and makes his check for $500, that is a reportable contribution.

MR. LEPIZZERA: Correct.

MR. CHAIRMAN: So if Mr. Laffey -- if an individual were to -- let's say Mr. Laffey is running his campaign -- correct that, if Mr. Laffey, as the Mayor, as he's filing his periodic reports, to conduct his whole political activity, were to use the office of a friend who says, you know, Steve, I want to -- I want to make

a campaign contribution to you, and in lieu of writing a check for $500, I have this office and I would, you know, I want you to feel free to use that office and this is going to be your office and that will be my campaign contribution to you, would that constitute an in-kind contribution?

MR. LEPIZZERA: I'm not an expert on Campaign Finance Laws, but if they had that conversation, okay, and you just stated that the Contributor X just said, in lieu of giving you $500, I'm going to let you use this office, that's my contribution to you, I think he has to report that. I think he has to report that.

MR. CHAIRMAN: Let me help you out. The Board of Elections would view the scenario that I just presented to you as an in-kind contribution. So the point that I just want to make sure that we've made clear, is that campaign contributions are both in the form of contributions that are reportable as checks, cash contributions, as well as in-kind contributions.

MR. LEPIZZERA: I agree with that.

MR. CHAIRMAN: Now, I just want to move then to, once again, you said that Mr. Laffey is filing

reports presently as Mayor. So, when you raise as part of your argument that Mr. Laffey is not running for something else, to me it sounds as though you're suggesting that the burden would be on Mr. Laffey only if he were to be either publicly declaring in some manner the intent to run for another office, and it would be my position that I don't know, and frankly, don't really care if he's running for another office or even if he's running for office next time, but that is by an incumbent -- being an incumbent elected official, as you indicated he is, he is filing campaign reports today, as he is, and filing those reports for all contributions, i.e., cash and in-kind contributions. I don't -- I don't -- I can't get to that place where you did that -- of leaping to running for another office. Would you acknowledge that that is not even a relevant matter of running for a different office, but what is relevant is what is today and what is the activity, the conduct, that is occurring today, would you agree with that?

MR. LEPIZZERA: I went off on a tangent a bit, because of the use of the word "candidate."

I would suggest that he's not a candidate. I agree that he has to file Campaign Finance Reports today, I agree that whether they are cash or in-kind, he has to report those. So I think we should get away from that and go with my parting words, which was, we have to look at the activity between WPRO and Stephen Laffey, which I would suggest is a business transaction.

MR. CHAIRMAN: If, as I said, if such a, as I posed the hypothetical to you of the office space --

MR. LEPIZZERA: Had to report.

MR. CHAIRMAN: -- Had to report, okay. So if -- now, let me just move to the next point. When WPRO is advertising for the appearance of Mr. Laffey, are they advertising -- is the promotion for Mr. Laffey, Mr. Stephen Laffey who's from Cranston, or is it for Mayor Laffey from Cranston?

MR. LEPIZZERA: I don't know the exact words they're using, if we're getting to semantics, I would suggest, and that's why I think it's important for WPRO to get here, I would suggest that they are advertising to get people to turn on

their radio station and listen to Stephen Laffey. They are not advertising for Stephen Laffey to say, Pull the lever for Stephen Laffey, vote for Stephen Laffey, vote for him for whatever office he may run again, support Stephen Laffey. They are advertising and spending money on their corporate line to make sure they have a profit at the end of the day. I would suggest, I can't speak to WPRO, I would suggest that that's a business expenditure so people -- marketing purpose, so people turn the dial to 630 WPRO, not to vote for Stephen Laffey.

MR. CHAIRMAN: Mr. Lepizzera, go back to the hypothetical that I posed to you about the office space. Does the donor of the office space have to declare with big signs vote for Mr. Smith for a particular office, or is the action of the donation of the space in and of itself an in-kind contribution, and thus does -- is the donation of the time on air, you know, because this conspiracy that you described that was almost a predicate of this, I'm not sure that I made that connection here, because does there need to be this, quote, conspiracy, or is the donation in and of itself a

donation, whether it be in the form of office space, a check for $500, or possibly, if the case is made, the appearance on a radio station?

MR. LEPIZZERA: I think that's why, like I said, this is not the garden variety complaint. We have to look at the transaction. You just said in your hypothetical, WPRO donating the air time to Stephen Laffey, that's not what they're doing. They are not donating it. In the business office example that you used, if that person is giving that office to assist or whatever Mayor Stephen Laffey, to aid him or support him in his run for office or his current office, that has to be absolutely disclosed and put on the Campaign Finance Reports, and that's why we have to go back to the WPRO transaction. Are they donating that air time? Because Steve Cass, same thing, all of Steve Cass, Dan York, is WPRO donating free air time to Dan York and Steve Cass? Absolutely not, that's a part of their job.

MR. CHAIRMAN: I have additional questions, but let me yield to Mr. Iannitti.

MR. IANNITTI: Good morning, Mr. Lepizzera.

MR. LEPIZZERA: Good morning.

MR. IANNITTI: A couple of things, one, I'm not going to talk about the conspiracy or the election conspiracy, because I don't (inaudible), nor am I going to address an FCC or an FEC issue, but -- and I agree, you're in dangerous grounds here. When we start talking about using the internet and everything else, we're getting into a whole new genre that we should be concerned about. Now, you said to me that Mr. Laffey is not a candidate for office, I think you said that earlier.

MR. LEPIZZERA: He's not a candidate.

MR. IANNITTI: But if I went to my computer, and I went to www.electlaffey.com, what would I find? Would I find something like this? That's the Elect Laffey website as of March 1, 2005. And on this website, it says, I want to contribute, I'd like to join Mayor Laffey's bullhorn club, I want to make a financial contribution, I want to put Elect Laffey lawn signs up, coffee hour with the Mayor, walk with the Mayor, distribute literature, or be a Journal volunteer worker, and then you see that the website says, Paid for by the friends of Laffey, Richard J. Sullivan,

Treasurer, with a telephone number, and in the middle of this whole web page is, Mayor Laffey everyday on WPRO. Now, let me tell you my problem, because I've gone right to left, right to left on this issue. I was buying into your argument all the way until I went to this website and I saw the Elect Laffey and I saw the WPRO. My concern is the definition of what a candidate is, because a candidate does not necessarily have to identify that he or she is a candidate. If he acts like a candidate, walks like a candidate, talks like a candidate, ergo, he or she is a candidate.

MR. LEPIZZERA: I agree.

MR. IANNITTI: And that concerns me, you know, it's almost like the previous issue of the Carcieri campaign. I would have been very comfortable had I gone to this website and there was nothing there to identify WPRO. That bothers me, because -- and even if -- the more you talk, as an old salesman, the more you talk, sometimes you may lose a sale, and I'm just becoming more convinced this may be an unauthorized political use of the radio. I'm not talking about his free

speech, but I have some grave concerns, and I was telling the Chairman earlier, I was laying in bed this weekend, for various reasons, and I happened to see, Representative Trillo, all the people you talked about, and I'm saying to myself, you know, we are really on -- we are on some thin ice here, and how far are we going to go where people have this access, albeit the difference is that I could go down and go to Cox Cable and get my friends to do the camera work for me, and I have free access, and I'm not a candidate for any office, but here's a case of Mayor Laffey working with WPRO. To this day, I still don't know if he's getting paid or he's not getting paid, I'll take your word for it, because I think you're an honorable guy.

MR. LEPIZZERA: He's not getting paid.

MS. JOHNSON: Are you getting paid?

MR. IANNITTI: Okay. I don't want to belabor this issue. I have some grave concerns as to whether or not this may in fact be skirting the election laws of the state of Rhode Island. The FEC issues, somebody else's ball game. WPRO's issues, that's something else. And the FCC, that's something else. I have real grave concerns

about Mayor Laffey having a website that says elect me. It doesn't say elect me for anything, but elect me. Is it General Treasurer? Is it United States Senator? He is a candidate, his website tells me he's a candidate. So I have to look at this individual as a candidate for public office. He's forced me to accept him as a candidate for some office.

MR. LEPIZZERA: Can I reply to that?

MR. IANNITTI: Sure.

MR. LEPIZZERA: I would agree in that one does not become a candidate up until he files some formal papers with the Board of Elections, I would absolutely agree with that statement.

MR. IANNITTI: Let me interrupt you. Mr. Marcaccio, I don't have it in front of me, that portion of the law -- do you have it in front of you on what a candidate is, could I have it or do you want to read it for me?

MR. MARCACCIO: I can read it right here, the definition?

MR. IANNITTI: Yes. The definition of a candidate, ladies and gentlemen.

MR. MARCACCIO: This is a summary I have, and

it is virtually verbatim, it's Section 17-25-(3)(2), defining candidate to be any individual who takes any action, whether preliminary or final, which is necessary to qualify for a nomination to a public office or who receives a contribution or makes an expenditure with a view to bringing about a nomination whether or not the specific public office is known at the time.

MR. IANNITTI: Thank you.

MR. LEPIZZERA: And I have the statute in front of me and that's a fair rendition. I would agree that someone can be a candidate without filing any formal papers. Otherwise, they could circumvent, well, I didn't file, so I'm not a candidate. I would agree with that. With respect to the website, I haven't even thought about it, but I'm bringing it up right now, I think you raised a legitimate point. I would say this, you still need to go back to the WPRO/Laffey transaction and look at the air time. If that website or that notation reference back to WPRO came after the fact, to say by the way, I'm on the show, okay, that does not go to the intent between

WPRO and Laffey. Should that be there, maybe that should be stricken?

MR. IANNITTI: Mr. Lepizzera, my issue is not with WPRO and CAT Broadcasting, whatever it is, my issue has now been brought down to, we have a candidate, to wit, Stephen Laffey, as his website, I am a candidate for office, I'm not telling you what office I'm running for, but I am acting like a candidate, talking like a candidate, walking like a candidate, therefore, in my mind, which you firmed up in your presentation this morning, that he is in fact a candidate, and my concern is whether or not this skirts the Rhode Island election laws, no other issue, no FEC, no FCC, no conspiracy, period. Had I not seen this website, I would have agreed with you 100 percent and I would agree on the First Amendment issue, but I have seen it, so.

MR. LEPIZZERA: Fine. So I think the next step in the analysis would be, it's a business transaction, should that reference to WPRO in his website, should that be stricken, and I would gladly speak to him about that. But I think that merely because that's in the website, you have to

go to the first step, is it a business transaction, and it's a business transaction. Now, the question is, should that remain there on the website, and finally, I would say, if there's no other questions for me, I would say this for future reference, Stephen Laffey, to the extent he runs for another office someday and announces formally, I want the Board to know that there will not be another issue like this again. So to the extent that there's some kind of formal announcement that he's going to run for Mayor, U.S. Senate or Lieutenant Governor, what have you, okay, we are not -- Stephen Laffey is not going to be on WPRO or any other show like that, so I want the Board to know that we want a level playing field, and we're going to play by the rules.

MR. IANNITTI: You know, just one final comment. As a former owner of a radio station, which I don't know if many of you know, but I was an owner of WPRI radio in West Warwick for about 5 years, and dealt with political campaigns, and knowing what my responsibility as a broadcaster is, is an entirely different responsibility than whether or not the election laws of Rhode Island

are being obeyed. I want you to bear that in mind.

MR. LEPIZZERA: I understand.

MR. CHAIRMAN: Mr. Marcaccio, I think has got a question.

MR. MARCACCIO: Not a question as much as a clarification so we're sure what the record will have here. With respect to Mr. Garabedian's complaint and the exhibits that were attached, there, of course, are legal conclusions in there that you dispute, but do you have any challenges to the facts, are there any facts in there that you are standing here denying or have proof to object to, any kind of facts that are in that complaint itself or the Exhibits?

MR. LEPIZZERA: I'd have to take a look at the complaint quickly. I mean, while Mr. Garabedian is giving his presentation, I could look at it and we could speed things along.

MR. MARCACCIO: Okay. And Mr. Chairman, I think we should mark the complaint by Mr. Garabedian, as well as all of his supporting exhibits as Exhibit 2.

MR. CHAIRMAN: So ordered.

(EXHIBIT 2 MARKED)

MR. CHAIRMAN: I have other questions, but I'm going to hold them, we're going to allow Mr. Garabedian to speak.

MR. GARABEDIAN: Members of the Board, Aram Garabedian, 173 Belvedere Drive, Cranston. I think the question the Board has before it is a simple one, can a Mayor of Cranston be above the law, the election law? While I'm not an attorney, I have taken a great interest in election laws, I've testified here about election laws, 10 years in the General Assembly, and I have a very keen interest in election laws, and I believe in supporting them. The simple issue is this, April 2005, a notice from this Board, it says, Dear Filer: This is pursuant to Rhode Island General Laws, you are hereby notified that your quarterly Campaign Finance Reports -- I would say this, if there was one important piece of paper I would want to impress you with, it's this --

MS. JOHNSON: Mr. Garabedian, if you could stand back from the microphone.

MR. GARABEDIAN: In Cranston, our microphones are not so good, and I have to get close, so if

you can hear me, that's fine.

MS. JOHNSON: Yes.

MR. GARABEDIAN: I bring to your attention, I would say the key document of my entire presentation, it's a simple sheet put out by this Board, and the first word is, Office holders, office holders, office holders, then it says, candidates and political party committees and political (inaudible). We all, under Rhode Island Law, Aram Garabedian, Mayor Laffey, as office holders, we have to file reports under the Rhode Island Contributions Act. Now, I then take you to Exhibit Number 2, Rhode Island Campaign Contribution Act, we all get these as candidates, office holders, if you turn to it, in the back page, it says this, Summary Chart: Corporations, money, prohibited; in-kind, prohibited; PAC, prohibited; political party; prohibited; political party, prohibited. This backs up -- and then look into the act itself on what an in-kind contribution is. In-kind contribution is a contribution which includes other things of value. The question for this Board to determine is, Mr. Laffey fits the bill of being an office

holder. Mr. Laffey fits the bill that he's on television. The corporation is WPRO. Is Mayor Laffey receiving something of value as a Mayor, as an office holder, and being a host of a show, 2 hours and 45 minutes every week, that's the issue that the Board has to decide on, that is the issue. Based on the simple fact that he's an office holder, if you accept the definition of in-kind being some other thing of value, you would have to make a decision that Mr. Laffey should not be the host of that show, and that corporation, which is another matter, but remember the corporation doesn't hold office, Mayor Laffey holds office. This was probably brought before this Board because the jurisdiction of this Board is for office holders and candidates and political parties. I would say to you that the case is simple. It's not complicated. I was very happy to see, actually, before I even filed my complaint, someone who is a strong supporter of the Mayor, THE PROVIDENCE JOURNAL, thought in agreement with me, the show should not take place. Now, other individuals, Joe Trillo, who is my personal friend and everything, the fact you must

remember is this, no action and no justice takes place many times without a complaint. I come forward on this show, whether Joe Trillo is operating illegally or one other Senator is operating illegally, it's based on the fact, that the citizen in this particular case, an office holder, has come forth and said, hey, listen, this is wrong, it has to be addressed, it can't be put underneath. The documents you referred to, Board member Mr. Iannitti, they are true. There is a website, it asks for money, and the fact that he hasn't got any money, we would say this show started late -- near February, the latter part of February. Whether he got money or not is irrelevant. There's only one issue for this Board to determine, coming back, is the man an office holder, is this corporation prohibited, and is it in-kind, that's really the case in front of the Board. The free speech issue and everything, we already know that we are limited to free speech and how much money we can spend on the campaign. There is only one issue, and I don't need the time that Mr. Lepizzera did, but I forwarded you enough information that there is a definite violation and

it must be stopped. Mr. Trillo's show and all these other shows where this is taking place, there is an advantage that corporations, whatever kind. Now, when you appear on a show as a guest, it's totally different than when you are a host of a program. WPRO, it's true, they have done this to boost their ratings. There is no question about it, they've done it for money. They've done it for money. That's what the real issue is. Mr. Chairman, if there are any questions, I told you I'd be short, because I know there's a narrow window here this way, it doesn't have to go to the right and left, it's defined in the law, and I would say this, this is complimentary, the Board, by putting out these documents makes it simple for candidates and lawyers. It's simple, follow the law, that's it. Any questions, Mr. Chairman?

MR. CHAIRMAN: Does anyone have any questions of Mr. Garabedian? Thank you, Mr. Garabedian.

MR. GARABEDIAN: Thank you very much.

MR. CHAIRMAN: I'm just going to go over a couple of points, express my own opinion on this matter and then I'll invite other Board members to --

MR. REGO: Mr. Chairman, just a minute. Do you want to testify?

MR. CHAIRMAN: I'm sorry, I didn't realize there was another party. Thank you, Mr. Rego.

MR. IANNITTI: Mr. Oliveira from Newport.

(OFF THE RECORD DISCUSSION)

MR. CHAIRMAN: Mr. Oliveira, I would like to hear you this morning, and I'm going to ask either Mr. Bowen or Mr. Marcaccio, I think there are some technical problems we have in allowing you to address us on this particular matter at this time, with respect to not giving notice or albeit that Mr. Lepizzera has waived the right of confidentiality of his client, there are certain notice requirements that have not been met with respect to your complaint, and thus may create a problem for us. So if that explanation is satisfactory to you --

MR. OLIVEIRA: That's fine.

MR. CHAIRMAN: Thank you very much. A couple of points that I just want to make and then we can bring this to resolution here. My opinion is as follows: Mr. Lepizzera, you made the argument that this is a business transaction, not a

campaign issue. When all is said and done, I think this Board needs to weigh all of the evidence that is before us and draw a conclusion as to what is campaign and what is personal. The reality is, every elected official, every person that is subject to the requirements of the Campaign Finance Reporting Laws, they are a person in their personal life, and they may have a business on the business side, and -- as well as their political. The separation of those activities is something that the body of evidence that -- on matters such as this as presented to the Board, we must weigh and make a judgment as to where that line is drawn between what is personal/business versus what is political. In my opinion, I believe that a case has been made that there's overwhelming evidence that this is not a business transaction, that the promotion of Mr. Laffey's presence on air is not as Mr. Laffey private citizen from Cranston, but it's as Mayor Laffey. I think that Mr. Iannitti has properly presented to this Board and to everybody the promotion of this on the website. There clearly is evidence that this is not a personal business

unbridled discretion not viewpt neutral

transaction, but it's a political one.

You raised the argument or you raised the point with respect to WPRO being a party of interest here, that they should be given notice, they should be here, and I would only remind you that as to what is practice and what is required under law, is the burden is on the campaign, not the donor, and that as there are from time to time, campaigns that either receive contributions in excess of the limits or inappropriate contributions, the burden is not on the donor, the burden is on the campaign to make right, that is, to return the contribution or to not accept the contribution in the first place. So I personally don't accept the necessity of having WPRO present here. Further, and I was very pleased, frankly, that you helped make the argument to my satisfaction anyway with respect to the matter of value. There would be some question as to is there something of value here that Mr. Laffey is receiving by being on air, and you very persuasively made the argument that this is something of value that he has. If -- and I pose to you the hypothetical, that if Mr. Laffey were

not present on air for the 2 or 3 hours or however long he's on air, then there would be another person of talent, i.e., Mr. Cass, who usually is on the air, who is paid for his presence on air. So clearly, the question of whether there's something of value, that has been, by your arguments, abundantly made clear and persuasive that indeed there is something of value, and that it is being donated to him by, not an individual, but by a corporation, as again, you've made very clear, and which again, I think as Mr. Iannitti pointed out, is in clear violation of the law.

donated by Laffey to WPRO

Final comment I'll make is with respect to the matter of free speech. I think that you and others have made the point or observation about Mr. Trillo and other individuals who do appear on air. There is -- I believe there is a very clear distinction between what is the open access that everybody has to cable television, that form of media, but it is not the same thing with respect to the kind of value, once again the arguments that you correctly made Mr. Lepizzera, that of appearing on a commercial radio program, where there is significant value that is being given to

the individual. So for all of those reasons, Mr. Lepizzera, I am persuaded that the complaint does have merit and would vote to support or to sustain the arguments of the complaint that were provided to us. And let me ask if there are any other comments and then I'll invite a motion by members of the Board. Mrs. Bailey?

MS. BAILEY: Yes, I came in here fairly rather ambiguous about the situation. I could have been persuaded to go either way, and both parties did good jobs of presenting their case, but I have to credit Mr. Iannitti with swaying me. I think the presence of the website and the fact that on the website he used his association with WPRO to enhance his political resume, and the definition of what a candidate is has swayed me, and I will be prepared to vote in favor of the complaint.

MR. CHAIRMAN: Are there further comments from the Board?

MR. REGO: Mr. Chairman.

MR. CHAIRMAN: Mr. Rego.

MR. REGO: I would have to agree with what you had to say, as well as Commissioner Bailey. I

looked at this as a situation, and again, when Mr. Lepizzera came in front of us and talked about the value, it raised the point that again, WPRO isn't just going to have 2 hours and 45 minutes of static, there would be somebody else sitting there. They would go out and maybe sell the time to somebody else. They would call a syndicated company and sell their time to a syndicated person. Mr. Garabedian raised the fact about being an office holder, and I'd have to agree with that, and then also I saw on a website on the 26th of April, Mr. Lepizzera said he's not a candidate for office, but it said, Please volunteer to join the campaign. Well, to be a candidate -- if you're a candidate, you have to first have a campaign. So if it's the Senate, Lieutenant Governor, Mayor, whatever other office there might be, to be a candidate, there has to be a campaign, and on the 26th of April on Laffey's website, it talks about a campaign. So with all those issues, too, it helped persuade me over to the side of supporting this motion.

MR. CHAIRMAN: Are there further comments?

MR. XAVIER: I don't have anything really new

to add to the discussion, just that I feel well-informed on the issue and I also am ready to vote.

MR. CHAIRMAN: Thank you. Mr. Lepizzera, do you have any objection to the facts that you set forth in your written complaint as asserting them as facts, I just want to make sure for the record --

MR. LEPIZZERA: I put a statement of undisputed facts out.

MR. CHAIRMAN: Okay. Mr. Marcaccio, is that what we need to hear?

MR. MARCACCIO: Can you just repeat that, Mr. Lepizzera?

MR. LEPIZZERA: In my response to the complaint, I think I listed it as, Statement of Undisputed Facts, so I mean, we can treat those as facts for purposes of the discussion.

MR. MARCACCIO: But standing here today, do you have any challenges to either the voracity of the exhibits that were attached or to any of the facts that were alleged. Obviously, I'm not saying with respect to the legal arguments, but with respect to the factual contentions that are

set forth in the actual complaint?

MR. LEPIZZERA: I don't have a problem with any Exhibits, I don't have a problem with any facts that were presented to this Board, but I do disagree with the --

MR. MARCACCIO: The conclusions.

MR. LEPIZZERA: -- the conclusions.

MR. REGO: We don't know it yet.

MR. LEPIZZERA: I see it coming. I do disagree with the conclusions, and I think the website is troubling this Board, and what troubles me is, if that was not on the website, that we might have a different -- potentially have a different conclusion.

MS. BAILEY: The fact that the website exists as it does.

MR. IANNITTI: That's the point. In all due respect, because I respect and I love to hear you when you speak, and you're right, this is a cutting edge issue, and knowing you and how tenacious you are as an attorney, I'm sure that this is not the end of it, and maybe there may be a higher power that really has to come down and give a more definitive ruling on that, but it is a

great concern to me for the future, not only on this issue, but the future of all politics in Rhode Island. Especially, the whole worldwide web, the internet concept, it opens up a whole new area.

MR. LEPIZZERA: If I could just add one more thing, I'll be done. I know WPRO is not here, and the Board is not persuaded that you can't decide the case because WPRO is not here, but I just don't see any evidence before this Board, besides the website, that really -- what this transaction truly is or isn't. I'll end with that.

MR. CHAIRMAN: I will entertain a motion from the Board to enjoin Mr. Laffey from further appearances on the radio program on WPRO, as -- where he serves as host, and I would also say that we will have a more complete statement of this matter in terms of clarity for legal purposes, but for purposes of the motion at this time, I will invite a motion to the effect as I just said.

MS. JOHNSON: So moved.

MR. CHAIRMAN: Motion has been made, is there a second?

MS. JOHNSON: Second.

MR. CHAIRMAN: Any further discussion.

MR. IANNITTI: Just for the purpose of discussion, you can rule me out of order if you'd like, but because of the nature of the vagueness of what's happening here, the issue of the internet and everything else, could we put a time frame of at least a couple of weeks before we put this order into effect in case there may be an appeal of that decision, and I don't know if that would be a proper response. I'm thinking out loud.

MR. MARCACCIO: Well, just to respond to that, if you want from a procedural perspective, what you could do is move to take certain action, vote on it, and then after that vote is taken, assuming that it is to enjoin further broadcasting, then the Board itself could move to stay the effect of that order pending an appeal for anywhere -- any amount of time that you seek.

MR. IANNITTI: Thank you.

MR. CHAIRMAN: But however, Mr. Marcaccio, if you were to make this order effective immediately, that would not preclude any right of appeal that the Mr. Laffey would have on that matter. So my

own opinion would be that we should make this order effective immediately.

MR. IANNITTI: My only concern that I want to raise, in the sense of fairness, is that I don't want to put an individual in position, if they truly believe that there's a remedy they can seek elsewhere, to then look like they're defying a ruling of the Board of Elections. I would rather just as a matter of some courtesy and common sense, say, and I agree, I think we should do as you say, enjoin him, but I would prefer if there's no feelings for that, I have no problem with that Mr. Chairman, that's my own. I'm prepared to vote to agree to enjoin.

MR. MARCACCIO: Either way is procedurally okay.

MR. CHAIRMAN: The motion has been made, and seconded. Is there further discussion?

MR. XAVIER: I don't think we had a second.

MR. CHAIRMAN: Yes, I did, it was Ms. Johnson.

(VOICE VOTE: MOTION CARRIES)

MR. CHAIRMAN: Thank you very much.

MR. LEPIZZERA: Can you clarify the ruling,

please?

MR. CHAIRMAN: The ruling is, effective immediately, Mr. Laffey is enjoined from further appearances in the manner as the host of the program on WPRO, you know, for all of the reasons that we recited. In terms of the action item, that's where we are. We'll have that, if you want it written out for your purpose.

MR. LEPIZZERA: Thank you.

(THIS PORTION OF THE HEARING CLOSED AT 11:00 A.M.)

C E R T I F I C A T E

I, Linda S. Pezza, hereby certify that I was authorized to and did stenographically report these proceedings, and the foregoing is a full and true record of the proceedings.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of April, 2005.

ÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄ

LINDA S. PEZZA, NOTARY PUBLIC/CERTIFIED COURT REPORTER

My Commission Expires

June 26, 2005 I.D. #3594

DATE: April 26, 2005

IN RE: BOARD OF ELECTIONS

STATE OF RHODE ISLAND
BOARD OF ELECTIONS

(5)

IN THE MATTER OF:

ARAM G. GARABEDIAN

VS.

STEPHEN P. LAFFEY

**ORDER**

This matter came for hearing on April 26, 2005, before the State Board of Elections on a complaint filed by Aram G. Garabedien against Stephen P. Laffey. The matter arises from Mr. Laffey's hosting of a weekly radio show aired on WPRO, identified as *The Steve Laffey Show*. The parties stipulated to the veracity of the facts set forth in the Garabedien complaint and further stipulated to the authenticity of the documents attached thereto as exhibits. After hearing thereon and by unanimous vote of this Board, it is hereby

**ORDERED AND ADJUDGED**:

Stephen P. Laffey's appearance as a host of the WPRO weekly *Steve Laffey Show*, constitutes a violation of the campaign finance laws of the State of Rhode Island, R.I. Gen. Laws §17-25-1, et seq. The receipt of airtime from WPRO in the format as a host of said radio show constitutes an "in-kind contribution" as that term is defined and applied under R.I. Gen. Laws §17-25-10.1.

For the reasons set forth above, and elaborated at the hearing today, Laffey is prohibited from the receipt of such in-kind contributions from WPRO and is therefore enjoined from appearing as the host of *The Steve Laffey Show*.

[signature]
Roger N. Begin, Chairperson

Date: 4/26/05

TOTAL P.02

( ) — PROJO 3-2-2 10g L (6)

# Our school-funding-reform map:[All Edition]

**SCOTT AVEDISIAN et al. Providence Journal**. Providence, R.I.: Mar 22, 2004. pg. A.11

**Full Text** (~~1114 words~~)

*Copyright Providence Journal/Evening Bulletin Mar 22, 2004*

By SCOTT AVEDISIAN, DAVID N. CICILLINE, JAMES E. DOYLE, A. RALPH MOLLIS and GARY S. SASSE

* * *

Rhode Islanders make a significant investment in public education, ranking seventh in America in per-pupil spending in fiscal year 2003. More than $1.8 billion was spent on public schools in Rhode Island in fiscal 2004, with local property taxes supporting nearly 60 percent of the costs (excludes the state contribution to the teacher retirement fund and housing aid).

Since 1998, school spending has grown nearly three times the general-inflation rate despite modest enrollment growth. Given the over-reliance on the property tax, which is compounded by changing economic and social conditions, state funding of public education is one of the most important issues facing Rhode Island.

We recognize that efforts to promote property-tax relief and education equity will fail if they are not built on the premise that we must operate our schools more efficiently, more effectively and more economically.

Rhetoric that may tend to polarize key stakeholders will make it more difficult to get the job done.

In a March 10 column here, "Dubious R.I. property-tax scheme," Cranston Mayor Stephen P. Laffey suggested two options to make schools more accountable. The first would be to give schools the authority to tax, in other words to create autonomous school districts. The result would be to create 36 more taxing authorities in Rhode Island. Rhode Island needs fewer, not more, agencies that can levy taxes. Studies have found little differences in the level of school spending between school districts with the authority to tax and those that did not. Giving school districts the power to tax, as Mayor Laffey suggests, would not necessarily result in more efficient and economical school systems, but rather result in unintended consequences for the municipal budgets and taxpayers alike.

His second option would be to give mayors control over school- budget line items perhaps making school committees unnecessary. It is not clear that municipal control of school budgets would necessarily cut costs, given state and federal mandates that schools must comply with.

There is certainly a disconnect between school-committee members, who are responsible for setting school budgets, and municipal officials, who are responsible for raising property taxes. In the current system of state-municipal-school fiscal relations, political accountability for tax-and-spending decisions is diffuse. While considering reform in school governance is appropriate, such reform will fail unless it is a part of a comprehensive plan for property- tax relief and education equity.

Simply changing governance will result in little benefit to taxpayers because there is no standard, definition, or baseline on what Rhode Island should spend to promote adequate education.

The core ingredient of an effective school-funding program is a clear policy framework that outlines the objectives of the funding program, how they relate to student achievement, and how they are linked to equity and accountability.

The first step in reforming public-education financing is to develop a foundation formula that identifies the cost of giving every child the opportunity to meet education standards. In Rhode Island, there is no methodology to determine what funding should be provided for elementary and secondary education. There has been no discussion of what resources schools need to enable their students to meet state learning standards. And, nobody in the state has systematically looked at expenditure data to determine if the system is being operated efficiently and effectively.

The method of financing schools must be built on a costing-out study to obtain objective information on how to fund public education and at what levels.

The significance of the cost-out approach is that it sets a true foundation amount of spending by identifying the specific resources and least-cost options necessary to provide reasonable educational opportunities. It then systematically calculates the amount necessary to fund efficient and effective education.

Since 1991, when a costing-out study was first conducted by a business group in Massachusetts, studies have been undertaken in 28 states.

Once the foundation amount of per-pupil spending is determined, the next step is to ensure that the state-local funding system is designed to provide a predictable funding structure that results in property-tax relief. A key element should include an expeditious mechanism that holds officials accountable for living within adopted budgets.

The Mayor/RIPEC Coalition proposes a statewide property-tax rate to replace existing local tax rates for schools. This rate has not been determined, nor has its design. There are many methods of introducing and integrating a statewide property-tax rate. Thus it requires greater examination by taxpayers, municipal officials, the General Assembly, school committees, parents, teachers and business leaders. Any time something as important and complicated as reforming a school-finance formula is considered, there are risks related to process and program design. Obviously, the process must be built in a way that minimizes domination by any single interest. That is why we have suggested a process that would not be completed until fiscal 2008, so that it would undergo the appropriate due diligence. Anything less would be a disservice to taxpayers and students.

But the biggest risk would be to do nothing and continue to have 6-7 percent annual growth rates in school spending, increasing property-tax burdens, a lack of a predictable and stable funding system, and perpetuation of inequities.

Therefore, school and municipal leaders should work with state decision makers to establish and maintain a predictable school-aid formula that addresses four key aspects of school funding cost control, property-tax relief, student need and education equity. If this is not done, Rhode Island's escalating property-tax burden will continue to hurt our economic competitiveness, orderly community development, and ultimately, the overall well-being of Ocean State taxpayers and families.

The Property Tax Relief and Educational Equity Act provides a road map that represents an inclusive process to achieve reforms so that:

* The school-funding system would treat property taxpayers equitably, limit the part of school budgets financed by property taxes, and establish sufficient cost controls on school spending.

* The state would ensure that its school-funding structure adequately reflects the different needs of students, and closes the educational inequities among the state's school districts.

* The state education-funding system would provide a predicable amount and source of funding to ensure stability in the funding of schools.

The stakes are too high for these issues to be trivialized by narrow parochial interests. Now is the time for taxpayers, parents, teachers, business leaders and state, municipal and school officials to join to address heavy property-tax burdens and education inequities.

Scott Avedisian is mayor of Warwick; David N. Cicilline mayor of Providence; James E. Doyle mayor of Pawtucket; A. Ralph Mollis mayor of North Providence; and Gary S. Sasse executive director of the Rhode Island Expenditure Council.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Section: *Editorial*

Text Word Count 1114

# 'I should have been more diligent'

GORDON D. FOX

IN 1992, I RAN for office to make a positive change for the Mount Hope and Summit neighborhoods of Providence, the city itself and Rhode Island. During 12 years, as a member of the Rhode Island House, I have worked tirelessly toward this goal. Throughout my career, honorable public service has been my single greatest priority. I appreciate the tremendous responsibility entrusted to me by the voters of House District 4.

Last year, when William Murphy and I were elected by our House peers to serve as speaker and majority leader, respectively, we pledged to create positive and honorable change. I am committed to creating a leadership that is above reproach.

Several months ago, the GTECH Corp. threatened to leave Rhode Island. Government officials worked hard to keep the company in our state. During these months, several issues arose, including the need for state legislation and a tax-stabilization agreement with the City of Providence. It was during these events that my role as a lawyer at the law firm of Ferrucci Russo, P.C., a firm that eventually represented GTECH before the Providence City Council, came under scrutiny and ethics complaints were filed.

As a result of an exhaustive investigation, I have agreed to pay a civil penalty of $10,000 to the Rhode Island Ethics Commission. The commission reported that it "undertook an extensive investigation into the allegations of the complaints, interviewed multiple witnesses, obtained sworn testimony via affidavit and deposition, and made use of the commission's subpoena authority and sought, obtained and reviewed hundreds of pages of relevant documents and hours of audio and videotape recordings in conducting their probe."

The commission concluded its investigation with a number of findings:

- I did not financially benefit from the work that my law firm did for GTECH.
- I had no knowledge of my firm's relationship with GTECH at the time of my vote as a legislator.
- The 2.4 hours billed to GTECH by my firm, before the House vote I took on April 30, 2003, was erroneously attributed to me.
- I did not willfully and knowingly take any action that was a conflict of interest.
- However, the Ethics Commission found that "I knew or should have known" of this legal business relationship.

This last point is the most important. The issue is that I should have known. I had a responsibility to be extremely sensitive to potential conflicts of interest. In my four months with the firm, I did not have a system in place to detect the earliest possibility of a conflict. I accept and agree with the commission's conclusion and will abide by its decision.

The Ethics Commission is working to create a higher standard for elected officials, and I commend its members and staff for conducting a professional and thorough investigation.

From the outset, I fully cooperated with the commission's investigation. I was eager to tell my side of the story, and my statements have remained the same since the process began. I will learn from this experience and work ever more diligently to create a higher level of trust.

I know that an apology will not immediately restore the full faith and confidence of my constituents, but I hope and pledge that my acceptance of responsibility will serve as a first step.

Beyond the resolution by the Ethics Commission, I am taking the additional step of terminating my association with Ferrucci Russo. I hope this will help reassure Rhode Islanders that I am making every effort to avoid any future conflicts of interest.

I never thought of myself as lacking in attention to the importance of honorable service, but now I have a greater appreciation for what we must do to assure our constituents that we can serve them with honor. We must do more to reconcile our private business interests with our public obligation.

Finally, I want to apologize for not taking every possible precaution to assure that my professional business interests did not conflict with my legislative role. I should have been more diligent, and for that, I am truly sorry.

*Gordon D. Fox, a Democrat from Providence, is majority leader of the Rhode Island House.*

1.04
ProJo

NarragansettTimes.com

04/20/2005

# VIEWPOINT: Pension reform will help taxpayers

By GOV. DONALD. L. CARCIERI

Advertisement



For the past two years, I have warned that Rhode Island is heading for a pension system crisis.

The state currently pays into a pension system that serves both state employees and local teachers. Local cities and towns like Narragansett and South Kingstown also pay into this system on behalf of the teachers they employ.

Unfortunately, over the past few years, state contributions to the pension system have been increasing at an unsustainable rate. Rhode Island 's cities and towns are also struggling under the burden of skyrocketing retirement costs.

The taxpayer bill for state and teacher pensions is set to explode. State contributions to the retirement system doubled over the last three fiscal years, and will soon double again if we don't act. In the next year alone, taxpayer contributions for state employee and teacher pensions will increase by $94 million, from $184 million to $278 million.

But that's only the beginning. Without reform, total taxpayer contributions to the state employee and teacher retirement system will increase by $213 million in the next five years. In other words, the total taxpayer bill for the state retirement system will be over $400 million in 2010.

The pension reform plan that I have submitted to the General Assembly will reduce these burdens. Under my plan, state and local contributions to the pension system will save Rhode Island taxpayers a total of $271 million over the next five years. In the next fiscal year alone, my plan will save the state and local communities nearly $49 million.

Locally, the savings are significant. Narragansett will save almost $300,000 in the next budget year. South Kingstown will save $600,000 in the same period.

We are also faced with a system that is not fully funded. Today, the pension system is only 66 percent funded for state employe percent for teachers, resulting in a total unfunded liability of $3.1 billion.

This year alone, we will pay out approximately $180 million more in benefits than we will collect in pension contributions. Thi will only get worse as the number of people collecting benefits grows from 18,500 today to 22,600 in 2015, while the number c contributing to the system remains the same.

Rhode Island 's overburdened taxpayers cannot continue to foot the bill for these exploding pension costs.

The only two alternatives to reform - dramatic tax hikes or dramatic cuts in the programs that serve our most vulnerable citizen: unacceptable.

Instead, we must begin to reform this system this year.

Let me stress that my plan will only affect newly hired employees, as well as state workers and local teachers with less than 10 service. Nobody who is vested in the current system, or who is already collecting a pension, will see any changes.

My plan has four basic elements.

First, we will establish a minimum retirement age. Today, a state employee can get a pension after 28 years of service, with no age requirements, or after 10 years of service if he or she is over 60 years old.

Under my plan, state employees must be at least 60 years old to collect a pension. State employees and teachers would be eligit pension at age 60 with 30 years of service, or otherwise, at age 65.

Second, we will reduce the rate at which an employee accrues benefits. Today, a state employee can receive a pension worth 8C his or her final salary after 35 years of service. Under my plan, the maximum pension a state employee can collect will be wortl percent of their final salary after 38 years.

Third, my plan would also change the way we calculate the cost-of-living adjustment. Currently, each retiree's pension automat increases by three percent every year, regardless of the rate of inflation.

As everyone knows, inflation has been consistently running far below three percent.

Under my proposal, the federal Consumer Price Index, or CPI, would be used to calculate the annual cost-of-living adjustment. benefits would increase every year according to the Consumer Price Index, or at 3 percent, whichever is lower.

Finally, my pension reform plan would begin to address the system's unfunded liability by devoting any unexpected state surplı $30 million to paying down our pension fund obligations.

While these reforms will not impact anyone who is already vested, or anyone already receiving a pension, these changes will pı significant savings for the state, and for Rhode Island 's cities and towns. In the next fiscal year, these reforms will save the stat than $28 million. Cities and towns across our state will save a total of more than $20 million next year.

The time has come to reform our retirement system.

The longer we wait, the worse the problem will be.

State taxpayers are already paying their fair share.
If we do not make necessary reforms today, we will be placing a huge burden on the backs of taxpayers tomorrow and for years




©The Narragansett Times 2005

# Regional tourism agencies are essential

SCOTT AVEDISIAN
JAMES E. DOYLE

RHODE ISLAND lawmakers will again have the opportunity to debate a controversial proposal to dismantle Rhode Island's regional tourism districts, in favor of doling out funding from a new quasi-governmental agency in Providence.

The legislature wisely rejected that idea when it was pushed years ago. Ocean State tourism agencies already work together, very well, to promote the state as a whole.

During this legislative session, Warwick and Pawtucket firmly stand with the seven regional tourism agencies — the North Kingstown, South County, East Greenwich, Central Rhode Island, East Bay, Northern Rhode Island, and South Kingstown chambers of commerce — to again oppose the creation of a Providence-based agency to spend the state's limited marketing dollars.

The proposal would wrest control of marketing funds from our regional districts. The new bureaucratic entity would disburse funds for local tourism efforts on an "as-needed basis." With the spending power consolidated in one entity, all marketing efforts in the state would take place with little or no input from municipalities and tourism offices outside Providence.

The proposed system would be unfair and disastrous. Regional tourism districts represent local interests and bring focus to those unique local gems that make Rhode Island so special. A centralized tourism council would not reflect the diversity of the state.

Moreover, municipalities would receive level funding from hotel-tax revenues for the next three years. Yet in the past decade, the number of hotel rooms has doubled in Warwick. And, unlike other communities — which offer tax incentives, taxpayer subsidies and other perks to developers — Warwick has successfully enticed developers to invest here privately.

Pawtucket, for its part, seeks to increase its available hotel capacity by attracting a waterfront hotel.

Warwick's 15 hotels generate millions of dollars annually for the state tax base. The Hilton Gardens Inn, a $67 million project, will open soon, adding 160 rooms to the city's total, and will generate hundreds of thousands of dollars more in revenue. The same developer also plans to open another hotel in Warwick, within two years.

Hotel-tax funds will let Warwick produce informational brochures, advertise in national publications, and maintain a presence in regional and national trade shows.

How, then, is the offer to level-fund Rhode Island's tourism districts fair to its residents and businesses?

Through tourism-tax dollars, Pawtucket and Warwick annually support a diverse mix of local organizations, as well as a variety of cultural and historical events, including the Pawtucket Arts Festival and Warwick's Gaspee Days, which draw tens of thousands of visitors. Pawtucket, the northern gateway to Rhode Island, puts its dollars to good use by producing visitor literature, maps and signs.

Given the statewide tourism industry's recent efforts to market one community at the expense of others, it is highly unlikely that a new statewide agency would effectively promote any local or regional event outside of the capital city. Would activities in other regions of the state be deemed worthy enough to receive funding on an "as-needed basis"?

We worry that this new agency would deliver to potential visitors a standard message, which would neglect the rich ethnic, historic and aesthetic diversity of local regions that makes Rhode Island Rhode Island!

Warwick, with its 90,000 residents, has more than 30 villages, each with its unique place in history and qualities that give closely knit neighborhoods their special character. Neighborhood associations know of community issues and are vocal advocates on their members' behalf. Yet these groups also work cooperatively to ensure that progress continues in Warwick, and that the exceptional quality of life there is maintained.

Pawtucket, the city of 73,000 that is the birthplace of America's Industrial Revolution, is a rich, ethnically diverse community where many live in the same neighborhoods as their grandparents and possess both civic pride and an eagerness to welcome visitors. Moreover, the arts are making Pawtucket "Rhode Island's creative community." With this success, we need our local tourism board now more than ever.

In 1986, when the legislature established a revenue stream dedicated to state tourism, it promoted sound policy. The legislation was especially designed so that Rhode Island's 39 communities could plan, develop, preserve, protect and promote their tourism districts. Lawmakers should not change a system that is not broken.

*Scott Avedisian is mayor of Warwick and James E. Doyle is mayor of Pawtucket.*

Fri.
Projo 4 22 05

projo.com The Providence Journal

# Joseph A. Trillo: Lawyers are salivating: Lead law will batter R.I.'s renters

**01:00 AM EDT on Thursday, April 7, 2005**

THE ELEVENTH HOUR is here, the clock is ticking, before one of the worst pieces of legislation to ever come out of the Rhode Island General Assembly takes effect. This outrageous mandate is, of course, the new lead-paint law, due to take effect on July 1.

Having been involved in trying to reform this legislation since 2000, I have heard from hundreds of people on both sides of the issue.

This law will destroy the rental market for young, low-income women with children, by making it increasingly expensive and difficult for them to rent apartments in older two- and three-family houses.

In 1994, the General Assembly passed a stiff lead-paint law that, along with the removal of lead from gasoline, had reduced the number of children reported to have elevated blood lead levels (BLL) from approximately 8,250 elevated levels in 1994. If we were to use the Massachusetts standard, of 25 BLL, or the New York standard, of 20 BLL, instead of the Rhode Island standard, we would have only 57 children with elevated levels today in Rhode Island.

While I would agree that one child is too many, I strongly disagree with the methods and penalties of enforcement placed in this new law, should it be allowed to take effect on July 1. It threatens to put a property owner in jail for not less than one year and not more than five. It threatens to fine property owners from $5,000 to $20,000. It threatens to make a property owner a felon. It also holds the property owner personally liable for any personal injuries incurred by the tenant. It does this and much more.

I have heard from hundreds of property owners who have said, "I won't rent to women with children" or "Why would I take a chance of being sued and personally financially ruined?"

Other states have tough lead laws, including Massachusetts and New York, but only Rhode Island will impose such draconian penalties. This law also requires all multi-unit properties built before 1978 to be lead-certified, yet it does not include the single-family homes built before 1978. Why? Could it be because children under the age of 6 don't live in them? I don't think so.

We know today that children can have an elevated BLL from wearing jewelry made in China, using dinnerware sold at Target with lead in it, drinking water through some of the old lead water-supply pipes still underground in our older cities, or visiting a day-care center that's operated out of an older single-family house. So why are we forcing all 45,000 who own multi-family houses comprising 165,000 rental units built before 1978 to spend $500 million-plus -- $28 million just to get them inspected? Why?

Since I entered the General Assembly, I have seen many bad laws passed, but only this one requires people to prove they are obeying it. Aren't we supposed to make laws and then penalize those who break them?

This law has already created a new industry of lead inspectors, lead contractors, home-improvement

companies, and lead-advocacy groups. It will be a windfall for the insurance companies that remain in the state (we have already had many pull-outs), and, of course, the litigation lawyers are salivating at all the possible lawsuits they can initiate.

One of the most important things to note before we move forward with this law is that the problem of elevated BLL in children has been reduced by approximately 95 percent without this new law on the books. It continues to go down even as the Rhode Island Department of Health continues to reduce the acceptable blood level down to 10 BLL.

When a law like this is passed, it becomes very difficult to change it, speak against it, or merely question it.

Members of the General Assembly need to realize that we already have a housing shortage in excess of 14,000 units. Rents have been skyrocketing. To implement this absurd and foolish piece of legislation would be counterproductive. It will do more harm than good.

Joseph A. Trillo is a Republican state representative from Warwick who serves on the House Committee on Corporations and the Special Legislative Commission to study the Lead-Hazard Mitigation Law.

---

Online at: http://www.projo.com/opinion/contributors/content/projo_20050407_cttril.215f85e.html

## Ensuring fair trials

# Defending the rights of Station victims

**PATRICK C. LYNCH**

THE JOURNAL'S Nov. 12 editorial "Fighting R.I. secrecy," as well as publicity from the release of 277 police recordings from the night of the Station nightclub fire, gives me the chance to explain to Rhode Islanders my priorities in handling matters arising from that horrific night in February.

In the intervening nine months, my office has conducted an exhaustive investigation, the findings of which I hope to announce soon. Our goals are to determine who, if anyone, is criminally liable for this tragedy; to protect the constitutional rights of victims and potential defendants with equal vigor; and to ensure that victims, survivors and their families and friends are not re-victimized by the needless dissemination of horrifying details of that night's events.

The Journal's recent attack on my office, however, readily illustrates that the newspaper's editorial board — or at least the editorialist who penned this at best misinformed piece — consulted with neither The Journal's own lawyer nor its reporter who covered the court hearing. In fact, The Journal's assertions diverge so wildly from the actual facts that one is left to wonder if The Journal's pique is really related to its failure to obtain the requested materials ahead of other media outlets.

The disclosure of the 277 police recordings and the two fire reports was certainly not a fight to the bitter end through "endorsed" secrecy, as The Journal maintains. By the middle of last July, my office had reached an agreement in principle with The Journal and the Town of West Warwick to disclose the records released on Nov. 6. By early September, my office had completed a review of all 360 police recordings and determined precisely which recordings could be disclosed without jeopardizing the ongoing criminal investigation or an individual's right to privacy.

Since that review, my office has requested that the court enter the order necessary for the full release of the recordings. Indeed, even if the editorialists did not want to consult with the reporter to get their facts straight, they certainly could have read The Journal, which correctly reported in its Nov. 6 story ("Court orders release of calls taped during Station fire") that "Lynch has concluded that releasing the material contained in the agreement would not hinder the ongoing criminal investigation into the fire."

The Access to Public Records Act (APRA), which I am duty-bound to uphold, still exempts from disclosure law-enforcement records if such disclosure would interfere with a person's right to a fair trial. It is certainly not within my prerogative, or The Journal's, to overlook the APRA provision that exempts the release of documents if disclosure would interfere with a right to a fair trial. This exemption, which obviously parallels the constitutional right to a fair trial, is not mine, or The Journal's; it is a *guarantee* to any person who may be charged with a crime in Rhode Island.

Despite these fundamental rights, The Journal's characterization of the argument that disclosure of these records could jeopardize a person's right to a fair trial through additional undue publicity as "nonsensical" perplexes me the most. It is also hypocritical in the extreme. This is the exact opposite argument that The Journal leveled against me in its earlier editorial, "Injudicious remarks" (May 26). "All that comments to the press can do is to gin up public hostility toward potential defendants," the editorial writers opined then. "This is dangerous and it could taint a jury pool." There also was no undue delay in releasing these records.

In fact, it was actually my office that first proposed entering into a consent order to disclose those records that we felt could be disclosed. Moreover, as a July 30 letter from my office to The Journal's lawyer attests, not only did we propose entering into the consent order with The Journal; we also drafted the orders that culminated in the Nov. 6 disclosure. This is hardly delaying the process, which included many discussions and conferences between the state's and The Journal's lawyers, both with and without the court's assistance. When the court had legitimate concerns about the use of such an order, a hearing was scheduled, and both The Journal and my office agreed that it would be the appropriate forum to resolve this issue.

The Station fire claimed victims from Rhode Island, Massachusetts, Connecticut and beyond. Its effects will linger with all of us for years; with some of us, for a lifetime. Individuals, including victims and their families; companies; parties to pending (and future) civil suits; and anyone who might be the target of a grand jury have constitutional and statutory rights — among them, the right to a fair trial.

I refuse to ignore these rights in an effort to abet one media outlet's attempt, in a misinformed editorial, to position itself as the gallant defender of freedom in Rhode Island.

The victims and their families have legitimate concerns about what is released and how it is released. The Journal has not taken those concerns into account. Not surprisingly, people affected by the Station fire have criticized the release of these tapes. The Journal dismisses those victims' concerns by noting that some of these transmissions played over "the public airwaves" on the night of the fire — as if that alone strips the victims, and indeed any citizen, of all constitutional and statutory protections, and means that we can forever ignore them.

The victims of the fire, no less than actual or potential defendants, deserve our respect and consideration, and they deserve to have this sensitive information released appropriately and in compliance with Rhode Island law.

These legal and human concerns will probably cause more delays and disputes between The Journal and the Department of the Attorney General. As inevitable as that may be, however, The Journal, as Rhode Island's newspaper of record, should at least try to get its facts straight before rushing to criticize those who strive to comply with the law, who recognize the rights of all concerned, and who empathize with those who suffered so much only nine months ago.

*Patrick C. Lynch is Rhode Island attorney general.*

ProJo
Wed. 11-26-03

## Consider federal workers' benefits

# Move toward universal health care

**JAMES LANGEVIN**

FOR YEARS NOW, elected officials at all levels of government have struggled to address the nation's health-care crisis, and meet the ever-increasing demand for affordable health care.

Thanks to programs such as RIte Care and RIte Share, along with private insurance, about 9 in 10 Rhode Islanders have insurance access to health care — a remarkable coverage rate, second only to Vermont's.

But, sadly, while Rhode Island enjoys a relatively high level of care, there remains a significant part of the population that lacks the most basic coverage. Over 100,000 Rhode Islanders — and 40 million people across America — still have no health insurance. Closing this gap is one of the greatest domestic challenges our nation faces.

As health-insurance premiums rise each year, small businesses face a difficult decision. To maintain the same level of coverage, they must either cover these extra costs or pass them along to employees. Many business owners confront an even starker choice: Decrease benefits or drop coverage altogether.

Year after year, the costs to businesses and consumers have increased at a rate much higher than inflation, often in the upper double digits.

Unfortunately, Rhode Island's primary health-insurance provider has failed to shoulder its fair share of the burden. Recent media reports regarding the state-formed nonprofit Blue Cross & Blue Shield of Rhode Island paint a picture of corporate misgovernance. Clearly, there must be more regulation of the health-care industry in general, and of Blue Cross in particular.

Blue Cross appears to have acted in its own interest, rather than the interest of the community — violating the very philosophy of a nonprofit organization. Simply put, it is inappropriate for any nonprofit to make loans to its executives — especially loans that are not required to be repaid. I challenge Blue Cross to justify its decision to increase rates while forgiving $600,000 loans.

Despite its flaws, Blue Cross provides a critical service to the people of Rhode Island. We all understand that without health insurance, Rhode Islanders would be reluctant to seek medical attention, or unable to afford preventive care — resulting in even higher costs in the long run. What we do not understand is how Blue Cross can raise rates to subsidize non-operating expenses in lieu of providing high-quality affordable medical care to its subscribers.

I eagerly await the findings of the General Assembly's Permanent Joint Committee on Health Care Oversight, and believe they will be an important tool as we work to improve health care in Rhode Island. I strongly support the committee's efforts and urge its members to act as aggressively as possible.

Meanwhile, I will continue my efforts in Congress to ensure that no family is forced to go without health coverage. As Rhode Island struggles with these great challenges on the local level, I am at work on my own health-care proposal in Washington.

At the crux of any meaningful health-care reform must be a commitment from the government to act in the best interest of its citizens. A national template for this type of coverage already exists: the Federal Employee Health Benefits Program (FEHBP). It manages health insurance for more than 8 million federal employees, retirees and dependents. This program, composed of private insurance carriers, is administered by the federal government, which assumes responsibility for approving or disapproving carriers, negotiating benefit and rate changes, and auditing carriers' operations under the law.

With administrative costs of less than 1 percent (compared with private-sector costs that can reach 30 percent), and a below-average annual premium increase, the government can offer a wide variety of choices and protections to its employees.

The system is funded by the taxpayers.

I think it is time we started offering every American the kind of coverage and oversight that members of Congress and federal workers have come to rely upon. Health care is much more than an issue that polls well with voters. Elected officials at every level of government must take the incremental steps needed to develop a universal health-care system that is affordable, high-quality and well managed.

I firmly believe that health care is a basic inalienable right of every American. If we work together to address this critical issue, I know we can realize this goal.

*James Langevin represents Rhode Island's Second Congressional District.*

ProJo 4 . 04

# Pawtucket and the economics of art

**JAMES E. DOYLE**

OVER THE YEARS, the City of Pawtucket has learned that art can spur the development of artists' studios and live/work lofts, bring restaurateurs, create jobs, and attract tourist dollars. And a growing art community can expand the city's tax base.

Pawtucket is the David that sits between the Goliaths of Providence and Boston. With hundreds of artists now moving to Pawtucket, we see our "village" growing as an arts center for the region.

Pawtucket has always been a home for creativity; to take just one example, artisans on the banks of the Blackstone River created the weaving machinery powered by the river to spin textiles. Today, our city can claim the studios of such recognized artists as Howard Ben Tre, Steve Weinberg, Morris Nathanson, Gretchen Dow Simpson, Regina Partridge and Elizabeth Goddard. In recent years, hundreds have followed these prominent artists.

We now see a growing number of developers coming into Pawtucket to turn old mills into artists' studios and lofts. Right behind City Hall, across the Blackstone River, a $15-million-plus development is being built, funded by BankRI, J.P. Morgan, Chase Manhattan Bank and Bank of Newport. This live/work condo-loft project, with 60 units, is scheduled for completion by late summer. Already, 46 units have been sold. Meanwhile, Providence-based developer Seven Stone Building Group has bought the former Parkin Yarn Mill, which is being renamed Bayley Lofts. The developer is creating 25 live/work lofts in this vacant old mill. To date, 10 condos have been sold.

Additionally, six vacant commercial buildings — some vacant for over 10 years — are now owned and occupied by artists and creative-sector companies. Let me tell you about a few.

Richard Kazarian, a well-known antiques dealer and interior designer, has converted 9 Montgomery St. into a 2,190-square-foot space for his residence/studio. This historic property formerly housed the Pawtucket Progressive Spiritualist Lyceum.

Richard has also purchased the underused Elks Club, at 27 Exchange St., and plans to bring back its former luster. Built in a Mediterranean style, the 20,000-square-foot Times Square landmark will be turned into artists' studios, restaurants, and arts venues.

Two former Providence residents, architect Joe Haskett and graphic artist Kirsten Murphy, have bought and brought new life to the 3,537-square-foot former Schaffer's Furniture Co. Building, at 163 Broad St. Built in 1926, the property is now a live/work loft and studios.

Meanwhile, artist Scott Roop, of Providence, has bought the long-vacant former Hospital Trust Building, at 216 Main St., and is turning the 8,000-square-foot commercial-bank structure into artist studios.

Moreover, Two Ton Inc., an architectural firm formerly based in San Francisco, has moved into Pawtucket because of the city's arts initiatives. The company recently bought a 3,500-square-foot former motorcycle-repair shop, at 49-51 Montgomery St.

Simply put, we in Pawtucket make use of our assets when reaching out to artists and arts groups. Rental space for studios is about $4 to $6 per square foot — a lot cheaper than in many other communities. And we have quick highway access: It's only 45 minutes to Boston, 10 minutes to Providence, and 5 minutes to the nearest commuter-rail station.

Meanwhile, artist-related jobs are also coming into our city. The formerly Providence-based Rag and Bones Bindery, for example, now creates handmade books at 1088 Main St., in a mill built in 1920. In addition to purchasing and rehabilitating this property, the company brought 15 jobs to Pawtucket.

Our philosophy as an arts community is simple: We roll out the red carpet. If other communities roll out the red carpet too, that's great, but we'll make our carpet plusher.

The City of Pawtucket has a full-time staff person in the Department of Planning and Redevelopment serving as an advocate for artists. This person has an open-door policy, letting artists come in at their own convenience, and will drive an inquiring artist around town. We also make it easy for an artist or arts group to lease or buy commercial or industrial properties; a detailed listing of these properties is available on request.

All city departments work together on behalf of artists and arts groups. For example, when Stone Soup Coffee House (one of the oldest nonprofit coffee houses in America), the Gamm Theatre and All Children's Theatre moved to Pawtucket, the Public Works Department provided a truck, driver and helper to move belongings to their new homes.

We have also hired researcher Ann Galligan to create our arts and cultural plan. With solicited community input, this document will help municipal officials attract and retain artists in Pawtucket.

And Pawtucket's business community is strongly behind the city's arts initiatives. Although arts funding has shrunk around the state, in Pawtucket last year over 200 companies provided funds or in-kind assistance to support the 2003 Pawtucket Arts Festival. Of the over $105,000 that we raised, over $70,000 came from businesses.

In short, we know that, ultimately, art will fuel Pawtucket's economic engine.

*James E. Doyle is mayor of Pawtucket.*

Prov. Sun. 6·13·04

back Print This Page

Executive Office, City of Providence, Rhode Island

DAVID N. CICILLINE
MAYOR

Date: September 22nd, 2004
For Immediate Release

Contact: Karen Southern, Press Secretary
(401) 421-2489 x 752
ksouthern@providenceri.com

# PRESS RELEASE

## MAYOR CICILLINE TO KICK-OFF NEW TELEVISION SHOW AND MONTHLY APPEARANCE ON WPRO RADIO

**Cable show and monthly radio appearance are in keeping with Cicilline's promise to make city government**

**Providence** - "Lights, action, Providence City Government on the move!" that's what Mayor David N. Cicilline says viewers will experience when they tune into his new television show each month. The show will be broadcast on Cox Communication's Public Access Channels 13 and 18. Cicilline says his new show, *The City*, will give residents a closer look at how Providence city government works.

Mayor Cicilline said he will tape his first cable show on Wednesday, September 29 and his first guests will be Art, Culture and Tourism Director, Cliff Wood, and his deputy director, Lynne McCormick. The show will air several times throughout the month of October.

Mayor Cicilline will also be a regular monthly guest of WPRO radio talk show host Steve Kass on *Ask the Mayor* beginning Wednesday, September 23 at 10 a.m.

"When I began *Mayors Night In/Out*, an initiative designed to give people an opportunity to meet one-on-one with me each month, it was an effort to make city government more accessible to the residents of this city," said Cicilline. "*The City* and *Ask the Mayor* are a continuation of that effort, as we try to keep residents engaged in city government and informed about how their tax dollars are being spent."