**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STEPHEN P. LAFFEY :
Plaintiff :
:
vs. : C.A.No.: 05-
:
ROGER N. BEGIN, in his capacity :
as Chairperson of The Rhode Island :
Board of Elections and :
THE RHODE ISLAND BOARD :
OF ELECTIONS :
Defendant :

05 206

---

**NOTICE OF MOTION FOR AN ORDER TO SHOW CAUSE WITH A REQUEST FOR A TEMPORARY RESTRAINING OREDER**

SIR:

***PLEASE TAKE NOTICE,*** that upon the plaintiff's verified complaint sworn to on May 11, 2005, the declaration of Barbara, Haynes, plaintiff's memorandum of law and all other proceedings had herein, the undersigned will move the United States District Court for the District of Rhode Island as soon as counsel can be heard, for the following relief (1) to issue an order pursuant to Federal Rule of Civil Procedure 65 that defendant be enjoined immediately from enforcing its Order of April 26, 2005 prohibiting Steve Laffey from hosting *The Steve Laffey Show* on WPRO and (2) to order that defendant show cause why a preliminary injunction should not issue

enjoining defendant from enforcing its Order of April 26, 2005 prohibiting Steve Laffey from hosting *The Steve Laffey Show* on WPRO.

Dated: May 11, 2005

Yours, etc.

Michael J. Lepizzera, Jr. (Bar No. 4995)
Lepizzera & Laprocina
301 Metro Center Boulevard Suite 102
Warwick, R.I. 02886
Tel: (401) 739-7397

Tom Marcelle (admission *pro hac vice* pending)
2 E-Comm Sq., 3rd Floor
Albany, New York 12207
Tel: (518) 427-1720

TO: Raymond Marcaccio
Counsel for Defendants
55 Dorance St., Suite 400
Providence, Rhode Island

# THE UNITED STATES DISTRICT COURT
# FOR
# THE DISTRICT OF RHODE ISLAND

---

STEPHEN P. LAFFEY, Plaintiff

05 206

-against- NO.05-CV-______(____/___)

ROGER N. BEGIN, in his capacity as Chairperson of The Rhode Island Board of Elections and THE RHODE ISLAND BOARD OF ELECTIONS, Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

---

Michael J. Lepizzera, Jr. (Bar No. 4995)
Lepizzera & Laprocina
301 Metro Center Boulevard, Suite 102
Warwick, R.I. 02886
Tel: (401) 739-7397

Tom Marcelle (admission *pro hac vice* pending)
2 E-Comm Sq., 3rd Floor
Albany, New York 12207
Tel: (518) 427-1720

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTS ........ 1

1. LAFFEY AND WPRO ........ 1

2. THE BOARD OF ELECTIONS STOPS THE RADIO SHOW ..... 4

3. LITIGATION COMMENCED ........ 6

STANDARD FOR GRANTING A T.R.O. ........ 7

ARGUMENT ........ 9

I. The Board's censorship of Laffey violated the First Amendment because the Board lacked a compelling state interest to censor the speech of a person who was not an announced candidate for office and who was employed as a radio talk show host ........ 10

A. Since Board's regulation of WPRO and Laffey involves access to channels of communications rather than access to money, in order for the regulation to be valid, the Board has the burden to prove that the censorship of *The Steve Laffey Show* serves a compelling state interest and the censorship is a narrowly tailored method to achieve that interest ........ 11

B. Defendant has the burden of proving a sufficiently compelling state interest to justify censorship of the plaintiff's speech ........ 14

C. Neither the Board's interest in the prevention of corruption nor its interest in the equalization of campaign speech provide it with a compelling interest sufficient to censor *The Steve Laffey Show* ........................ 15

1. The prevention of corruption does not provide the Board a compelling interest sufficient to censor *The Steve Laffey Show* ........................................ 15

2. The equalization of campaign speech does not provide the Board a compelling interest sufficient to censor *The Steve Laffey Show* ......................... 16

D. Because the political contribution regulation prohibits speech not related to a political campaign, it is unconstitutionally overbroad................................ 19

II. The Board violated the First Amendment prohibition against vague statutes because neither any State Statute nor any Board regulation defined the term "in kind contribution." .............................................................. 23

III. The Board violated plaintiff's right guaranteed by the Equal Protection Clause of Fourteenth Amendment of the United States Constitution by allowing an announced candidate for public office to write a weekly newspaper column, but forbidding an unannounced candidate from hosting a radio show ........................................................... 24

IV. The Federal Government's Regulation of Radio Broadcasts Preempts the Board's Ability to Enjoin Plaintiff from Hosting a Radio Show ............................ 29

CONCLUSION ........................................................................................ 34

# TABLE OF AUTHORITIES

Cases

*Airline Pilots Association, International v. Guilford Transportation Industries, Inc.*,
399 F.3rd 89 (1st Cir 2005) ........ 8

*Buckley v. Valeo*,
424 U.S. 1, (1976) ........ 10, 11, 12, 13, 15

*Carey v. Brown*,
447 U.S. 455, (1980) ........ 26, 28

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1984) ........ 25

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 8, 18, 23, 24, 28

*Federal Election Commission v. Beaumont*,
539 U.S. 146 (2003) ........ 11

*Federal Election Commission v. Christian Action Network*,
110 F.3rd 1049 (4th Cir. 1997) ........ 20

*First National Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ........ 13

*Greater New Orleans Broadcasting Ass'n., Inc.* v. *United States*,
527 U.S. 173 (1999) ........ 14

*Heller v. Doe*,
509 U.S. 312 (1993) ........ 25

*Kansas For Life, Inc. v. Gaede*,
38 F. Supp. 2d 928 (D. Kan. 1999) ........ 19

*Kotch v. Board of River Port Pilot Comm'rs forPort of New Orleans,*
330 U.S. 552 (1947) .......... 26

*McConnell v. Federal Election Commission,*
540 U.S. 93 (2004) .......... 12, 15, 20, 22

*Memphis Community School District v.Stachura,*
477 US 299 (1986) .......... 8

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) .......... 28

*New Comm Wireless Servs. v. SprintCom, Inc.*,
287 F.3d 1 (1st Cir. 2002) .......... 8

*New Orleans v. Dukes,*
427 U.S. 297 .......... 25

*North Carolina Right to Life, Inc. v. Bartlett,*
168 F. 3d 705 (4th Cir. 1999) .......... 19

*Planned Parenthood Affiliates v. Miller*,
21 F. Supp.2d 740 (E.D. Mich. 1998) .......... 19

*Playboy Entertainment Group,*
520 U.S. at 818 .......... 14

*Railway Express Agency, Inc. v. New York,*
336 U.S. 106 (1949) .......... 26

*Red Lion Broadcasting Co. v. FCC,*
395 U.S. 367 (1969) .......... 10, 28

*Reed v. Reed,* 404 U.S. 71 (1971) .......... 25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
102 F.3d 12 (1st Cir. 1996) .......... 8

*Seidman v. Paradise Valley Unified School Dist. No. 69*,
327 F.Supp.2d 1098, 1115 (D. Az. 2004) .................................................... 26

*Shrink v. Missouri Government PAC*,
528 U.S. 377 (2000) ................................................................... 11, 13

*Streetwatch v. National Railroad Passenger Corporation*,
875 F. Supp. 1055 (S.D.N.Y 1995) ................................................................ 9

*Vermont Right to Life Committee, Inc. v. Sorrell*,
221 F. 3rd 376 (2nd Cir. 2000) ..................................................................... 19

*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955) ...................................................................................... 25

*Winters v. New York*,
333 U.S. 507 (1948) ................................................................................ 23, 24

## INTRODUCTION

This case involves a direct assault on freedom of speech and of the press. WPRO and Steve Laffey, by means of a free press, entered the market place of ideas to discuss political issues. This speech was made more than 18 months before any election. It was made by a person who was not an announced candidate for office and who never advocated his election to office. Nevertheless, the Board of Elections deemed that *The Steve Laffey Show* represented an illegal political campaign contribution by WPRO to Laffey. The Board censored Laffey and ordered him off the air.

## FACTS

Steve Laffey currently serves as the Mayor of Cranston Rhode Island. Mayor Laffey was re-elected as Cranston's Mayor in November 2004 and was sworn in January 2005. He has not announced that he is a candidate for any public office.

### 1. LAFFEY AND WPRO

Sometime in the summer of 2004, WPRO management heard Steve Laffey hosting a radio talk show on WHJJ - an AM radio competitor. WPRO concluded that Laffey had a talent in dealing with callers and providing the audience with stimulating conversation. WPRO believed that

he would appeal to WPRO's audience. Laffey expressed an interest in hosting a radio show after the November Election.

After the election, WPRO began discussions with Laffey about regularly appearing on the radio. In January 2005, WPRO offered Laffey a job as host of the Friday morning time slot between 9:00 am to 11:00 am. The show was called *The Steve Laffey Show*. Mr. Laffey refused to take compensation for the show.

WPRO viewed employing Laffey's talent as offering a valuable economic service to WPRO. At no time did WPRO intend to make a contribution to Laffey. WPRO neither supports political candidates nor advocates the election or defeat of any candidate.

Laffey's first show aired on February 25, 2005 and his last show aired April 15, 2005. At no time during the radio show did Laffey advocate for his election to any public office. During his show, Laffey would take phone calls from listeners, had guests, and discussed the following topics:

- On the February 25, 2005 show, Laffey took calls and discussed the following topics: (a) whether the Pope should resign his office in light of his illness, (b) property tax relief, and (c) Immigration with Julio Aragon.

- On the March 4, 2005 show, Laffey took calls and discussed the following topics: (a) school spending and property taxes with Richard Sanitti Town Councilmen from Coventry, (b) voter

initiative with Bob Arruda, Senator Cote and Maris Code, and (c) the worst state legislative bills of the week.

- On the March 11, 2005 show, Laffey took calls and discussed the following topics: (a) the Expungement Bill; and (b) Rhode Island Training School conditions with Peter Salom.

- On the March 18, 2005 show, Laffey took calls and discussed the following topics: (a) credit card companies and bankruptcy; (b) adolescence attire; and (c) gambling casinos.

- On March 25, 2005, Laffey was away and did not host his show.

- On the April 1, 2005 show, Laffey took calls and discussed the following topics: (a) Terry Schiavo and (b) property taxes, municipal budget, and school spending.

- On the April 8, 2005 show, Laffey took calls and discussed the following topics: (a) the Pope's death; and (b) contract negotiations between the East Greenwich School Committee and teachers.

- On the April 15, 2005 show, Laffey took calls and discussed the following topics: (a) Armenian Genocide with Vitali Ianko (author of "The Promise at the Sea"); (b) *The Lively Experiment* show, (c) federal income tax reform, and (d) placing sex offenders names on a public list. Mr. Laffey's last show was April 15th.

- Laffey's did not do his show on Friday, April 22nd because he was unavailable.

- On April 27, Laffey informed WPRO that he would not appear on Friday's (April 29) show because he was enjoined by the Board of Elections.

## 2. THE BOARD OF ELECTIONS STOPS THE RADIO SHOW

On March 1, 2005, Aram Garabedian filed a complaint against Laffey with the Board. The complaint alleged that Laffey's radio show

represented an in-kind contribution to a political candidate by a corporation in violation of R.I.G.L §17-25-10.1. On March 28, 2005, Mr. Michael Lepizzera, Jr., legal counsel for Laffey, answered the complaint. Mr. Lepizzera argued that Laffey's job at WPRO was not a campaign contribution under the Rhode Island Election Law and more importantly the First Amendment protected Laffey's speech.

On April 26, 2005, defendant, the Board of Election, held a hearing on the allege violation of R.I.G.L § 17-25-10.1. After the hearing, on April 26, 2005, the Board ordered:

> Stephen P. Laffey's appearance as a host of the WPRO weekly Steve Laffey Show, constitutes a violation of the campaign finance laws of the State of Rhode Island, R.I. Gen. Laws §17-25-1, et seq. The receipt of airtime from WPRO in the format as a host of said radio show constitutes an "in-kind contribution" as that term is defined and applied under R.I. Gen. Laws §17-25-10.1.
>
> For the reasons set forth above, and elaborated at the hearing today, Laffey is prohibited from the receipt of such in-kind contributions from WPRO and is therefore enjoined from appearing as the host of *The Steve Laffey Show*.

There are several salient facts concerning the Board's determination that are critical to plaintiff's application for a temporary restraining order. First, the Board reached a conclusion that "[t]he receipt of airtime from WPRO in the format as a host of said radio show constitutes an 'in-kind contribution' as that term is defined and applied under R.I. Gen. Laws §17-

25-10.1." However, neither any State statute nor any Board regulation defines "in-kind contribution."

Additionally, the Board never offered a unified explanation why hosting a radio show was an "in-kind contribution." Some Board Members suggested that "free airtime" was an in-kind contribution. Others suggested that the in-kind contribution was the enhanced political reputation Laffey received by being a radio talk show host. The Chairman of the Board Roger Begin, in reaching his decision, reasoned that:

> When all is said and done, I think this Board needs to weigh all of the evidence that is before us and draw a conclusion as to what is campaign and what is personal. The reality is, every elected official, every person that is subject to the requirements of the Campaign Finance Reporting Laws, they are a person in their personal life, and they may have a business on the business side, and – as well as their political. The separation of those activities is something that the body of evidence that – on matters such as this as presented to the Board, we must weigh and make a judgment as to where that line is drawn between what is personal/business versus what is political.

Chairman of the Board Roger Begin stated publicly that "As a general rule, [the Board] made a distinction between an individual who appears on a commercial radio station, and somebody who appears on a cable TV program. ... Cable TV, by its charter and its franchise, has to permit public access to anybody whereas a commercial radio show is only available to a select few."

Finally, the Board, as permitted by Rhode Island law, issued an advisory opinion in the case of Barbara A. Szepatowski. Ms. Szepatowski is running for Jamestown Town Council and writes a weekly pet column for *The Jamestown Journal.* She was not paid for her column. The Board ruled that *The Jamestown Journal* was not providing Ms. Szepatowski an "in-kind" contribution. The Board distinguished between Ms. Szepatowski's situation and Mayor Laffey's on the basis that everyone has uninhibited access to the newspaper and if it so chose, *The Jamestown Journal* could stop printing her column at anytime.

**3. LITIGATION COMMENCED**

On May 11, 2005, plaintiff filed a complaint with the Clerk of this Court together with a motion for a temporary restraining order and a preliminary injunction.

The complaint asks this Court:

> (1) to declare that defendant's action in enjoining him from hosting *The Steve Laffey Show* on WPRO violated both the free speech and free press clauses of the First Amendment to the United States Constitution; (2) to declare that defendant's action in enjoining him from hosting *The Steve Laffey Show* on WPRO violated the Equal Protection Clause of Fourteenth Amendment of the United States Constitution; (3) to declare that plaintiff had a right under the free speech and free press clauses of the First Amendment to the United States Constitution to host *The Steve Laffey Show* on WPRO; (4) to enjoin the defendant from penalizing plaintiff or enforcing its Order of April 26 2005, (5) to declare RIGL §17-25-10.1

> violates the First Amendment to the United States Constitution to because it is unconstitutionally vague, unconstitutionally overboard, and not viewpoint neutral; (6) to award plaintiff $ 1.00 in damages, (7) to award plaintiffs the cost of prosecuting this action together with attorney fees pursuant to 42 U.S.C. §1988, and (8) to grant other and different relief that the Court, in the exercise of its wisdom and discretion, deems just and proper.

Concurrently with his complaint, plaintiff moved this Court for a Temporary Restraining Order (T.R.O.) to enjoin the defendant from enforcing its Order of April 26, 2005 and to allow plaintiff to continue his radio show on WPRO.

## STANDARD FOR GRANTING A T.R.O.

Whether a Temporary Restraining Order (T.R.O.) should issue usually depends upon a medley of four factors - (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996).[1]

---

[1] This Court has held that the standard for granting a TRO is identical to the standard for granting a preliminary injunction. *Martin v. Coughlin*, 895 F. Supp. 39, 41 (N.D.N.Y. 1995), *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994). Since the standards are the same, plaintiff, has cited cases dealing with a preliminary injunction.

Although a court must consider all four factors, "the *sine qua non* of this four-part inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *Airline Pilots Association, International v. Guilford Transportation Industries, Inc.*, 399 F.3rd 89, 95 (1st Cir 2005).

Irreparable harm, as the name suggests, is a harm that cannot be repaired with the award of damages. The loss of First Amendment freedoms constitutes irreparable harm because a defendant is not required to pay compensatory monetary damages for violating the First Amendment rights of its victims. *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986). The Supreme Court, in recognition of this principal, has declared that "the loss of First Amendment freedoms, for even minimal periods of time constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When an alleged deprivation of the First Amendment is involved, no further showing of irreparable injury is necessary. *Streetwatch v. National Railroad Passenger Corporation*, 875 F. Supp. 1055, 1058 (S.D.N.Y 1995).

## ARGUMENT

## SUMMARY OF ARGUMENT

Plaintiff makes four arguments. (**1**) The Board's censorship of Mr. Laffey's speech violated the First Amendment because the Board lacked a compelling state interest to censor the speech of a person who is not an announced candidate for office and who never advocated his election to office on his radio show. Moreover, assuming that the Board had a compelling state interest in censoring Mr. Laffey, complete censorship of an unannounced candidate more than 18 months before an election was not the least restrictive means to accomplish any alleged compelling state interest; (**2**) The Board violated the First Amendment prohibition against vague statutes because neither any State Statute nor any Board regulation defined the term "in-kind contribution;" (**3**) The Board violated plaintiff's right guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by allowing an announced candidate for public office to write a weekly newspaper column, but forbidding an unannounced candidate from hosting a radio show; (**4**) The federal government's regulation of radio broadcasts preempts the Board's ability to enjoin plaintiff from hosting a radio show.

## I. The Board's censorship of Laffey violated the First Amendment because the Board lacked a compelling state interest to censor the speech of a private citizen who was not an announced candidate for office and was employed as a talk radio host.

The "purpose of the First Amendment [is] to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390 (1969). "The First Amendment affords the broadest protection to political expression in order to assure [the] unfettered interexchange of ideas for the bringing about of political and social change issued by the people." *Buckley v. Valeo* 424 U.S. 1, 14 (1976). Additionally a free press is "one of the greatest bulwarks of liberty." 1 J. Elliot, Debates on the Federal Constitution 335 (2d ed. 1876) (declaration of Rhode Island upon the ratification of the Constitution). Given the exalted purpose of the First Amendment, restrictions on core political speech are subject to the strict scrutiny.

Laffey's talk show on WPRO is not a contribution by WPRO to Laffey to advocate for his election. Instead it serves as a forum to discuss various topics, some of which are related to government, some of which are merely human interest in nature, but none include the express advocacy related to any candidate. The Board of Election's order is not the

implementation of a typical campaign finance law, but something more far reaching.

**A. Since Board's regulation of WPRO and Laffey involves access to channels of communications rather than access to money, in order for the regulation to be valid, the Board has the burden to prove that the censorship of *The Steve Laffey Show* serves a compelling state interest and the censorship is a narrowly tailored method to achieve that interest.**

The Board of Elections can regulate political contributions, of that there is no question. *See Buckley v. Valeo*, 424 U.S. 1 (1976). The initial question when reviewing a regulation of political speech is the level of scrutiny that a court should employ.

The basic premise that the Supreme Court has followed in setting First Amendment standards for reviewing political financial restrictions is that "the level of scrutiny is based on the importance of the political activity at issue to effective speech or political association." *Federal Election Commission v. Beaumont,* 539 U.S. 146, 161 (2003) (internal quotations omitted). Speaking in broad terms, the Supreme Court has made a distinction between money given as a political contribution and money expended for political speech.

Political contributions, unlike campaign expenditures, bear "more heavily on the associational right than on freedom to speak," *Shrink v. Missouri Government PAC,* 528 U.S. 377, 388 (2000). Political

contributions are justified more easy because they "entai[l] only a marginal restriction upon the contributor's ability to engage in free communication." *McConnell v. Federal Election Commission,* 540 U.S. 93, 135 (2004) (internal quotations and citations omitted). Thus, a political contribution limit "is valid if it closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 136.

In contrast, where a regulation causes a "markedly greater burden on basic freedoms, ... [the regulation] cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations. Rather, the constitutionality of [the regulation] turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Buckley v. Valeo,* 424 U.S. 1, 44-45 (1976).

In sum, less exacting review applies to regulations that "significantly interfere" with First Amendment rights; but any regulation of speech creating "markedly greater interference" receives strict scrutiny. *See McConnell,* 540 U.S. at 138-39 ("The relevant inquiry [in determining the level of scrutiny] is whether the mechanism adopted to implement the contribution limit ... burdens speech in a way that a direct restriction on the contribution itself would not.").

Traditional strict scrutiny is applicable in this case. The Board's regulation of the "in-kind" contribution by WPRO is not just an abridgement of associational rights. This is not a case where the Board's regulation of WPRO and Laffey bears "more heavily on the associational right than on freedom to speak." *Shrink v. Missouri,* 528 U.S. at 388. Here, the Board is engaging in direct regulation and ultimately censorship of speech and of the press. Since the Board's regulation of WPRO and Laffey involves access to channels of communications rather than access to money, strict scrutiny applies.

Laffey's talk show on WPRO is not a contribution by WPRO to Laffey to advocate the election or defeat of any candidate. Instead it serves as a forum for Laffey and others to discuss various topics, some of which are related to government, some of which are merely human interest in nature, but none include the express advocacy related to any candidate. The Board of Election's order is not the implementation of a typical campaign finance law, but something more far reaching. The Board's restrictions on WPRO and Laffey involve "limit political expression at the core … of the First Amendment freedoms." *Buckley*, 424 U.S. at 39. Therefore in order for the regulation to be valid, the Board has the burden to prove that the censorship of *The Steve Laffey Show* serves a compelling

state interest and complete censorship is a narrowly tailored method to achieve that interest. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978).

### B. Defendant has the burden of proving a sufficiently compelling state interest to justify censorship of the plaintiff's speech.

Before discussing the merits of the government's censorship, plaintiff wishes to address which party has the burden of proof in this matter. Defendant has the burden of proving a sufficiently compelling state interest to justify censorship of plaintiff's speech. "When First Amendment compliance is the point to be proved, the risk of non-persuasion - operative in all trials - must rest with the Government, not with the citizen." *Playboy Entertainment Group*, 520 U.S. at 818. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Id*. at 816. *See Greater New Orleans Broadcasting Ass'n., Inc*. v. *United States*, 527 U.S. 173, 183 (1999) (State bears burden of justifying its restrictions on speech).

As discussed below, defendant has not met its burden and neither has demonstrated that it had a compelling interest in the censorship of *The Steve Laffey Show* nor that censorship was narrowly tailored to serve that compelling interest.

### C. Neither the Board's interest in the prevention of corruption nor its interest in the equalization of campaign speech provide it with a compelling interest sufficient to censor *The Steve Laffey Show*.

For Rhode Island's "in-kind" regulation to survive constitutional scrutiny, it must be justified by a compelling state interest. There are two potential justifications for the regulation – (1) the prevention of corruption and (2) the equalization of campaign speech.

#### 1. The prevention of corruption does not provide the Board a compelling interest sufficient to censor *The Steve Laffey Show*.

The Supreme Court has held that "the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell*, 540 U.S. at 143. However, in *Buckley*, the Supreme Court found that "the preventing of corruption or the appearance of corruption ... inadequate to justify [limiting] independent expenditures." *Buckley*, 424 U.S. at 45. The Court reasoned that "assuming, *arguendo* that large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions ... . So long as persons and groups eschew expenditures that in express terms advocate the election or defeat of a clearly identified candidate, they are free to spend as much as they want to promote the candidate and his views." *Id.*

Here the situation is analogous. This speech was made over 18 months before any election. It was made by a person who was not an announced candidate for office and who never advocated his election to office. The radio show, as detailed in the complaint (¶31 - ¶42) and this brief at p. 3-4, dealt with, *inter alia,* property taxes, the death of Pope John Paul II, the Armenian genocide, and the worst state legislative bills.

WPRO is not giving a contribution to Laffey to assist his election to a public office. Unlike a political contribution which is a one-way street that benefits the recipient, WPRO's and Laffey's relationship is a two-way street. This is a case where WPRO and Laffey are engaged in a mutually beneficial economic relation. WPRO does not advocate the election or defeat of any candidate including Laffey. Thus, because the timing of the speech and nature of the speech are divorced from a political campaign, corruption is not an issue. Therefore concerns over corruption can not justified the Board's censorship of *The Steve Laffey Show.*

**2. The equalization of campaign speech does not provide the Board a compelling interest sufficient to censor *The Steve Laffey Show.***

The Board's primary focus was on the alleged unique and unequal access that WPRO gave to Mayor Laffey by allowing him to host a radio show. Chairman of the Board Roger Begin stated publicly that "[a]s a

general rule, [the Board] made a distinction between an individual who appears on a commercial radio station, and somebody who appears on a cable TV program. … Cable TV, by its charter and its franchise, has to permit public access to anybody whereas a commercial radio show is only available to a select few."

Additionally, the Board, as permitted by Rhode Island law, issued an advisory opinion in the case of Barbara A. Szepatowski. Ms. Szepatowski is an announced candidate for Jamestown Town Council. She also writes a weekly pet column for *The Jamestown Journal.* Ms. Szepatowski was and is not paid for her column. The Board ruled that *The Jamestown Journal* was not providing Ms. Szepatowski an "in-kind" contribution. The Board distinguished between Ms. Szepatowski's situation and Mayor Laffey's on the basis that everyone has uninhibited access to the newspaper and if it so chose, *The Jamestown Journal* could stop printing her column at anytime. Again equal access was the driving motivation by the Board.

The government interest in equalizing "the relative speech of candidates competing for elective office" is particularly weak in this case where there are no opposing candidates and there is no election being conducted or even talked about. The free marketplace of ideas does not necessarily require that all who participate in it do so with identical

resources. Rather Laffey is a radio talk show host because he is talented (complaint at ¶17), popular (complaint at ¶10), and people like listening to his ideas (complaint at ¶25).

More importantly, as a matter of law, the government interest in equalizing "the relative speech of candidates competing for elective office ... is clearly not sufficient to justify the provision's infringement of fundamental First Amendment rights." *Buckley*, 424 U.S. at 51. The concept that government may "restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Id*. at 48-49.

Since neither the Board's alleged interest in the prevention of corruption nor its interest in the equalization of campaign speech provides it with a compelling interest sufficient to censor *The Steve Laffey Show*, the plaintiff has shown that he is likely to establish a violation of the First Amendment. Plaintiff, having established likelihood of a First Amendment injury, also has established an irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, the plaintiff requests the Court issue a T.R.O. allowing plaintiff to return to hosting *The Steve Laffey Show*.

**D. Because the political contribution regulation prohibits speech not related to a political campaign, it is unconstitutionally overbroad.**

In addition to proving a sufficiently compelling interest in the censorship of *The Steve Laffey Show*, the Board must also prove that the censorship was narrowly tailored to serve its interest in preventing political corruption. The Board cannot prove its case.

The "in-kind" political contribution prohibition, according to the Board, regulates anything that benefits a candidate. Moreover, it regulates speech and activities which are not closely related to a political campaign. Because the political contribution regulation prohibits speech not related to a political campaign, it is constitutionally overbroad. Overbreath is a common constitutional defect in state campaign finance laws. *See e.g.*, *Planned Parenthood Affiliates v. Miller*, 21 F. Supp.2d 740 (E.D. Mich. 1998), *Kansas For Life, Inc. v. Gaede*, 38 F. Supp. 2d 928 (D. Kan. 1999), *North Carolina Right to Life, Inc. v. Bartlett*, 168 F. 3d 705 (4th Cir. 1999), and *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F. 3rd 376 (2nd Cir. 2000).

In *Buckley*, the Supreme Court made clear that government regulation in the context of campaign finance can only be permitted if the communication expressly influences an election. The Court declared "that

in order to preserve the provision against invalidation on vagueness grounds" a campaign finance provision "must be construed to apply only to...communication that in express terms advocate the election on defeat of a clearly identified candidate." 424 U.S. at 44-45.

Absent a "bright-line limitation, the distinction between issue discussion...and candidate advocacy would be sufficiently indistinct that the right of citizen to engage in the discussion of issues of public interest...would be intolerably chilled". *Federal Election Commission v. Christian Action Network* 110 F.3rd 1049, 1051 (4th Cir. 1997). A discussion of issues that do not expressly relate to an election is beyond the reach of campaign finance regulation. *See Buckley,* 424 U.S. at 79. The Supreme Court recently noted that the government "could not regulate financial contributions to political talk show hosts...on the sole basis that their activities conferred a benefit to the candidate." *McConnell,* 540 U.S. at 668, n.51 (2003).

The Board's interest in limiting speech is ultimately tied to preventing the corruption of elections and public officials. The in-kind political contribution regulation blurs the line between elections and public discourse. The Board defines an in-kind contribution as a "contribution that includes other thing of value and paid personal services as well as

contributions other that money." It is not limited to contributions that expressly affect an election. Under this definition, anything that benefits a person, who happens to have a state campaign account even if he is not running for any office, would be considered an in-kind contribution. In essence, the Board's interpretation of what constitutes an in-kind political contribution encompasses a wide range of activities which are then subject to government regulation.

The contribution regulation is overbroad because an in-kind political contribution is defined as any thing that benefits a candidate. If given to its logical meaning, the regulation against in-kind contributions would prohibit a candidate from writing an editorial; it would prohibit radio talk show hosts or a newspaper editorial from endorsing a candidate; it would prohibit a private school from inviting an elected official from reading to school children; it would bar a little league from inviting an elected official to throw the ceremonial first pitch; it would prohibit an elected official from touring a factory; and it would prohibit an elected official from speaking at the Lions club. All these activities certainly benefit a candidate – a prudential candidate would be left to wonder which of the above activities are illegal campaign contributions. The record, even at this early stage of this litigation, is replete with examples of politicians and

elected officials using channels of communications to express their ideas to the public.

If the Board can censor a radio station from allowing someone to host a political discussion who is not a candidate, 21 months before a hypothetical election, the chilling endpoint of the Board's reasoning is not difficult to foresee: outright regulation of the press. If the Board can censor such speech that marginally influences a hypothetical election, it is hard to see how the regulation would not apply to the press when it actually seeks to influence an election by endorsing a candidate.

As the Chief Justice recently noted in *McConnell*, *supra*:

> Yet the Court cannot truly mean what it says. Newspaper editorials and political talk shows *benefit* federal candidates and officeholders every bit as much as a generic voter registration drive conducted by a state party; there is little doubt that the endorsement of a major newspaper *affects* federal elections, and federal candidates and officeholders are surely "grateful," for positive media coverage.

*McConnell*, 540 U.S. at 355 (Rehnquist, C.J., dissenting in part) (emphasis in the original).

The in-kind contribution regulation prohibits speech not related to a political campaign; thus, it is constitutionally overbroad and not narrowly tailored to serve a compelling state interest. Even the Board charged with enforcing the statute could not uniformly describe it. Consequently, the

plaintiff has shown that he is likely to establish a violation of the First Amendment and thereby establishing both a likelihood of success on the merits and irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, the plaintiff asks the Court to issue a T.R.O. allowing plaintiff to return to hosting *The Steve Laffey Show*.

## II. The Board violated the First Amendment prohibition against vague statutes because neither any State Statute nor any Board regulation defined the term "in-kind contribution."

"A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment violates ... freedom of speech or press" *Winters v. New York*, 333 U.S. 507, 510 (1948). The Board's injunction against plaintiff violated the First Amendment prohibition against vague statutes because no State statute nor any Board regulation defined the term "in-kind contribution."

Rhode Island law prohibits corporations from making a contribution to a candidate. Section 17-25-10.1(h) provides that "It shall be unlawful for any corporation ... to make any campaign contribution or expenditure, as defined in § 17-25-3, to or for any candidate." Under Rhode Island law contributions "include all transfers of money, paid personal services, or

[any item of tangible real or personal property of a fair market value in excess of one hundred dollars] to or by any candidate … ." RIGS §17-25-3(3).[2]

Neither a Rhode Island Statute nor the Board's regulations define the phrase "in-kind."[3] Without a definition, the Board's regulations fail "to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment violates … freedom of speech or press" *Winters v. New York*, 333 U.S. 507, 510 (1948). Having established a First Amendment injury, plaintiff also has established an irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, the plaintiff requests the Court issue a T.R.O. allowing plaintiff to return to hosting *The Steve Laffey Show.*

**III. The Board violated plaintiff's right guaranteed by the Equal Protection Clause of Fourteenth Amendment of the United States Constitution by allowing an announced candidate for**

[2] RIGS §17-25-3(3) actually reads "include all transfers of money, paid personal services, or *other thing of value* …" However §17-25-3-(6) defines "other thing of value" to "mean[] any item of tangible real or personal property of a fair market value in excess of one hundred dollars ($100)." For ease of reading the statute, plaintiff has substituted the definition for "other thing of value" into the definition of "contribution."

[3] While neither statute or regulation defines the term "in-kind," Board's Guide to the Rhode Island Campaign Contributions & Expenditures Reporting Act, defines as an in-kind as a "contribution that includes other thing of value and paid personal services as well as contributions other that money." But the Guide does not define what constitutes "contributions other than money."

**public office to write a weekly newspaper column, but forbidding an unannounced candidate from hosting a radio show.**

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV, §1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440-41 (1984), (citations omitted). The government may not distinguish between individuals solely on differences that are irrelevant to a legitimate governmental objective. *Reed v. Reed,* 404 U.S. 71, 75-76 (1971).

The Equal Protection Clause does not deprive government of all power of classification, but does require government to treat alike persons who are similarly situated in absence of sufficient justification for the discriminatory treatment. The amount of justification the government is required to offer to sustain its discriminatory practices depends on the nature of the classification.

A discriminatory law that neither burdens a fundamental right nor targets a suspect class will be upheld so long as it bears a rational relation to some legitimate end. *See, Heller v. Doe,* 509 U.S. 312, 319-320 (1993). Thus, a law will be sustained if it can be said to advance a legitimate

(1980); *Seidman v. Paradise Valley Unified School Dist. No. 69*, 327 F.Supp.2d 1098, 1115 (D. Az. 2004).

The Board violated plaintiff's rights guaranteed by the Equal Protection Clause by allowing an announced candidate for public office to write a weekly newspaper column, but forbidding an unannounced candidate from hosting a radio show. The Board, as permitted by Rhode Island law, issued an advisory opinion in the case of Barbara A. Szepatowski. Szepatowski is an announced candidate for Jamestown Town Council. She also writes a weekly pet column for *The Jamestown Journal*. Szepatowski was and is not paid for her column. The Board ruled that *The Jamestown Journal* was not providing Szepatowski an "in-kind" contribution. The Board distinguished between Szepatowski's situation and Laffey's on the basis that everyone has uninhibited access to the newspaper and if it so chose, *The Jamestown Journal* could stop printing her column at anytime.

Szepatowski and Laffey are similarly situated. Both Laffey and Szepatowski weekly have access to a media outlet. Szepatowski is an announced candidate for public office; Laffey had not announced his candidacy for public office but holds a public office. Yet WPRO is

considered to be making an in-kind political contribution to Laffey, while *The Jamestown Journal* is not.

The Board distinguished between Ms. Szepatowski's situation and Mayor Laffey's on the basis that everyone has uninhibited access to the newspaper and that *The Jamestown Journal* could stop printing her column at anytime. The first distinction is wrong and the second represents no distinction at all. The Board got the access question backwards. Radio stations are required to provide equal access, *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367 (1969), while papers are not. *Miami Herald Pub. Co. v. Tornillo***,** 418 U.S. 241 (1974). Additionally, while it is true that *The Jamestown Journal* could stop printing Szepatowski's column at anytime, it is equally true that WPRO could pull the pug on Laffey at any time.

The Board's unequal application of the in-kind contribution cannot be said "to serve substantial state interests, nor the justifications offered for any distinctions [narrowly tailored]." *Carey v. Brown,* 447 U.S. 455, 461-62 (1980). Plaintiff is likely to prevail on his Equal Protection claim. Having established likelihood of a First Amendment injury, plaintiff also has established an irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, the plaintiff requests the Court issue a T.R.O. allowing plaintiff to return to hosting *The Steve Laffey Show.*

government interest, even if the law seems unwise or works to the disadvantage of a particular group. *See New Orleans v. Dukes,* 427 U.S. 297 (1976) (tourism benefits justified classification favoring pushcart vendors of certain longevity); *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483 (1955) (assumed health concerns justified law favoring optometrists over opticians); *Railway Express Agency, Inc. v. New York,* 336 U.S. 106 (1949) (potential traffic hazards justified exemption of vehicles advertising the owner's products from general advertising ban); *Kotch v. Board of River Port Pilot Comm'rs for Port of New Orleans,* 330 U.S. 552 (1947) (licensing scheme that disfavored persons unrelated to current river boat pilots justified by possible efficiency and safety benefits of a closely knit pilot age system).

On the other hand, if a law's classification burdens either a fundamental right or targets a suspect class, the constitutional bar is raised. In the First Amendment arena, "[w]hen government regulation discriminates among speech-related activities ..., the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown,* 447 U.S. 455, 461-62

**IV. The federal government's regulation of radio broadcasts preempts the board's ability to enjoin plaintiff from hosting a radio show.**

The Board's April 26 Order is constitutionally frail not only with respect to the First and Fourteenth Amendments, but the Order also runs afoul with the Supremacy Clause of the United States Constitution. *U.S. Const. art VI, cl.2.* The Supremacy Clause is the constitutional centerpiece in governing the relationship and, more importantly, the potential clashes between federal and state law.

The Supremacy Clause provides *in toto:*

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

*U.S. Const. art VI, cl.2.*

Congress has time and time again invoked the Supremacy Clause in passing federal legislation intending to either preempt an area or field of law yet to be addressed by the states or trump existing state law that interferes or conflicts with the new federal law. This mechanism is commonly known as the preemption doctrine.

Preemption may occur in three (3) different instances including: (1) express preemption; (2) field preemption; and (3) conflict preemption. *Shaw v. Delta Airlines, Inc.* 463 U.S. 85, 95-96 (1983). Express preemption occurs when (1) the federal statute at issue expressly provides that it shall supersede related state law and (2) the state legislation at issue falls within a class of law Congress intended to preempt. *Gade v. National Solid Wastes Management Association,* 505 U.S. 88, 95-97 (1992). Both field preemption and conflict preemption "reflect the congressional intent to preempt state laws based upon 'the federal statute's structure and purpose.'" *Verizon New England v. Rhode Island Public Utilities Commission,* 822 A.2d 187 (R.I. 2005) *citing Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31 (1996). Field preemption prohibits states from enacting legislation or regulations in an area in which Congress implements a comprehensive regulatory framework. *Id.* The mere passage of such a comprehensive regulatory framework signifies Congress' intent to maintain exclusive legislative control over that particular area. *Id.* Conflict preemption is found in those cases where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 (1963), "and where 'under the circumstances of [a] particular

case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 373 (2000).

*Assuming arguendo* that the Board possesses some legitimate concern over Laffey's unfair advantage in hosting a radio show, which it does not, the preemption doctrine prohibits the Board from regulating Laffey's conduct.

Congress, by the power granted to it by the interstate commerce clause, licensed stations to broadcast on certain frequencies. The Supreme Court has held that Congress intended to preempt the field of radio broadcasting. Communications Act of 1934, Congress authorized the Commission "to regulate *all* aspects of interstate communication by wire or radio." and that the Commission's authority "extends to all regulatory actions 'necessary to ensure the achievement of the Commission's statutory responsibilities.' " *Crisp, supra,* 467 U.S. at 700, quoting *FCC v. Midwest Video Corp.,*1440 U.S. 689, 706 (1979).

Congress specifically had the issue of "equal time" in mind in passing 47 U.S.C. § 315. Section 315 which provides in pertinent part:

**315. Candidates for public office**

> (a) Equal opportunities requirement; censorship prohibition; allowance of station use; news appearances exception; public interest; public issues discussion opportunities
>
> If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station:

The First Circuit recently had this to say about the "equal [air] time" provisions of Section 315:

> This equal time doctrine has been described as a "contingent right of access"; it does not require a licensee to offer time to any candidate, but once a candidate is permitted to use the station, the station must provide other candidates "with equal time at an equal rate, at a comparable hour of the day, and with a similar format for presentation. *Kennedy for President Comm. V. FCC,* 636 F.2d 432, 437 n. 33, 438 (D.C. Cir. 1980). The purpose of the equal time doctrine is to facilitate political debate by qualified candidates. *Farmers Educational & Co-op Union v. WDAY, Inc.,* 360 U.S. 525, 529 (1959). A candidate seeking equal opportunity must request it no more than seven days after another candidates broadcast. 47 C.F.R. § 76.205(c) (2003). Candidates who feel they have not received equal time may file a complaint with the FCC.

*Rosenberg v. City of Everett,* 328 F.3d 12, 16 (1st Cir. 2003).

In regulating the broadcasting field, Congress was confronted with and resolved the dilemma: how to strike a proper balance between private

and public control. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390 (1969). Cf. *Farmers Educational and Co-op. Union of America, North Dakota Division v. WDAY, Inc.,* 360 U.S. 525, 528 (1959). The equal access doctrine represents Congress' finding that more speech was consistent with the conflicting principle of limited spectrum and the First Amendment.

Congress specifically implemented a doctrine of equal access not censorship. In fact, Congress specifically rejected censorship as a solution to regulate broadcasting. Section 326 provides that "Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication." Congress, having struck the balance, has left the states powerless to interfere and censor radio broadcasters.

With this in mind, we turn to Congress' intent in enacting Section 315. Like the Board of Elections, Congress was obviously concerned with equal air time when it came to political foes. However, Congress, unlike the Board of Elections, tempered its concerns with the First Amendment in fashioning an appropriate resolution to the potential controversy.

Congress, unlike the Board of Elections, did not carte blanche extinguish the First Amendment Rights of a political candidate. It did not say to a candidate "Well, you are now a candidate and therefore you no longer have the right to express your thoughts, your ideas and your words over the air waves during your candidacy." Congress, mindful of the First Amendment, employed a least restrictive means in order to level the playing field during political season. In balancing the First Amendment against the government's interest in regulating the conduct of candidates, Congress preempted the field by adopting a policy of "equal time" as opposed to the onerous "no time" doctrine fashioned by the Board of Elections. Clearly, the federal policy of "equal time" trumps the state doctrine of "no time" as the two conflicting policies can not be reconciled with one another.[4] Therefore, plaintiff is likely to prevail.

## CONCLUSION

For all of the above stated reasons and for any other that seems to the Court just and wise, the plaintiff requests the Court issue a T.R.O. allowing plaintiff to return to hosting *The Steve Laffey Show* and to prevent the Board from enforcing its Order of April 26, 2005.

[4] No political opponent of Laffey has requested "equal time" of WPRO. In the event WPRO denied such a request, the exclusive venue to lodge a "equal time" complaint would be with the Federal Communications Commission, not the Rhode Island Board of Elections. See *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969).

Respectfully submitted this 11th day of May 2005,

Plaintiff, Stephen P. Laffey
By and through his Attorneys,

Michael J. Lepizzera, Jr. (Bar No. 4995)
Lepizzera & Laprocina
301 Metro Center Boulevard Suite 102
Warwick, R.I. 02886
Tel: (401) 739-7397

Tom Marcelle (admission *pro hac vice* pending)
2 E-Comm Sq., 3rd Floor
Albany, New York 12207
Tel: (518) 427-1720