UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN P. LAFFEY<br>*Plaintiff,* | : | |
| v. | : | C.A. No. 05-206ML |
| ROGER N. BEGIN, in his capacity as Chairperson of the Rhode Island Board of Elections and the RHODE ISLAND BOARD OF ELECTIONS<br>*Defendants.* | : | |

**OBJECTION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants Roger N. Begin, in his capacity as Chairperson of the Rhode Island Board of Elections and the Rhode Island Board of Elections hereby object to Plaintiff Stephen P. Laffey's motion for temporary restraining order on the grounds that Plaintiff cannot establish a reasonable likelihood of success on the merits of his claims.

In further support of their objection, Defendants rely on the accompanying memorandum of law and exhibits attached thereto.

DEFENDANTS,
By their Attorneys,

RAYMOND A. MARCACCIO, ESQ. (#3569)
CHRISTINE M. CURLEY, ESQ. (#4529)
OLIVERIO & MARCACCIO, LLP
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903
(401) 861-2900
(401) 861-2922 Facsimile

8

**CERTIFICATION**

I hereby certify that on May 16, 2005, a copy of the forgoing Objection to Plaintiff's Motion for Temporary Restraining Order wa sent by facsimile and hand delivered to the following counsel of record:

Michael J. Lepizzera, Jr.
Lepizzera & Laprocina
301 Metro Center Boulevard, Suite 102
Warwick, RI 02886

Tom Marcelle
2 E-Comm Sq., 3rd Floor
Albany, New York 12207

____________________

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN P. LAFFEY<br>*Plaintiff,* | : | |
| v. | : | C.A. No. 05-206ML |
| ROGER N. BEGIN, in his capacity as Chairperson of the Rhode Island Board of Elections and the RHODE ISLAND BOARD OF ELECTIONS<br>*Defendants.* | : | |

**MEMORANDUM IN SUPPORT OF OBJECTION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants Roger N. Begin, in his capacity as Chairperson of the Rhode Island Board of Elections and the Rhode Island Board of Elections (referred to herein collectively as the "Board"), hereby object to Plaintiff Stephen P. Laffey's ("Plaintiff" or "Laffey") motion for a temporary restraining order.

## I. INTRODUCTION

This case raises the issue of whether the Board has the authority to restrict campaign contributions that have the effect of limiting a candidate's speech in the form of his or her political message. The answer to this question is well-settled: courts permit the enforcement of campaign contribution laws even where the First Amendment is implicated. The Board has the authority to (1) determine if a person is a candidate, and if so, (2) determine if the candidate has received something of value that advances his or her candidacy, i.e., a contribution. Where such a campaign contribution is from a corporation or exceeds the statutory limit of $1,000, the Board must terminate further violations of campaign laws.

As discussed below, this case involves the application of the Rhode Island Campaign Contributions and Expenditures Reporting Act, R.I. Gen. Laws § 17-25-1 *et seq*. (the "Act"). The Board determined that (1) Laffey is a "candidate" as that term has been defined in R.I. Gen. Laws § 17-25-3(2); (2) that the receipt of two-and-a-half hours of commercial air time in the form of a radio show paid for and promoted by WPRO is something of value constituting a "contribution", as defined in R.I. Gen. Laws § 17-25-3(3); and (3) that such campaign contributions have been made by the corporate entity, Citadel Broadcasting, and have a value in excess of $1,000, both of which violate R.I. Gen. Laws § 17-25-10.1.

Confronted with clear evidence of illegal contributions, the Board was statutorily required to terminate the ongoing violation. In doing so, the Board stopped Laffey from appearing as a host of the radio talk show. That termination curtailed Laffey's political speech. However, this is legally no different than a finding by the Board that a corporation has paid for a candidate's billboard and orders it removed. Once again, the removal of the billboard curtails the candidate's political speech. Both the removal of the talk show and the removal of the billboard result from the enforcement of campaign contribution laws, while both admittedly curtail the candidates' political message. The First Amendment can be, and often is, constitutionally and legally impacted in the process of properly enforcing campaign contribution laws.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. The Statutes at Issue

This case was precipitated by the Board's enforcement of the contribution limits contained in the Act. R. I. Gen. Laws § 17-25-10.1 provides in pertinent part:

> (a)(1) No person, other than the candidate to his or her own campaign, nor any political action committee shall make a contribution or contributions to any candidate, as defined by § 17-25-3, or political action committee or political party

> committee which in the aggregate exceed one thousand dollars ($1,000) within a calendar year...
>
> (h)(1) It shall be unlawful for any corporation, whether profit or non-profit, domestic corporation or foreign corporation, as defined in § 7-1.1-2, or other business entity to make any campaign contribution or expenditure, as defined in § 17-25-3, to or for any candidate, political action committee, or political party committee, or for any candidate, political action committee, or political party committee to accept any campaign contribution or expenditure from a corporation or other business entity.

R.I. Gen. Laws § 17-25-3 (2) defines "candidate" broadly to include any individual who takes any action, whether preliminary or final, which is necessary to qualify of nomination to public office or receives a contribution or makes an expenditure with a view to bringing about a nomination, whether or not the specific public office is known at the time.

A "contribution" is defined under the Act as "all transfers of money, paid personal services, or other thing of value to or by any candidate, committee of a political party, or political action committee." R.I. Gen. Laws § 17-25-3 (3). In addition, "the financing by any person of the dissemination, distribution or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, the candidate's campaign committees, or their authorized agents shall be considered to be a contribution to the candidate." R.I. Gen. Laws § 17-25-10.1 (d).

**B. The Proceedings and Record before the Board**

Aram Garabedian filed a complaint with the Board on March 1, 2005. Garabedian alleged that Laffey's presence as the host of "The Steve Laffey Show" constituted an "in kind contribution" by WPRO-AM. The Garabedian complaint was heard before the Board on April 26, 2005. Laffey did not appear at the hearing and instead presented his case through his counsel, Michael J. Lepizzera, Jr. ("Lepizzera"). Garabedian appeared pro se. Neither party presented any witnesses, relying instead on documents. Of significance to the proceeding,

Lepizzera admitted to the veracity of all of the facts presented in the Garabedian complaint, as well as all exhibits that Garabedian produced. *See*, Hearing Transcript at 46-47. Moreover, *Laffey conceded that the value of the air time provided by WPRO exceeded $1,000 in value. See*, Hearing Transcript at 8. As Lepizzera stated, "WPRO is not going to give away two-and-a-half hours every Friday, which I'm sure, we don't have them here today, which I'm sure is valuable time, and give it to Stephen Laffey." *See*, Hearing Transcript at 9.

The radio show focused in part on political issues, including challenges to union contracts, challenging "lousy politicians" in the General Assembly who have passed special interest legislation that is adverse to the city of Cranston, promotion of the Tax Relief Act of 2005, and city of Cranston property taxes. *See,* Garabedian Complaint at Exhibit 2.

The Board reviewed the definition of the term "candidate" which includes "any individual who undertakes any action, whether preliminary or final, which is necessary under the law to qualify for nomination for election or election to public office, and/or any individual who receives a contribution or makes an expenditure, or gives his or her consent for any other person to receive a contribution or make an expenditure, with a view to bringing about his or her nomination or election to any public office, whether or not the specific public office for which he or she will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he or she has announced his or her candidacy or filed a declaration of candidacy at that time." R.I. Gen. Laws § 17-25-3(2).

At the hearing, Petitioner Garabedian presented unrefuted evidence that Laffey has taken significant actions to qualify for the nomination of a public office and has been seeking contributions from the public for such campaign activity, despite having not announced his candidacy or filed a declaration of candidacy at this time. Exhibit 5 of the Garabedian complaint consisted of a printout of a website, *www.electlaffey.com*, which is sponsored by Mayor Laffey.

The website includes information on how to contribute to the candidate, including joining "Mayor Laffey's bullhorn club" or how to "make a financial contribution." The website also informs the public on how to volunteer to support Mayor Laffey's next election, including information on how to post want signs on your property, host a coffee hour for the Mayor, walk with the Mayor, distribute literature, or do general volunteer work. The website is frequently updated and specifically makes reference to "Mayor Laffey every Friday at 9:00 a.m. on 630 WPRO."

Based upon the undisputed evidence the Board ruled that:

> Stephen P. Laffey's appearance as a host of the WPRO weekly *Steve Laffey Show*, constitutes a violation of the campaign finance laws of the State of Rhode Island, R.I. Gen. Laws § 17-25-1 et seq. The receipt of airtime from WPRO in the format as host of said radio show constitutes an "in-kind contribution" as that term is defined and applied under r.I. Gen. Laws § 17-25-10.1.
>
> For the reasons set forth above, and elaborated at the hearing today, Laffey is prohibited from the receipts of such in-kind contributions from WPRO and is therefore enjoined from appearing as the host of *The Steve Laffey Show*.

It is respectfully submitted that the Board's enforcement decision should not be enjoined by this Court.

### C. The Board's Authority to Enforce the Election Laws

The Rhode Island Constitution vests in the General Assembly the exclusive jurisdiction over the time, manner and place of conducting elections "for the prevention of abuse, corruption and fraud in voting. R.I. Const. Art. 2 § 2; *Malinou v. Board of Elections*, 108 R.I. 20, 26, 271 A. 2d 798, 801 (1970). The General Assembly in turn has vested the authority over the manner of conducting elections and ensuring the integrity of the election process with the Board. R.I. Gen. Laws § 17-7-5. *See, Board of Canvassers and Registration of City of Woonsocket v. Board of*

*Elections of State*, 82 R.I. 358, 107 A.2d 651 (1954): (explaining the legislative intent in creating the Board "to vest in that Board statewide supervision of elections.")

Pursuant to statute, the Board is delegated the express authority to: "(a)(1) Exercise general supervision of the administration of the election law by local boards." R.I. Gen. Laws § 17-7-5. The statute also expressly provides:

> (c) The state board has power to make the rules, regulations and directives that it deems necessary to carry out the objects and purposes of this title not inconsistent with law.
>
> (d) The state board also has jurisdiction over all election matters on appeal from any local board and over any other matters pertinent and necessary to the proper supervision of the election laws.

The Board is specifically empowered to perform the duties that are necessary to implement the provisions of the state campaign contribution and expenditure reporting laws. R.I. Gen. Laws § 17-25-5(a). The statute also expressly permits the Board to conduct investigations or hearings relative to alleged violations of said laws either on its own initiative or upon receipt of a verified written complaint. R.I. Gen. Laws § 17-25-5(a)(7).

Thus, the Board has jurisdiction over all matters pertinent and necessary to the proper supervision of the election laws. *DeLuca v. Rhode Island State Board of Elections,* 118 R.I. 932, 374 A.2d 560 (1977). The Rhode Island Supreme Court has recognized that the Board is a quasi-judicial body which has the right and statutory obligation to hear evidence, make findings of fact apply its findings of fact to the pertinent principles of law and fashion equitable remedies to enforce the election laws. *Id*; *Buonanno v. DiStefano*, 430 A.2d 765 (R.I. 1981). The Board has also been acknowledged as the "agency that serves as the guardian of the franchise" which has the task to ensure "that all of the laws of this state in respect to elections are faithfully and properly obeyed with regard to the rights of the electors and political candidates." *Roch v. Garrahy*, 419 A.2d 827 (R.I. 1980).

## III. ARGUMENT

### A. R.I. Gen. Laws § 17-25-10.1 Establishing Election Contribution Limits Does Not Violate the First Amendment Because the Statute Serves a Compelling State Interest.

The Act was promulgated by the Rhode Island General Assembly to regulate state election procedures. Although elections implicate free speech and other First Amendment considerations, state election laws routinely withstand constitutional scrutiny.[1]

"A State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock v. Carter*, 405 U.S. 134, 145, 92 S. Ct. 849, 857 (1972). "The states' authority to regulate elections comes from a recognition, embodied in the Constitution, that elections must be structured carefully to ensure that they are fair and honest, so 'some sort of order, rather than chaos, is to accompany the democratic processes'." *Ayers-Schaffner v. DiStefano*, 37 F. 3d 726, 729 (1st Cir. 1994) (citing to *Burdick v. Takushi*, 504 U.S. 526, 112 S. Ct. 2059, 2063 (1992)). While the First Amendment is implicated in the election process, "the States may, and inevitably must, enact reasonable regulations of parties, elections and ballots to reduce election and campaign related disorder" and such reasonable regulations are not violative of First Amendment concerns." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364 (1997).

A state's right to control its election procedures and political processes also permits regulation of campaign contributions in the form of contribution limits to candidates and their campaigns.

The state has a legitimate and powerful interest in eradicating public corruption. *See, e.g., Nixon v. Shrink Missouri Gov. PAC*, 528 U.S. 377, 389, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)

[1] It must be recognized that when reviewing the constitutionality of the Act and R.I. Gen. Laws §17-25-10.1 in particular, the focus is not on whether its application to *The Steve Laffey Show* is appropriate but whether the statute itself serves a compelling state interest.

("The importance of the governmental interest in preventing [corruption] has never been doubted.") (*quoting First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n. 26, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). In *Nixon*, the Supreme Court extended its earlier decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612 (1976) upholding federal contribution limits, to state laws limiting contributions to state political candidates. The statute at issue was a Missouri election law limiting the amount of contributions to candidates ranging from $275-$1075. The Supreme Court found the statute constitutional, based upon the premise first espoused in *Buckley*, that limiting contributions, although having a marginal impact on free speech, left the communication itself significantly unimpaired, thereby requiring only that the regulation of contributions be "closely drawn" to match a "significantly important interest. *Id* at 904. The Supreme Court expressly found the prevention of corruption and the appearance of corruption to be a constitutionally sufficient interest for the contribution limits at issue. *Id* at 905-906.

Furthermore, state statutes banning corporate contributions to candidates have been consistently held to be constitutional by the United States Supreme Court. *First National Bank of Boston v. Bellotti*, 435 U.S 765, 98 S.Ct. 1407, 1422 (1978). The espoused premise behind governmental regulation of corporate contributions in political campaigns is that corporations should not be able to use amassed corporate wealth to unfairly influence elections. *Federal Election Commission v. National Right to Work Committee*, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982); *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).

These compelling state interests do not have to be specifically supported by new studies or evidence independent of studies already generated by other legislative bodies, where there is objective evidence of facts acknowledged by other federal court sufficient to render that statute valid. *Missouri Republican Party v. Lamb*, 270 F. 3d 567 (8th Cir. 2001) (finding that "any other

rule would prove unworkable because, among other things, the minds of legislatures are largely unknowable, individual legislatures have various motives for voting the same way on the same bill, and legislative history is nonexistent in many states.") In other words, since the federal courts have consistently reaffirmed that avoidance of corruption is a valid interest furthered by contribution limits, no separate Rhode Island legislative history is necessary to support the compelling state interest furthered by the Act. Accordingly, the Act and the contribution limits set forth therein comply with the constitutional requirements.

### B. The Board Properly Applied R.I. Gen. Laws § 17-25-10.1 to Restrict Plaintiff from Receiving Further Contributions from WPRO in the Form of Broadcast Radio Air Time.

R.I. Gen. Laws § 17-25-3 (2) defines "candidate" broadly to include any individual who takes any action, whether preliminary or final, which is necessary to qualify for nomination to public office or receives a contribution or makes an expenditure with a view to bringing about a nomination, whether or not the specific public office is known at the time." Thus, a formal declaration of candidacy is not required for an individual to fall within the purview of the Act. Indeed, the Board has uniformly required all current and former candidates to file contribution and expenditure reports until a certification of dissolution of a campaign has been filed with the Board. R.I. Gen. Laws § 17-25-11(b).

Here, the Plaintiff has never filed a certification with the Board indicating that his campaign fund has completed its business or has been dissolved. In addition, Plaintiff continues to maintain his website, "*www.electlaffey.com*" which solicits volunteer support and monetary contributions. The website is frequently updated and refers the viewer to the weekly WPRO radio program. The Board properly concluded that Plaintiff is a "candidate" governed by the strictures of the Act.

The Board likewise properly concluded that the radio air time received from WPRO was a "thing of value" thereby constituting a contribution under the Act. A "contribution" is defined under the Act as "all transfers of money, paid personal services, or other thing of value to or by any candidate, committee of a political party, or political action committee." R.I. Gen. Laws § 17-25-3 (3). An "in-kind contribution" is defined under the Guide to the Rhode Island Campaign Contributions & Expenditures Reporting Act as including "other thing of value" and "paid personal services" as well as contributions other than money.[2] Moreover, "the financing by any person of the dissemination, distribution or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, the candidate's campaign committees, or their authorized agents shall be considered to be a contribution to the candidate." R.I. Gen. Laws § 17-25-10.1 (d).

Thus, the literal anguage of the Act supports the Board's conclusion that where a corporation provides a candidate with his own radio show on a commercial, as opposed to public access medium, it constitutes a contribution to a candidate, since it is clearly something of value.[3] Moreover, Plaintiff represented to the Board that the value of the radio broadcast was in excess of $1000.00. Thus, at the time the Board issued its Order, the contribution limit of $1000.00 had already been met and the prohibition against receiving corporate contributions had already been violated by the Plaintiff.

In the Board's view the Plaintiff's ability to host a radio program free of charge was a contribution that benefited Plaintiff as a candidate and not merely as a public official. The Board's determination was based upon its analysis of the totality of the circumstances: the

[2] The Board published and distributed the Guide pursuant to the legislative mandate set forth in R.I. Gen. Laws § 17-25-5.1 ("The board of elections shall prepare and publish a manual prescribing the requirements of the law.")

[3] Although the Board's Order referred to an "in-kind contribution," the Act itself makes no such distinction. Essentially, both an in-kind contribution, traditionally viewed as a contribution other than money given by a political party or political action committee to a candidate, is subsumed by the broad definition of "contribution" under the Rhode Island statute. *See, e.g., Federal Election Commission v. National Rifle Ass'n of America*, 254 F.3d 173, 183-87 (D.C.Cir. 2001) (use of employees of not-for profit association in candidate's campaign was a "contribution"); *California Med. Ass'n v. Federal Election Commission*, 641 F.2d 619, 630 (9th Cir. 1980) (value of administrative services donated to campaign was a "contribution").

Plaintiff's website anticipated a future campaign; the website solicited volunteers and contributions for his next campaign; Plaintiff's website directed individuals to listen to the weekly radio program; the radio program dealt with public issues that were likely to relate to a state or federal campaign; and the call-in format presented a substantial likelihood that other candidates, a potential election, and Plaintiff's view on potential election related issues might be discussed by the Plaintiff.

Plaintiff argues that his right to free speech is being censored by the Board. As set forth above, it is not Plaintiff's speech that is being curtailed, but his acceptance of a free radio broadcast program which is being prohibited by the Board. The Board has not prevented Plaintiff from speaking; it has merely prohibiting him from hosting his own radio program, that is paid for and promoted by Citadel Broadcasting Company.

Since the Board is the agency statutorily empowered to interpret and enforce the election laws, its determination as to the applicability of the contribution limit to a candidate's hosting of a radio program is entitled to considerable judicial deference. *See Pawtucket Power Associates Limited Partnership, et al. v. City of Pawtucket*, 622 A.2d 452, 456 (R.I. 1993) (affirming doctrine that deference is accorded to an administrative agency when it interprets a statute the administration and enforcement of which has been entrusted to the agency. ) Deference is accorded even when the agency interpretation is not the only permissible interpretation that could be applied. *Id.* In addition, when a statute is silent or unclear on the question presented the administrative determination is entitled to heightened deference. *Defenders of Animals, Inc. v. Department of Environmental Management*, 553 A.2d 541, 543 (R.I. 1989). These maxims govern as long as the construction of the statutes by the agency is not clearly erroneous or unauthorized and is consistent with the overall purposes of the legislation. *Asadoorian v.*

*Warwick School Committee*, 691 A. 2d 573, 577 (R.I. 1997); *Parkway Towers Associates v. Godfrey*, 688 A.2d 1289, 1293 (R.I. 1997).

Here, the purpose of the Act is set forth in its title, "Rhode Island Campaign Contributions and Expenditures Reporting" and is further declared as follows:

> **17-25-2. Declaration of policy.** - It is declared to be in the public interest and to be the policy of the state to require the reporting of certain contributions received and expenditures made to aid or promote the nomination, election, or defeat of all candidates for public office.

Before the recent United States Supreme Court decision in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2004) (addressing the constitutionality of the Bipartisan Campaign Reform Act ("BCRA")) the term "express advocacy" was given a narrow "bright line" construction by the federal courts. In other words, unless the ad contained "magic words" such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," " defeat," or "reject," the ad was considered issue advocacy and could not be limited under the First Amendment.

However, *McConnell* has effectively abrogated the bright-line test of *Buckley* in favor of a practical analysis of whether an ad can be objectively viewed as advocating in support or defeat of a candidate. Similarly, Board could permissibly construe campaign-related based upon a common sense analysis as opposed to be restricted to a bright line or magic words type test.

The Board reasonably construed term "contribution" to mean anything of value that is campaign related such that it serves to promote the election of Plaintiff as a candidate for public office. Although the content of the radio programs did not expressly advocate to support the Plaintiff as a candidate or to solicit monetary contributions to a campaign, these factors are not dispositive. The Board reasonably concluded that the totality of the circumstances pointed to an

a connection between the radio program and a future campaign. The Board's decision should not be disturbed by this Court.

### C. The Act Regulating Campaign Contributions, as Construed and Enforced by the Board, is Not Overbroad.

Plaintiff raises a facial constitutional challenge to the Act, and consequently confronts "a heavy burden" in advancing his claim. *National Endowment for the Arts v. Finley*, 118 S.Ct. 2168, 2175 (1998). Facial invalidation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); *see also FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990) (noting that "facial challenges to legislation are generally disfavored").

First Amendment overbreadth doctrine permits "an individual whose own speech or conduct may be prohibited ... to challenge a statute on its face because it also threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (internal quotation omitted). The Supreme Court imposed"[t]he requirement that the overbreadth be substantial." *Id.; see also Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). Consequently, a "facial" overbreadth challenge will not succeed unless "there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court...." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 748 (1st Cir. 2004).

In addressing Plaintiff's overbreadth challenge, this Court must be mindful of the First Circuit's admonition that " 'the mere fact that one can conceive of some impermissible

applications of a statute is not sufficient to render it susceptible to overbreadth challenge.' " *Dupres v. City of Newport, R.I.*, 978 F.Supp. 429, 432 (D.R.I. 1997) (citing to *United States v. Johnson*, 952 F.2d at 577 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)). "To warrant facial invalidation, ... 'the overbreadth of a statute must not only be real, but substantial as well....' " *Id.* at 579 (quoting *New York v. Ferber*, 458 U.S. 747, 770, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982)).

In evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered. *Whiting v. Town of Westerly*, 942 F.2d 18, 21 (1st Cir. 1991) (citing to *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1981) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972)). Here, the Board has construed the contribution limits in the Act to apply to anything of value that advances a person's candidacy for political office. The Board has applied the Act so that only campaign related speech, not all speech, be restricted by the contribution limits. Laffey's own radio show ran afoul of the contribution limits because it is something of value to Laffey as a candidate. Laffey's weekly radio program is distinguishable from writing an editorial in a newspaper or speaking in a town square, or hosting a show on a public access cable station. Although the latter examples benefit the candidate, neither the newspaper, the town square, nor the public access cable channel is contributing a "thing of value" since as no citizen or other candidate has to pay to receive the same benefit. Because the contribution limits, as applied by the Board, do not reach a substantial amount of constitutionally protected conduct, Plaintiff's overbreadth challenge must fail.

The cases cited by the Plaintiff, (Plaintiff's Memorandum, p. 19-20) do not alter this conclusion as their precedential value is suspect in light of the United States Supreme Court

decision in *McConnell* which abrogated "express advocacy/issue advocacy" distinction as not being constitutionally compelled. *McConnell*, 540 U.S. at 194, 201, 205.

Moreover, Plaintiff mischaracterizes the statement in *McConnell* relating to talk show hosts as somehow precluding regulation of broadcast services which confer a benefit to a candidate. When read in context, it is readily apparent that the Court was referring to financial contributions by the talk show hosts *themselves* who speak in support of or against a candidate, and agreed that these financial contributions or political discussions could not be considered contributions to a candidate simply because their viewpoints might benefit a candidate. *Compare McConnell*, 540 U.S. at 668, n.51 *to* 540 U.S. at 355 (Rehnquist, C.J., dissenting in part). In contrast, this case does not involve a third party political discussion or editorial, but a weekly radio show hosted by the potential candidate himself.

### D. The Act Regulating Political Contributions, as Applied to the Plaintiff, is Not Vague.

#### 1. Plaintiff Does Not Have Standing to Challenge the Contribution Limits Under the Vagueness Doctrine.

A law which does not reach constitutionally protected conduct and, therefore, surmounts the overbreadth test, may nevertheless be facially challenged as unduly vague, in violation of due process. For such a facial challenge to succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications. From this requirement it follows that a plaintiff who engages in conduct that is clearly proscribed by the statute cannot complain that the statute is vague on its face nor challenge the vagueness of the law as applied to the conduct of others. *Whiting v. Town of Westerly*, 942 F.2d 18, 21 (1st Cir. 1991) (citing to *Hoffman Estates*, 455 U.S. at 495, 102 S.Ct. at 1191; *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974)). Under this standard, the Plaintiff's vagueness challenge must also fail.

Plaintiff's attorney represented to the Board that the value of the radio air time to Laffey exceeded one thousand dollars. The Board was also presented with evidence that Laffey actively maintained a website, *www.electlaffey.com*, which solicited volunteers and financial contributions for a future campaign and directed visitors to Plaintiff's weekly radio show on WPRO. Based upon these facts, Plaintiff was a "candidate" as defined under the Act. Given that his own conduct fell clearly within the scope of the statute, Plaintiff cannot complain that the ordinance is unconstitutionally vague on its face, nor does he have standing to challenge the statute as applied to hypothetical third parties who are not before this Court. *Id* at 22.

2. <u>The Contribution Limits are Not Vague.</u>

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *see also Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 3255-56, 82 L.Ed.2d 462 (1984). Generally, laws must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. at 108, 92 S.Ct. at 2298-99; *see also Whiting v. Town of Westerly,* 942 F.2d 18, 22 (1st Cir. 1991); *Brasslett v. Cota,* 761 F.2d 827, 838 (1st Cir. 1985). A vague law both "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis" and leads "citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.' " *Grayned v. City of Rockford,* 408 U.S. at 108-09, 92 S.Ct. at 2299 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322-23, 12 L.Ed.2d 377 (1964)) (internal quotation marks omitted); *see also Whiting v. Town of Westerly,* 942 F.2d at 22.

Indeed, the vagueness of a statute's terms can often be dispelled by language reciting the statute's purpose and specifically defining the setting in which it applies. *Dupres v. City of*

*Newport, R.I.*, 978 F.Supp. 429, 432 (D.R.I. 1997)(citing to *Grayned v. City of Rockford,* 408 U.S. at 112-14, 92 S.Ct. at 2301-02*)* (vagueness of terms in statute dispelled by fact that statute was "written specifically for the school context," and that "prohibited disturbances are easily measured by their impact on the normal activities of the school."). Such qualifying language makes it possible for individuals to determine what conduct is prohibited. *See Id.* at 114, 92 S.Ct. at 2302.

The contribution limits of the Act clearly define the conduct it proscribes with the requisite specificity so as to pass constitutional muster. The statute expressly defines "contribution" to mean any thing of value to a candidate. The Act, in both its title and declared purpose, is directed to campaign related contributions and expenditures. These provisions, when read together, provide individuals with a clear, defined description of proscribed conduct, thus permitting them to specifically tailor their conduct and actions to conform with the Act. As such, the Act and the contribution limits satisfy the requirements of the First and Fourteenth Amendments.

### E. The Board's Enforcement Action Against Plaintiff Did Not Contravene the Equal Protection Clause.

Plaintiff's equal protection argument fails to distinguish between political speech that influences an election vs. non-political speech that does not influence an election. Plaintiff states that "the Board violated plaintiff's right guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by allowing an announced candidate for public office to write a weekly column, but forbidding an unannounced candidate from hosting a radio show." Plaintiff's Memorandum of Law at 24-25. The candidate to whom Laffey refers is Barbara A. Szepatowski ("Szepatowski"), a candidate for the Jamestown Town Council.

Plaintiff correctly states that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." Plaintiff's Memorandum at 25, *quoting*, *City of Cleburne v. Cleburne Living Center,* 473 U.S. 71, 75-76 (1971). However, Plaintiff fails to report the relevant facts that distinguish Szepatowski from the plaintiff's fact pattern. Szepatowski writes a weekly column in the Newport Daily News and has done so frequently since March of 2004. Admittedly, Szepatowski gets recognition from writing the column. However, the column does not relate to campaign activity -- it is devoted to the topic of pets. Szepatowski owns and operates a business called Paws & Claws. Szepatowski is not compensated for writing the column. Szepatowski is also active in trying to get an animal shelter built in the Town of Jamestown. In rendering its advisory opinion, the Board focused on this significant distinction. Unlike Laffey's weekly radio talk show, the pet column is not political in subject matter. There is no discussion on political issues nor is there any reference to a political message: the column focuses exclusively on pet-related issues. At the hearing on the advisory opinion, the Board's legal counsel explained that the column neither relates to campaign activity nor attempts to influence an election. This critical distinction justifies the different results between Laffey and Szepatowski. Simply put, if Plaintiff's radio show dealt exclusively with pets, or flowers, or anything that the Board determined did not constitute campaign activity, Plaintiff could continue to air his weekly radio show.

The advisory opinion rendered in Szepatowski is consistent with the Board's long-standing position that allows radio and television messages on non-political information. In 1998, the Board rendered advisory opinion 98-02, in the matter of *William Guglietta v. Eva Mancuso.* A copy of said opinion is attached as Exhibit. The petitioner and respondent were political rivals, competing for the Democratic nomination for Attorney General in 1998. Guglietta requested an advisory opinion seeking a prohibition of Eva Mancuso's commercials for

her law firm, Hamel, Waxler, Allen & Collins. Guglietta argued that the payment of the commercials by the law firm constituted a contribution to Eva Mancuso's candidacy. The advertisements made reference to honesty and integrity, and presented a "common theme as to the virtue of trusting your attorney presented in all the advertisements viewed by the Board." Advisory Opinion at 2. The Board found that the content of the commercials related to promoting the business of Hamel, Waxler, Allen & Collins, not the candidate Eva Mancuso. By focusing on the content of the message, the Board concluded that "the purpose of the advertisements is to promote the law firm of Hamel, Waxler, Allen & Collins and *not to influence an election.*" *Id.* (emphasis provided.) This is the critical distinction found in both the advisory opinions rendered in the Mancuso and Szepatowski matters.

Laffey also contends that other elected officials are similarly situated since they appear on the air or write op-ed pieces that are published in the local newspapers. Laffey fails to recognize the critical distinction between elected officials who appear in the public arena and Laffey, who appears on his own weekly radio program, sponsored by Citadel Broadcasting. A public forum does not convey something of value similar to the value that Laffey receives from his own radio talk show. Elected officials have the opportunity - if not duty - to appear in a public forum and address public issues. This includes appearances on radio shows, TV news programs, public access cable channels, public events, and the like. During these public appearances, elected officials and candidates discuss matters of public interest. Such communications are clearly legal and have never been questioned by the Board. It is certain that Laffey appears on such radio shows, television programs and makes public appearances. In each such instance, the elected official or candidate is not receiving something of value that can be categorized as a contribution. It is only here, where Laffey is bestowed with the valuable commodity of a weekly radio show in which he is the host - not a guest - and which is widely

advertised by WPRO's corporate parent, Citadel Broadcasting. The Board repeats that Laffey's counsel admitted that the value of the weekly broadcast exceeds $1,000. The Board agrees with Laffey's valuation and can do nothing other than conclude that Laffey receives something of value from this talk show. Appearances in the town square, (or the modern equivalent: cable access channels, radio and TV news programs), does not bestow the same value to the guest.

## F. Enforcement of State Election Contribution Limits by the Board is Not Preempted by the Federal Communications Act.

### 1. The Federal Communications Act is Not Applicable to Plaintiff's Case as He Has Not Qualified as a Candidate for Federal Office.

While issues have been raised with respect to FCC requirements regarding declared candidates and equal access to media air time, those issues are not ripe for review.

The requirements of the FCC Act are not triggered until an individual has legally qualified as a candidate. *CBS, Inc. v. F. C. C.*, 101 S.Ct. 2813, 453 U.S. 367,388, n. 11(1981). In order to be "legally qualified" under the FCC's rules a candidate must: (a) be eligible under law to seek the office he seeks; (b) announce his candidacy; and (c) qualify for a place on the ballot or be eligible under law for election as a write-in candidate. *Id.* Since Plaintiff has alleged he has not yet declared his candidacy, the provisions of the FCC Act are not applicable.[4]

[4] The Federal Communications Act ("FCC Act") provides: "If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station...." 47 U.S.C. 315(a). This equal time doctrine has been described as a "contingent right of access"; it does not require a licensee to offer time to any candidate, but once a candidate is permitted to use the station, the station must provide other candidates "with equal time at an equal rate, at a comparable hour of the day, and with a similar format for presentation." *Rosenberg v. City of Everett*, 328 F.3d 12, 15 (1st Cir. 2003) (citing to *Kennedy for President Comm. v. FCC*, 636 F.2d 432, 437 n. 33, 438 (D.C.Cir.1980)). The purpose of the equal time doctrine is to facilitate political debate by qualified candidates. *Id.* (citing to *Farmers Educational & Co-op Union v. WDAY, Inc., 360 U.S. 525, 529, 79 S.Ct. 1302,* 3 L.Ed.2d 1407 (1959).

2. The Federal Communications Act Does Not Preempt Election Laws.

Plaintiff has cited to no case wherein the Federal Election Commission has been constrained or preempted by FCC equal access laws when enforcing and applying campaign finance laws. Indeed, the Supreme Court has acknowledged that the FCC should not be improperly involved in the electoral process. *CBS, Inc. v. F. C. C.* 453 U.S. at 388. Likewise, this Court has held that the state election laws are not preempted by the Federal Communications Act. *See Vote Choice v. DiStefano*, 814 F.Supp. 195, 208 (D.R.I. 1993)

Moreover, notwithstanding that the FCC Act grants to legally qualified candidates for federal elective office a special right of access to broadcasting, on an individual basis, public interest requirements still govern obligations of broadcasters with respect to political races at state and local levels. *CBS, Inc. v. F. C. C.*, 453 U.S. at 378-379.

The enabling statutes for both the FCC and FEC clearly delineate the scope of each agency's authority in this area. Pursuant to 47 U.S.C.A § 151, the FCC was created to execute and enforce the provisions of Title 47 regulating interstate wire and radio communications. *See CBS, Inc. v. F. C. C.*, 453 U.S. at 390 (recognizing that the FCC is "the experienced administrative agency long entrusted by Congress with the regulation of broadcasting). The Federal Elections Commission was created to administer and enforce the Federal Election Campaign Act, as amended. 2 U.S.C.A § 437c(b)(1). *A fortiori*, federal broadcasting statutes and regulations and the agencies which enforce them, do not preempt, but rather coexist with election laws.

Finally, in situations where a broadcast involves campaign related issues, the federal laws set forth a news or press exemption from contribution and expenditure limits as follows:[5]

[5] Although this argument was not raised by the Plaintiff and would arguably only apply to a federal election, the federal analysis of this issue provides instructive guidance with respect to the interplay between the rights of the press and election laws.

> The term "expenditure" does not include--(i) any news story, commentary, or editorial distributed through the facilities or any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political party or candidate."

2 U.S.C.A. § 431 (9) (B). The intent of this legislation was to ensure that the campaign finance laws did not limit or burden the First Amendment freedoms of the press. *See Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622 (1994). However, if the news or press exemption is not applicable, a broadcast would be considered a contribution or expenditure under the campaign finance laws. *See Reader's Digest Ass'n v. FEC*, 509 F. Supp. 1210 (S.D.N.Y. 1981) (articulating a two part test for determining the applicability of the press exemption: 1) whether the press entity was acting as a press entity in making the distributions complained of, and 2) whether a press entity is owned by a political party or candidate.)[6]

In the present case, the question of whether a press exemption could be applicable to WPRO turns on whether the radio program is a bona fide newscast, bona fide news interview, bona fide news documentary or on-the spot coverage of bona fide news events. However, based upon the controlling statutes and FEC advisory opinions, it is unlikely that WPRO's radio broadcast of *The Steve Laffey Show* would constitute a legitimate press function under the press exemption to contribution laws inasmuch as the social commentary made during the show is made by one candidate running or contemplating running for elective office and no effort has been made to balance his opinions with commentary from the opposition.

[6] In addressing the relationship between the equal access laws and the campaign finance laws the FEC has cautioned that if equal opportunities were not provided to all candidates for a given office, or a broadcaster's activities reflect an intent to advance one candidate over another, or to give preference to any candidate, the broadcast would fall outside the press exemption and would be considered a contribution to that candidate. *See* FEC AO No. 1998-17. *See also* 22 AO No. 1982-44 (applying the press exemption to television station that intended to distribute free time to both political parties as part of its legitimate broadcast function, finding that in that circumstance the free air time would not be considered a contribution or expenditure).

## IV. CONCLUSION

For the reasons set forth herein, Plaintiff Stephen P. Laffey cannot establish a likelihood of success on the merits of his First Amendment claims and, accordingly, his motion for temporary restraining order must be denied in all respects.

DEFENDANTS,
By their Attorneys,

RAYMOND A. MARCACCIO, ESQ. (#3569)
CHRISTINE M. CURLEY, ESQ. (#4529)
OLIVERIO & MARCACCIO, LLP
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903
(401) 861-2900
(401) 861-2922 Facsimile

## CERTIFICATION

I hereby certify that on May 16, 2005, a copy of the forgoing Memorandum in Support of Objection to Plaintiff's Motion for Temporary Restraining Order wa sent by facsimile and ~~hand delivered~~ mailed to the following counsel of record:

Michael J. Lepizzera, Jr.
Lepizzera & Laprocina
301 Metro Center Boulevard, Suite 102
Warwick, RI 02886

Tom Marcelle
2 E-Comm Sq., 3rd Floor
Albany, New York 12207

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

BOARD OF ELECTIONS
50 Branch Avenue
Providence, R.I. 02904
(401) 222-2345 Telephone
(401) 621-3255 Fax
(401) 222-2239 TDD

May 4, 1998

William R. Guglietta, Esquire
101 Angell Avenue
Cranston, RI 02920

RE: Advisory Opinion #98-02

Dear Attorney Guglietta:

Reference is made to Attorney Guglietta's request for an Advisory Opinion dated April 13, 1998, a copy of which appended hereto and made part hereof. The question contained in his letter is repeated below, followed by an Advisory Opinion with respect to said question.

QUESTION

Pursuant to Rhode Island General Laws § 17-25-5(c)(1), I am writing to you and/or the Board of Elections for an Advisory Opinion as to whether the advertisements of a "candidate" as defined in Rhode Island General Laws § 17-25-3(2), are to be used against the expenditure limits imposed in Rhode Island General Laws § 17-25-20 for the office of Attorney General, whether the ads are in violation of the law or spirit of Rhode Island General Laws § 17-25-10.1(h) or Rhode Island General Laws § 17-25-23(3) or (6), whether the ads are an in-kind contribution which must be reported pursuant to Rhode Island General Laws § 17-25-7 or whether these ads violate any provision of Chapter 25 of Title 17.

RESPONSE

On April 23rd, the Rhode Island Board of Elections conducted a hearing with reference to the aforementioned question posed to the Board by Attorney Guglietta requesting an Advisory Opinion. At said hearing, Attorney Guglietta presented several questions as components of his original question contained in his letter of April 13, 1998. The first question posed was whether or not the law firm of Hamel, Waxler, Allen & Collins made an actual or in-kind contribution to the candidacy of

Attorney General candidate Eva Mancuso by paying for and running television ads using Attorney Mancuso to promote the services of their law firm. The Board had the opportunity to view several of the aforementioned ads, heard the testimony of Attorney Guglietta, as well as the testimony of Attorney Joseph Cavanagh, on behalf of Eva Marie Mancuso. As a result of the testimony and evidence presented, it is the decision of the Board that in this instance the advertisements paid for and sponsored by the law firm of Hamel, Waxler, Allen & Collins do not identify Attorney Mancuso as a candidate for Attorney General, or any other public office. Since there was no evidence presented that the frequency of the ads has accelerated since Attorney Mancuso became a candidate for Attorney General in October of 1997, the Board has concluded that the purpose of the advertisements is to promote the law firm of Hamel, Waxler, Allen & Collins and not to influence an election. Therefore, no actual or in-kind contribution has been made by the law firm on behalf of Attorney Mancuso's candidacy as a result of the firm's purchase of said advertising. (Citing *Federal Election Commission Advisory Opinion 1982-15* where the Federal Election Commission recognized that an individual may pursue gainful employment at the time he or she is a candidate for federal office, provided that the law firm advertising on behalf of the attorney/candidate for public office do so "for the purpose of promoting the individual's gainful employment, rather than a candidacy for federal office").

Since the expenses incurred by the law firm of Hamel, Waxler, Allen & Collins were not contributions as defined in Rhode Island General Laws § 17-25-3(3), then funds expended by the firm do not count against the campaign expenditure limits as defined in Rhode Island General Laws § 17-25-20 for the office of Attorney General.

The second question posed was whether or not the advertisements in question were used to promote the candidacy of Attorney Eva Marie Mancuso for Attorney General of the State of Rhode Island. Again, having had the opportunity to view several commercials wherein the spokesperson on behalf of the law firm of Hamel, Waxler, Allen & Collins was Attorney Mancuso, as well as partners Paul Hamel, David Waxler, and John Collins, the Board has come to the conclusion that the purpose of the advertisements is to promote the law firm of Hamel, Waxler, Allen & Collins and its representation of past, present and future clients. The Board comes to this conclusion on the basis that having viewed several editions of the law firm's advertising campaigns dating back to 1995, there has been little or no change in the message delivered by the individual partners over the prior three years in general. Specifically, with reference to Attorney Mancuso, there has been a common theme as to the virtue of trusting your attorney presented in all the advertisements viewed by the Board. As such, the allegation that there has been a change in the theme of the law

firm advertising since Attorney Mancuso became a candidate for Attorney General is not supported by the evidence presented.

Although Rhode Island General Laws § 17-25-3(3) defines a contribution as "something of value", the evidence clearly shows that the purpose of the advertisement is not to promote the candidacy of Attorney Mancuso, but rather, to promote the business of the law firm of Hamel, Waxler, Allen & Collins.

Since the purpose of the advertisement is not to promote the candidacy of Attorney Mancuso, the expenditures by her law firm will not be considered "in kind" contributions to Attorney/candidate Mancuso's candidacy pursuant to Rhode Island General Laws § 17-25-23. As a result, the funds expended by Hamel, Waxler, Allen & Collins were not expended to directly influence the outcome of an electoral contest involving Attorney/candidate Mancuso and shall not be considered a contribution received by or an expenditure made by candidate Mancuso or Hamel, Waxler, Allen & Collins for purposes of the Rhode Island Campaign Contributions and Expenditures Reporting Act.

The last question posed to the Board by Attorney Guglietta in his request for an Advisory Opinion was whether or not there was a common theme to the advertisement done by Hamel, Waxler, Allen & Collins and the brochures printed on behalf of Attorney General candidate Mancuso? As a result of the previous analysis in the first two questions posed, the Board need not reach that question since the Board has found that the purpose of the advertisement was not political and therefore, not in violation of the Rhode Island Campaign Contributions and Expenditures Reporting Act. In addition, the Board need not address the first amendment consideration raised by Attorney Mancuso for the same reasons. Furthermore, it is the Board of Election's decision that this Advisory Opinion be confined to the facts of this case alone.

I trust the foregoing is responsive to your question, but if you require any clarification or any additional information, we would be pleased to be of further assistance.

Very truly yours,

Roger N. Begin

Roger N. Begin, Chairman

RNB/pc
Enclosure
cc: Eva Marie Mancuso

# RI STATE BOARD OF ELECTIONS
# MINUTES OF MEETING
# APRIL 23, 1998

The Rhode Island State Board of Elections met this day at 3:00 p.m.. A quorum was present which included Chairman Roger Begin, Commissioners Leo Blais, Judith Bailey, John A. Daluz, Florence Johnson and Raymond Xavier. Robert E. Craven, Robert J. Fontaine and Henry A. Johnson the Board's legal Counsel, Executive Director and Chief Auditor, respectively, were in attendance.

Chair Begin began by stating the purpose of the meeting: Mr. William R. Guglietta, candidate for the Office of Attorney General, had requested an advisory opinion from the Board of Elections. The Chair stated that the purpose of the hearing was to gather public testimony and comments regarding the issues raised by Mr. Guglietta.

Mr. Guglietta asked to address the Board and posed the following questions: Pursuant to RIGL 17-25-5 (c) (1), are the advertisements of a "candidate" as defined in 17-25-3(2) to be used against the expenditure limits imposed in 17-25-20 for the Office of Attorney General; are the ads in violation of the law or spirit of 17-25-10.1(h), 17-25-23(3) or (6); are the ads an in-kind contribution which must be reported pursuant to 17-25-7 and are these ads in violation of any provision of Chapter 25 of Title 17?

Mr. Guglietta presented the "facts and legal analysis" (see attached communication dated 4/13/98) of his case to the Board. He questioned whether Eva Marie Mancuso, also a candidate for the office of Attorney General, can appear in advertisements as the managing partner of her law firm Hamel, Waxler, Allen & Collins without doing the following:

- reporting the ads as expenditures against her campaign
- deducting expenditures against her spending limitations with regard to her participation in the matching public funds program
- forego reporting these expenditures as "in-kind" contributions by the law firm; or
- allowing the amount of "in-kind" contributions to be in violation of the provisions of 17-25-10.1 (h) or the limits in 17-25-10.1 (a).

Essentially, Mr. Guglietta maintained that Attorney Mancuso would circumvent public financing laws and spending limitations if she were allowed to appear in advertisements for her firm and was not required to report the cost of the ads as expenditures or "in-kind" contributions.

In closing, Mr. Guglietta thanked the Members for the opportunity to address the Board and asked that the Board of Elections issue an advisory opinion forthwith so that it would apply to this campaign election cycle.

Joseph V. Cavanagh, Jr., Esquire, of Blish & Cavanagh asked to address the Board. He represented Attorney Mancuso in her right to pursue gainful employment while running for state office. In support of his case, Attorney Cavanagh offered a copy of advisory opinion (AO) 1982-15 (D. Sprik for Congress, MI) issued by the Federal Election Commission (FEC) regarding a set of circumstances very similar to those before the Board of Elections. The Commission determined that Attorney Sprik's advertising for his law firm was intended to build business for the firm and not the promotion of his candidacy; therefore, monies spent for such advertisement would not be regarded as contributions under the applicable law. Similarly, Attorney Cavanagh argued, Attorney Mancuso's long-standing and present advertising practices for her firm have nothing to do with her candidacy. Therefore, Attorney Mancuso need not report the cost of the advertisements in question as expenditures or "in-kind" contributions to her campaign. Accordingly, the cost of producing or airing the advertisements would be exempt from spending limitations.

Chair Begin had some questions for Attorney Cavanagh: He asked if Attorney Cavanagh would be troubled if the advertisements were to change so that the content promoted his client's candidacy or the frequency of the ads were to increase as the election got closer. Attorney Cavanagh answered in the affirmative to both questions. In fact, he stated Attorney Mancuso plans to stop appearing in the ads for the firm in the weeks preceding the primary. He further stated she intends to leave her position at the firm and not practice law because she will be too busy campaigning.

As for the content of the advertisements, Attorney Cavanagh asked the Members if they would like to view the firm's advertisements from the period 1995 to 1997. They answered in the affirmative; Mr. Guy Dufault assisted Attorney Cavanagh in running videos of the commercials. The videos contained the words trust, integrity, expertise, leadership, competence, etc.; no mention was made of candidacy, election, contributions, campaign, etc.

In closing, Attorney Cavanagh thanked the Members for the opportunity to address the Board and added that Attorney Waxler had some comments relevant to the case.

Chair Begin recognized Attorney Waxler from the law firm Hamel, Waxler, Allen & Collins. Mr. Waxler stated that Attorney Mancuso is the managing partner of the firm and that is the reason for her appearing in the ads. She is an employee of the firm (who is still working) and happens to be running for office. The commercials are not election or political ads. They are simply ads to bring business to the firm. He maintains that the firm's rights (First Amendment) would be violated if the ads could not continue to run.

Attorney Waxler thanked the Members for the opportunity to address the Board.

After a short deliberation at the bench, the Chair, on behalf of the Members, declared that the Board was ready to issue an advisory opinion (verbal); a written opinion would be forthcoming. A motion was made by Commissioner Blais, seconded by Commissioner Xavier to return at a later date to approve a written decision. All Members said, "Aye".

In response to Attorney Guglietta's request for an advisory opinion dated April 13, 1998, the opinion is as follows:

- since the expenses incurred by the law firm were not contributions as defined as defined in RIGL 17-25-3(3), then the funds expended by the firm do not count against the campaign expenditure limits as defined in RIGL 17-25-20 for the office Attorney General,
- the ads were not shown to be in violation of the law or spirit of 17-25-10.1(h) or 17-25-23 (3) or (6), because the evidence clearly showed that the purpose of the advertisement was not to promote the candidacy of Attorney Mancuso, but rather, to promote the business of the law firm of Hamel, Waxler, Allen & Collins,
- the expenditures by the law firm are not to be considered "in-kind" contributions pursuant to RIGL 17-25-27 because the monies expended by the firm do not directly influence Attorney Mancuso's campaign for Attorney General; and
- these ads do not violate any provision of Chapter 25, Title 17 because the ads were not political and therefore, not in violation of the RI Campaign Contributions & Expenditures Reporting Act.

With a verbal advisory opinion issued on the matter before the Board, Chair Begin asked that a motion be made to conclude this portion of the meeting. Commissioner Johnson made the motion, seconded by Commissioner DaLuz. All in favor said, "Aye". The Board retired to the Executive Office at 4:55 p.m.

After a brief recess, Chair Begin called the Board to order at 5:05 p.m.. He asked the Executive Director to update the Members on any matters concerning the Board. The Director stated that a pre-bid conference, that is, a question and answer session for auditing firms interested in bidding for the Matching Public Funds (MPF) project was held at the Board of Elections on April 23, 1998 at 3:00 p.m.. He, as well as, the Board's Legal Counsel, Chief Auditor, and members of the staff attended the meeting (see

attached minutes of pre-bid conference). The Director hopes to have the successful bidder selected by May 15th.

Chair Begin asked that Commissioner DaLuz work with the Executive Director and Chief Auditor to study the qualifications of those firms participating in the bidding process for the MPF project. Commissioner DaLuz was pleased to accept the assignment.

Next order of business: The Executive Director is in receipt of a communication from Mr. Jack Potter. Mr. Potter asked if he could have his party principle or belief listed as "Independent Democrat" on the November ballot with those words meaning "democracycrat." Upon examination of Mr. Potter's request, the Members determined that this would be in violation of R.I.G.L.17-19-9.1. By a unanimous vote, the Board asked the Director to respond to his communication and to forward a copy of the applicable law to Mr. Potter.

Next order of business: The Executive Director informed the Members that the General Assembly passed a supplemental appropriation for the Board of Elections. However, the bulk of these additional funds were to pay for the purchase order covering the electronic voting equipment/service contract and special elections not covered in the original purchase order. The Electronic Reporting System (ERTS) for the Campaign Finance Division and two (2) auditors positions were not part of the supplemental funds granted. The Executive Director will attempt to gain funds for these things in FY 1999.

Next order of business: The Executive Director stated that the Board of Elections needs to consider a "No Smoking" policy in the agency in light of communications from the Department of Administration and occasional complaints from the public and employees. The Executive Director also cited provisions of the Workplace Smoking Pollution Control Act. The Members took a vote to institute a "No Smoking" ban in the workplace. The Board asked the Executive Director to issue a written policy. By a unanimous vote the Members voted in favor of instituting a "No Smoking" policy.

Next order of business: The Chair asked Attorney Craven, the Board's Legal Counsel, to prepare a written advisory opinion re: Attorney Guglietta's request; and to circulate the document to the Members. The Members agreed to meet sometime next week to vote on the advisory opinion.

Before adjourning for the day, the Board's Legal Counsel posed a question to the Board that had been asked at the MPF pre-bid conference on April 21st by Jerry Sansivieri of the accounting firm Sansiveri, Kimball & McNamee. Mr. Sansiveri wanted to know the meaning of "independent" when determining an association between any of the five

general officers and the proposers bidding for the MPF project. The Members agreed that they would examine any "association" or "relationship" between bidders and candidates on a case by case basis and make a determination at that time.

With no other business before the Members, the Board voted to adjourn the meeting at 5:30 p.m. to the call of the Chair.

Attest: Frances A Keating 5/4/98
Frances A. Keating, Coordinator, Special Projects Date